**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| SARAH MCCRIMMON and CARON DETTMANN, as Co-Administrators of the Estate of Curtis Dettmann, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| CENTURION OF FLORIDA, LLC; CENTURION MANAGED CARE OF FLORIDA, LLC; CENTURION, LLC; MHM SERVICES, INC.; CENTENE CORPORATION; RAKESH SHARMA; MARINETTE GONZALEZ; DAVID RODRIGUEZ; G. PEDROZA; J. QUINTINO; L. SWANSON; LPN C.S.; NURSE L.C.; K. NIELSON; L. BROWN; L. ROBERTS; NURSE ~~Jane Jacoh to~~; C. SMITH; K. MCCARTER; S. COOPER; T. ADKINS; B. PURVIS; S. JACKSON; LPN A.R.; NIKKI RICHARDSON; A. MASON; E. MORTON; C. MOODY; T. MAHONEY; M. ROTH; L. SWANSON; A. HARVEY; S. JACKSON; PRISCILLA ROBERTS; TAMARA TAYLOR; ROBERT E. SMITH, JR.; JULIE JONES; ERICH HUMMEL; THOMAS REIMERS; TIMOTHY WHALEN; DAVID ALLEN; and MAURICE RADFORD, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs, Sarah McCrimmon and Caron Dettmann, as Co-Administrators of the Estate of

Curtis Dettmann, by and through their attorneys, Loevy & Loevy and Sheppard, White,

Kachergus & DeMaggio, P.A., hereby complain of Defendants Centurion of Florida, LLC,

Centurion Managed Care of Florida, LLC, Centurion, LLC, MHM Services, Inc., Centene Corp.,

Rakesh Sharma, Marinette Gonzalez, David Rodriguez, G. Pedroza, J. Quintino, L. Swanson,

LPN C.S., Nurse L.C., K. Nielson, L. Brown, L. Roberts, Nurse ~~*[signature]*~~, C. Smith, K. McCarter, S. Cooper, T. Adkins, B. Purvis, S. Jackson, LPN A.R., Nikki Richardson, A. Mason, E. Morton, C. Moody, T. Mahoney, M. Roth, L. Swanson, A. Harvey, S. Jackson, Priscilla Roberts, Tamara Taylor, Robert E. Smith, Jr., Julie Jones, Erich Hummel, Thomas Reimers, Timothy Whalen, David Allen, and Maurice Radford, stating as follows:

## INTRODUCTION

1.     On January 23, 2018, Curtis Dettmann died from pseudomembranous colitis as a result of Clostridium difficile (C. diff) infection. Curtis's death was entirely preventable, had Defendants provided even the most minimally adequate care.

2.     In the days before his death, Curtis was a prisoner at the Reception and Medical Center, and Defendants were responsible for his medical care. Rather than fulfill their responsibilities, however, Defendants instead watched as Curtis's health deteriorated in the infirmary under their watch. Over the course of a few days, Curtis constantly vomited, became unable to eat, lost control of his bowels, lost nearly 30 pounds, and became so weak that he could not ambulate without the use of a wheelchair. Rather than provide any diagnostic testing or treatment, though, Defendants discharged him to the general population of the prison, where he was found dead a few hours later.

3.     Curtis's death was no isolated incident. To the contrary, medical staff at RMC and other FDC facilities, where Centurion and its affiliated corporate entities have contracted to provide medical care, routinely ignore the serious medical needs of patients, prioritizing profits over care.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

5.       Venue is proper under 28 U.S.C. §1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## PARTIES

6.       Curtis Dettmann is the decedent in this case. At all times relevant to the events at issue in this case, he was in the custody of the Florida Department of Corrections (FDC) and was housed at the Reception and Medical Center (RMC) in Lake Butler, Florida. Curtis is survived by his parents, Caron and William Dettmann, and his sister, Sarah McCrimmon.

7.       Plaintiff Sarah McCrimmon is the duly appointed Co-Administrator of the Estate of Curtis Dettmann. Ms. McCrimmon is Curtis's sister.

8.       Plaintiff Caron Dettmann is the duly appointed Co-Administrator of the Estate of Curtis Dettmann. Ms. Dettmann is Curtis's mother.

9.       Defendant Centurion of Florida, LLC is a corporation headquartered in St. Louis, Missouri doing business in Florida. Centurion, pursuant to a contract with the State of Florida, is responsible for providing medical care to prisoners in FDC custody. At all times relevant to the events at issue in this case, Centurion was responsible for the implementation, oversight, and supervision of policies and practices at RMC and the FDC generally. At all times relevant to the events at issue in this case, Centurion was acting under color of law by and through its agents, including the individual Defendants and other unknown employees.

10.       Defendant Centurion Managed Care of Florida, LLC is a corporation headquartered in St. Louis, Missouri doing business in Florida. The officers identified in filings with the State of Florida are identical to those identified in filings by Centurion of Florida, LLC and it is thus an alter-ego of Centurion of Florida, LLC.

11.     Defendant Centurion, LLC is a corporation headquartered in St. Louis, Missouri doing business in Florida. Centurion, LLC is a corporation identified by the State of Florida as a cross-referenced name, or alter-ego, for Centurion Managed Care of Florida, LLC. The officers identified in filings with the State of Florida are identical to those identified in filings by Centurion of Florida, LLC and it is thus an alter-ego of Centurion of Florida, LLC.

12.     Defendant MHM Services, Inc. (MHM) is a corporation headquartered in Vienna, Virginia doing business in Florida. MHM's website indicates that it provides medical services to governmental agencies across the country, including Florida. The officers identified in filings with the State of Florida overlap substantially with those identified in filings by Centurion of Florida, LLC. MHM's website indicates that it is a parent company of Centurion.

13.     Defendant Centene Corp. (Centene) is a corporation headquartered in St. Louis, Missouri doing business in Florida. Centene's website indicates it employs 2,300 people in the State of Florida and provides healthcare to Florida through its affiliated corporation, Centurion. The officers identified in filings with the State of Florida overlap substantially with those identified in filings by Centurion of Florida, LLC, and the corporations' headquarters are the same. Centene is the parent company of Centurion.

14.     At all times relevant to his involvement in this case, Defendant Dr. Rakesh Sharma was the Medical Director at RMC, and was responsible for the implementation, oversight, and supervision of policies and practices at RMC. Defendant Rakesh is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Rakesh was acting under color of law and within the scope of his employment with Centurion.

15.     At all times relevant to her involvement in this case, Defendant Priscilla Roberts was the Health Services Administrator at RMC, and was responsible for the implementation,

oversight, and supervision of policies and practices at RMC. Defendant P. Roberts is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant P. Roberts was acting under color of law and within the scope of her employment with Centurion.

16.     At all times relevant to their involvement in this case, Defendant Tamara Taylor was a Regional Director for Centurion. Defendant Taylor is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Taylor was acting under color of law and within the scope of her employment with Centurion.

17.     At all times relevant to their involvement in this case, Defendants Dr. Marinette Gonzalez, Dr. David Rodriguez, and Dr. G. Pedroza were physicians employed by Centurion to work at RMC, including the infirmary. Defendants Gonzalez, Rodriguez, and Pedroza are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Gonzalez, Rodriguez, and Pedroza were acting under color of law and within the scope of their employment with Centurion.

18.     At all times relevant to their involvement in this case, Defendants J. Quintino, L. Swanson, Nurse L.C., K. Nielson, L. Brown, L. Roberts, Nurse ⟨illegible handwriting⟩ C. Smith, LPN C.S., K. McCarter, S. Cooper, T. Adkins, B. Purvis, S. Jackson, LPN A.R., Nikki Richardson, A. Mason, E. Morton, C. Moody, T. Mahoney, M. Roth, L. Swanson, A. Harvey, and S. Jackson (Nursing Defendants) were nurses employed by Centurion to work at RMC, including the infirmary. Each of the Nursing Defendants encountered Curtis between January 17 and January 23, 2018 and saw the clear signs of his serious medical illness. The Nursing Defendants are sued here in their individual capacities. At all times relevant to the events at issue in this case, the Nursing Defendants were acting under color of law and within the scope of their employment with Centurion or FDC.

19.     At all times relevant to her involvement in this case, Defendant Julie Jones was the Secretary of the Florida Department of Corrections. Defendant Jones is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Jones was acting under color of law and within the scope of her employment with the FDC.

20.     At all times relevant to his involvement in this case, Defendant Robert E. Smith, Jr. was the Warden at RMC. Defendant Smith is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Smith was acting under color of law and within the scope of his employment with the FDC.

21.     At all times relevant to his involvement in this case, Defendant Erich Hummel was the Regional Director for the FDC for Region 2, which includes RMC. Defendant Hummel is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Hummel was acting under color of law and within the scope of his employment with the FDC.

22.     At all times relevant to their involvement in this case, Defendants Thomas Reimers and Timothy Whalen worked for the FDC in the Office of Health Services as Health Services Director and Clinical Advisor, respectively. Defendants Reimers and Whalen are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Reimers and Whalen were acting under color of law and within the scope of their employment with the FDC.

23.     At all times relevant to their involvement in this case, Defendants David Allen and Maurice Radford worked for the FDC's Office of the Inspector General. Defendants Allen and Radford are sued here in their individual capacities. At all times relevant to the events at

issue in this case, Defendants Allen and Radford were acting under color of law and within the scope of their employment with the FDC.

## **ALLEGATIONS**

24.     Curtis Dettmann was 31 years old at the time of death. He was expecting to be released in the early months of 2020, and was planning to return to live with his sister, Sarah McCrimmon, or other family in the area. While in custody, he had worked hard toward earning his GED so that he could obtain a commercial driver's license and begin a career driving trucks.

25.     While in the custody of the Florida Department of Corrections, Curtis was housed at the Reception and Medical Center (RMC), a prison intended in part to provide care for prisoners with serious medical needs.

26.     Curtis was such a prisoner. He had a history of hidradenitis, a chronic skin condition that causes small, painful lumps to form beneath the skin. In the fall of 2017, Curtis suffered an outbreak of hidradenitis near his anus.

27.     On January 10, 2018, Dr. Osvaldo Contarini surgically removed perianal hidradenitis from Curtis's buttocks at Memorial Hospital Jacksonville.

28.     On January 12, 2018, Memorial Hospital Jacksonville discharged Curtis to RMC in stable condition with instructions not to lift, sit, or do any strenuous activities for two weeks. He was prescribed Augmentin (generically known as amoxicillin/clavulanate), an antibiotic prescription drug, to be administered twice daily for 5 days. He was also prescribed a stool softener once a day for two weeks, and multiple pain medications to be used as needed over the next several days to address the pain from his surgery.

29.     Curtis arrived back at RMC on January 12, 2018. At the time of his arrival, Curtis

weighed 134 pounds. RMC staff gave Curtis his antibiotic medication as prescribed, and for the

first few days after his surgery, Curtis's recovery was more or less normal.

30.     On the morning of January 17, however, Curtis's health began to deteriorate. He

began to vomit and complained to Nurse Quintino and Dr. Gonzalez that he was feeling

nauseous and was vomiting. Curtis's blood pressure and temperature were elevated; a blood test

showed that Curtis's white blood cell and monocyte counts were elevated, and his lymphocyte

counts were low—all signs of an active infection. Dr. Gonzalez did not order a stool sample or

other test to determine the source of Curtis's symptoms. Instead, Dr. Gonzalez ordered Zofran,

an antiemetic, to be administered by IV.

31.     The Zofran did not relieve Curtis's nausea and vomiting, and by January 18, it

was so severe that Curtis was unable to eat. Curtis's temperature remained elevated. Curtis began

to report abdominal pain and diarrhea, and Defendant Nurses noted that Curtis began to appear

weak. Curtis consistently reported these symptoms to Defendant Nurses, Dr. Gonzalez, and other

staff in the infirmary.

32.     Curtis called his sister, Sarah McCrimmon, in the early evening hours of January

18, crying and begging her to help him. Curtis reported that Defendants had put him in a diaper

because he was unable to control his bowels. During their conversation, Curtis defecated on

himself.

33.     Curtis's symptoms were classic signs of a Clostridium difficile (C. diff) infection.

C. diff is a bacterium that causes inflammation of the colon. C. diff infections are a well-known

possible complication for post-surgical patients like Curtis who take a course of antibiotics

(because the antibiotics can kill "good" bacteria in the gut that protect against infections,

allowing the C. diff bacterium to flourish). C. diff infections are easily treated by particular classes of antibiotics that target the C. diff bacterium. Left untreated, however, they can cause severe pseudomembranous colitis, which if not addressed, can lead to death. C. diff is easily diagnosed with a stool test, which is frequently ordered by medical staff for any patient with diarrhea who is taking or has recently taken a course of antibiotics.

34.     Rather than take Curtis's symptoms seriously, however, Defendants disregarded his health. When Curtis told Dr. Gonzalez on January 18 that the Zofran did not relieve his nausea and vomiting, Dr. Gonzalez took no further action. On January 19, when Curtis told Dr. Gonzalez about the continued nausea and other symptoms that he was suffering, Dr. Gonzalez did not examine Curtis or perform any tests to determine the source of his weakness, nausea, inability to eat, or incontinence. Instead, he simply reissued the ineffective Zofran and prescribed Protonix, a proton-pump inhibitor used to treat gastroesophageal reflux disease that commonly causes *increased* nausea and abdominal pain. Dr. Gonzalez additionally ordered a short-term dose of Imodium and an over-the-counter probiotic supplement, neither of which would detect or address a C. diff infection at all.

35.     After being refused treatment by Defendants, Curtis became extremely worried about his health. He repeatedly begged medical staff to refer him to a hospital for proper evaluation and treatment. The Nursing Defendants notified Dr. Gonzalez and Defendant Unknown House Supervisor of Curtis's concerns and request. But none of the Defendants responded to Curtis's requests, and they further failed to take steps to perform the proper evaluations and treatment in the infirmary.

36.     On the morning of January 20, Curtis saw Dr. Rodriguez again. Curtis reported his symptoms and the fact that the medications he was prescribed did not relieve them. Dr.

Rodriguez took no action to evaluate Curtis, perform any diagnostic tests, or to provide him proper treatment. Instead, he did nothing.

37.     Curtis's health continued to get worse. He continued to be unable to eat. A few hours after he saw Dr. Rodriguez, Curtis's nausea was so extreme that he could not even drink water without vomiting. Curtis continued to suffer from sharp abdominal pain, and he became so weak that he could no longer walk and had to use a wheelchair instead.

38.     Nurse Roberts contacted Dr. Pedroza to evaluate Curtis. Curtis reported his symptoms to Dr. Pedroza, who additionally noted that Curtis was dehydrated. But like the other doctors, Dr. Pedroza took no action to properly evaluate Curtis, perform any diagnostic tests, or to provide him proper treatment. Instead, Dr. Pedroza simply ordered Curtis to begin a full liquid diet and follow up with his primary care provider. It is not clear that Curtis ever received the liquid meals.

39.     On January 21, Curtis's condition became even more severe. Curtis remained extremely nauseous, unable to consume anything other than ice chips. His abdominal pain continued, and he remained so weak that he could not ambulate without a wheelchair.

40.     At approximately 10:00 a.m. that day, Curtis saw his sister. Curtis remained in the wheelchair during their visit and was obviously weak. Curtis wore a diaper and spent a significant portion of the visit vomiting.

41.     Staff reported Curtis's incontinence to Nurse McCarter, who did nothing in response. Curtis's incontinence continued, and he defecated on himself repeatedly throughout January 21 and 22.

42.     Dr. Rodriguez saw Curtis after his visit with his sister on January 21. Despite being aware of all of Curtis's symptoms, Dr. Rodriguez again took no action to evaluate Curtis,

perform any diagnostic tests, or provide him proper treatment. Instead, Dr. Rodriguez did nothing.

43.    The next day, Curtis saw Dr. Gonzalez again. By now, Curtis had lost nearly 20 pounds over the past 10 days, weighing just 115 pounds. Dr. Gonzalez noted Curtis's drastic weight loss but failed to take action to address it. Instead, despite knowing that Curtis's obvious signs and symptoms of serious illness that had not resolved, Dr. Gonzalez discharged Curtis from the infirmary and ordered that he be returned to K dorm in general population at RMC.

44.    At approximately 6:00 p.m. on January 22, 2018, Curtis was taken to K dorm via wheelchair, being still too weak to walk.

45.    Dr. Gonzalez notified Dr. Sharma, RMC's medical director, of Curtis's unresolved symptoms. Rather than take immediate action to procure immediate diagnostic testing and treatment, Dr. Sharma and Dr. Gonzalez decided to submit a non-emergent request for a consultation with a gastroenterologist to evaluate Curtis.

46.    A few hours after leaving the infirmary, at approximately 3:40 a.m. the next morning, Curtis reported to Nurse Morton that he was "on death's door," or words to that effect. He described his symptoms to Nurse Morton, who documented Curtis's reports that he had recently taken antibiotics, had been vomiting and experiencing diarrhea for several days and had not eaten, and had severe abdominal pain throughout his abdomen. Nurse Morton noted that Curtis's abdomen appeared severely tender, and that his bowel sounds were hypoactive. She noted that at the time of her evaluation, Curtis weighed just 106 pounds (having lost a total of 28 pounds since he was admitted to the infirmary 11 days earlier). The protocol Nurse Morton used to guide her evaluation of Curtis directed her to immediately notify a clinician. But Nurse

Morton instead did nothing but fill out a non-urgent/routine request form to mental health.  Nurse Mahoney signed off on Nurse Morton's actions in the early morning hours of January 23, 2018.

47.     A few hours after Nurse Morton decided not to notify a physician about Curtis's health status, Curtis was found unresponsive during count time in his cell. Efforts to revive him failed, and Dr. Dure pronounced Curtis dead.

48.     The forensic pathologist who conducted Curtis's autopsy determined that Curtis died of pseudomembranous colitis. That colitis was caused a C. diff infection.

49.     In the days prior to his death, Curtis's sister contacted several Defendants in an effort to save Curtis's life. On January 18, after Ms. McCrimmon spoke with Curtis on the phone, she contacted Defendants Radford and Allen, notifying them of Curtis's deteriorating condition and asking them to investigate. Defendant Radford acknowledged receipt of Ms. McCrimmon's email but did not address it.

50.     Ms. McCrimmon also contacted Centurion, notifying the corporation of Curtis's serious medical condition and her fear that Curtis would die if he did not receive proper medical attention. Ms. McCrimmon asked Centurion to provide Curtis with proper testing and care, and to investigate the response by their staff at RMC. Farrah Hudson, a regional assistant at Centurion, acknowledged that Centurion had received Ms. McCrimmon's email and referred it to Defendant Priscilla Roberts, the Health Services Administrator at RMC, to investigate. Administrator Roberts wrote to Ms. McCrimmon, promising to investigate Curtis's health status the following day.

51.     Ms. McCrimmon also notified Warden Smith of Curtis's urgent health needs on January 18. Warden Smith promised Ms. McCrimmon that he would investigate. On information

and belief, however, Warden Smith did not conduct any adequate investigation into Curtis's condition or treatment.

52.     On information and belief, none of the parties contacted by Ms. McCrimmon took any steps to adequately investigate Curtis's health condition, or to ensure that he was receiving proper testing, evaluation, and treatment.

53.     On January 21, following her visit with Curtis, Ms. McCrimmon confronted Administrator Roberts at RMC about Curtis's abhorrent treatment. Administrator Roberts refused to take further action to ensure that Curtis received proper treatment, and instead had Ms. McCrimmon escorted out of RMC.

54.     Later that same day, Ms. McCrimmon contacted Defendant Hummel to report her concerns about Curtis's health condition and lack of care and ask for help for Curtis. Defendant Goodwin confirmed receipt of Ms. McCrimmon's email and indicated that her request was being forwarded to Defendants Reimers and Whalen in the Office of Health Services to review and act. On information and belief, none of these Defendants took appropriate action to intervene to ensure Curtis received constitutionally adequate medical care.

55.     Ms. McCrimmon also contacted Defendants Radford, Jones, and Smith to report her concerns and request assistance for Curtis. In response, Warden Smith again promised Ms. McCrimmon to investigate Curtis's health status and treatment, but instructed Ms. McCrimmon to "refrain from your continued scrutiny" of Curtis's treatment by medical staff at RMC.

56.     The next day, Curtis told his sister that he was being discharged to general population, even though none of his symptoms had resolved. Ms. McCrimmon immediately contacted Defendant Whalen and begged him to intervene. She told him: "If my brother is

discharged from the hospital he's going to die." Defendant Whalen took no steps to ensure that Curtis received adequate medical care.

57.     Ms. McCrimmon also contacted Defendant Feltner, who forwarded her request to Defendant Taylor. Defendant Taylor promised to investigate and intervene to ensure Curtis was not discharged from the RMC infirmary. But on information and belief, Defendant Taylor took no action to ensure that Curtis received adequate medical care.

58.     Ms. McCrimmon also spoke with Dr. Sharma and begged him to take action to evaluate and treat Curtis. Dr. Sharma refused.

59.     In total, Ms. McCrimmon sent dozens of emails and made dozens of phone calls in an effort to obtain assistance for her brother in order to prevent his death. Yet each of these Defendants refused to take action to intervene on Curtis's behalf, leaving Curtis to die.

**<u>COUNT I</u>**
**<u>42 U.S.C. § 1983 – DENIAL OF MEDICAL CARE (EIGHTH AMENDMENT)</u>**
**(Defendants Centurion of Florida, LLC; Centurion Managed Care of Florida, LLC; Centurion, LLC; MHM Services, Inc.; Centene Corp.; Rakesh Sharma; Priscilla Roberts; Tamara Taylor; Marinette Gonzalez; David Rodriguez; G. Pedroza; J. Quintino; L. Swanson; LPN L.C.; K. Nielson; L. Brown; L. Roberts; Nurse _[handwritten]_; C. Smith; K. McCarter; S. Cooper; T. Adkins; B. Purvis; S. Jackson; LPN A.R.; Nikki Richardson; A. Mason; E. Morton; C. Moody; T. Mahoney; M. Roth; L. Swanson; A. Harvey; S. Jackson)**

60.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

61.     In the manner described more fully above, Defendants were aware of Curtis Dettmann's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Dettmann if he did not receive appropriate medical care. Despite that knowledge, Defendant Doctors and Nurses failed to provide him with proper medical care or access to medical care in violation of the Eighth Amendment to the United States Constitution.

62.     As a result of Defendants' unjustified and unconstitutional conduct, Mr. Dettmann experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

63.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Dettmann's rights.

64.     Alternatively, Defendants were deliberately indifferent to Mr. Dettmann's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Mr. Dettmann's health and safety.

65.     Mr. Dettmann's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by the actions of Defendants.

66.     Mr. Dettmann's injuries were also proximately caused by the policies and practices of Defendants Centurion of Florida, LLC, Centurion Managed Care of Florida, LLC, Centurion, LLC, MHM Services, Inc. and/or Centene Corp. (the Corporate Defendants).

67.     Prior to and during the events giving rise to Plaintiffs' Complaint, the Corporate Defendants maintained policies and practices pursuant to which prisoners like Mr. Dettmann with serious medical needs were routinely denied medical care and access to medical care.

68.     Specifically, there exist policies and widespread practices at the FDC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which (1) healthcare staff commonly disregard reports by patients of objectively serious symptoms; (2) healthcare staff refuse to provide adequate treatment to patients that they perceive as difficult; (3) healthcare staff refuse to conduct or obtain diagnostic testing for patients; (4) healthcare staff fail to create a sensible treatment plan for patients whose health status require the creation of a treatment plan; (5) healthcare staff fail to ensure continuity

of care among healthcare staff; (6) employees prioritize profits at the expense of constitutionally adequate care; (7) inadequate levels of health care staffing are maintained; and (8) healthcare staff fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

69.     These policies and practices were allowed to flourish because the Corporate Defendants, which direct the provision of healthcare services at the RMC and within the FDC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, the Corporate Defendants violated Mr. Dettmann's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

70.     The above-described policies and practices were able to exist and thrive because the Corporate Defendants were deliberately indifferent to the problem, thereby effectively ratifying it.

71.     The Corporate Defendants also acted to violate Mr. Dettmann's constitutional rights through the actions and failures to act by individuals with final policymaking authority for one or more of the Corporate Defendants.

72.     Mr. Dettmann's injuries were caused by employees of the FDC and the Corporate Defendants, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

### COUNT II
### 42 U.S.C. § 1983 – FAILURE TO INTERVENE (EIGHTH AMENDMENT)
**(All Defendants)**

73.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

74.     In the manner more fully described above, Defendants were made aware of a need to intervene to prevent the violation of Mr. Dettmann's constitutional rights.

75.     Defendants had a reasonable opportunity to intervene to prevent or stop the violation of Mr. Dettmann's constitutional rights as set forth above had they been so inclined, but failed to do so.

76.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Dettmann's rights.

77.     As a direct and proximate result of Defendant's misconduct, Mr. Dettmann's rights were violated and he suffered injuries, including but not limited to pain, suffering, emotional distress, and death.

78.     Mr. Dettmann's injuries were caused by employees of the FDC and the Corporate Defendants, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

### COUNT III
### 42 U.S.C. § 1983 – CONSPIRACY
### (All Defendants)

79.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

80.     Defendants reached an agreement among themselves to deprive Mr. Dettmann of his constitutional rights and to protect one another from liability for depriving Mr. Dettmann of his rights, all as described in the various paragraphs of this Complaint.

81.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

82.     The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Dettmann's rights.

83.     As a direct and proximate result of the illicit prior agreement referenced above,

Mr. Dettmann's rights were violated and he suffered injuries, including pain, suffering,

emotional distress, and death.

84.     Mr. Dettmann's injuries were caused by employees of the FDC and the Corporate

Defendants, including but not limited to the individually named Defendants, who acted pursuant

to the policies and practices described more fully above.

### COUNT IV
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Defendants Rakesh Sharma; Priscilla Roberts; Marinette Gonzalez; David Rodriguez; G. Pedroza; J. Quintino; L. Swanson; LPN L.C.; K. Nielson; L. Brown; L. Roberts; C. Smith; K. McCarter; Nurse** ~Jane La Jacomb tr~ **; S. Cooper; T. Adkins; B. Purvis; S. Jackson; LPN A.R.; Nikki Richardson; A. Mason; E. Morton; C. Moody; T. Mahoney; M. Roth; L. Swanson; A. Harvey; S. Jackson)**

85.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

86.     In the manner described more fully above, by denying Mr. Dettmann medical

evaluation or treatment, or access to medical evaluation or treatment, Defendants engaged in

extreme and outrageous conduct.

87.     Defendants' actions as set forth above were rooted in an abuse of power or

authority.

88.     Defendants' actions as set forth above were undertaken with intent or knowledge

that there was a high probability that the conduct would inflict severe emotional distress and with

reckless disregard of that probability.

89.     Defendants' actions, as set forth above, were undertaken intentionally, with

malice, and/or with reckless indifference to Mr. Dettmann's rights.

90.     As a direct and proximate result of Defendants' misconduct, Mr. Dettmann

experienced suffering injuries, including severe emotional distress, before his death.

### COUNT V
### F.S.A. § 768.19 – WRONGFUL DEATH
### (All Defendants)

91.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

92.     In the manner described more fully above, each of the Defendants named herein, either individually or through their agents or employees, wrongfully caused the death of Curtis Dettmann.

93.     Each of the Defendants' acts, omissions, policies, practices, and/or customs described above were wrongful acts within the meaning of F.S.A. § 768.19 and was the direct and proximate cause of Curtis Dettmann's untimely and wrongful death.

94.     Caron and William Dettmann are the parents of Curtis Dettmann. They are entitled to recover for their mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, filial care, attention, advice, and counsel related to the loss their late son.

### COUNT VI
### RESPONDEAT SUPERIOR
### (Defendants Centurion of Florida, LLC; Centurion Managed Care of Florida, LLC; Centurion, LLC; MHM Services, Inc.; and Centene Corp.)

95.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

96.     In committing the acts alleged in the preceding paragraphs, the above described Defendants were employees, members, and agents of one or more of the Corporate Defendants, acting at all relevant times within the scope of their employment.

97.     Consequently, the Corporate Defendants are liable for the actions of their employees acting within the scope of their employment under state law.

98.     The Corporate Defendants, as private corporations acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of their employees

acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

WHEREFORE, Plaintiffs Sarah McCrimmon and Caron Dettmann, as Co-Administrators of the Estate of Curtis Dettmann, hereby respectfully request that this Court enter a judgment in their favor and against Defendants Centurion of Florida, LLC, Centurion Managed Care of Florida, LLC, Centurion, LLC, MHM Services, Inc., Centene Corporation, Rakesh Sharma, Marinette Gonzalez, David Rodriguez, G. Pedroza, J. Quintino, L. Swanson, LPN C.S., Nurse L.C., K. Nielson, L. Brown, L. Roberts, Nurse _____, C. Smith, K. McCarter, S. Cooper, T. Adkins, B. Purvis, S. Jackson, LPN A.R., Nikki Richardson, A. Mason, E. Morton, C. Moody, T. Mahoney, M. Roth, L. Swanson, A. Harvey, S. Jackson, Priscilla Roberts, Tamara Taylor, Robert E. Smith, Jr., Julie Jones, Erich Hummel, Thomas Reimers, Timothy Whalen, David Allen, and Maurice Radford, awarding compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff Curtis Dettmann hereby demands a trial by jury pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure on all issues so triable.

Dated: <u>January 16, 2020</u>

Respectfully submitted,

<u>    /s/ Jesse Wilkison            </u>
Jesse Wilkison
Attorney for Plaintiff

Jesse Wilkison
SHEPPARD, WHITE, KACHERGUS, & DEMAGGIO, P.A.
215 North Washington St.
Jacksonville, FL 32202
(904) 356-9661

Arthur Loevy
Jon Loevy
Sarah Grady
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900