IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

SARAH MCCRIMMON and CARON )
DETTMANN, as Co-Administrators of the )
Estate of Curtis Dettmann, )
                                           )    Case No. 3:20-cv-0036-BJD-JRK
            Plaintiffs, )
                                             )    Hon. Brian J. Davis, J.
           v. )
                                               )    Hon. James R. Klindt, M.J.
CENTURION OF FLORIDA, LLC., et al., )
                                               )
           Defendants. )

## PLAINTIFFS' CONSOLIDATED RESPONSE
## TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiffs Sarah McCrimmon and Caron Dettmann, as Co-Administrators of the Estate of

Curtis Dettmann, hereby respectfully submit this response to the Motions to Dismiss filed by the

Centurion Defendants[1] (ECF 63), Defendant Cooper (ECF 64), and Defendants Purvis, Brown,

and Swanson (ECF 68), stating as follows:

### INTRODUCTION

Curtis Dettmann died of a common, treatable condition while in the custody of the

Florida Department of Corrections (FDC) at the Reception and Medical Center (RMC). After

undergoing surgery, Mr. Dettmann began to show symptoms of an intestinal bacterial infection

called C. diff.  Over several days he experienced a catastrophic decompensation ending in his

death.  During his illness, Mr. Dettmann repeatedly told Defendant medical care providers,

---

[1] The Centurion Defendants include Defendants Centurion of Florida, LLC, Rakesh Sharma, Marinette Gonzalez Morales, David Rodriguez, Gerardo Pedroza-Sierra, John Quintino, Luz Cruz, Kimberly Nielson, Linda Roberts, Alex Renelus, Cayman Smith, Kayla McCarter, Tanesha Adkins, Shenka Jackson, Nikki Richardson, April Mason, Elizabeth Morton, Clarissa Moody, Tabatha Mahoney, Michael Roth, Ashley Hawkins, Priscilla Roberts, and Tamara Taylor.

employed by Defendant Centurion of Florida, of his serious symptoms. Indeed these symptoms were so obvious that the Defendants had provided Mr. Dettmann, who was 31, with a diaper to contain his constant diarrhea. What none of the Defendants did, even though Mr. Dettmann lost 15 percent of his body weight over the course of a few days, was make any serious attempt to determine what was ailing him. Indeed when Mr. Dettmann's sister, Plaintiff Sarah McCrimmon, notified multiple defendants of her brother's life threatening condition, they brushed her aside. Defendants uniformly ignored Mr. Dettmann's urgent pleas, evincing shared attitude of indifference to Mr. Dettmann's deadly condition. His death is the direct result of Defendants' unconstitutionally deficient medical treatment.

The Defendants have filed Rule 12(b)(6) motions collectively seeking dismissal of every claim against them. None of their arguments, however, are grounds for dismissal. Plaintiffs have adequately pled claims against both Centurion and the individual defendants under the Eighth Amendment, intentional infliction of emotional distress and wrongful death, that surpass the notice pleading threshold at this early stage. Despite their assertions, Defendants are not entitled to qualified immunity or sovereign immunity defenses against these claims. The Court should deny Defendants' motions to dismiss and allow the case to proceed.

## FACTS

Curtis Dettmann was a prisoner at the Reception and Medical Center (RMC) in Lake Butler, Florida. ECF 12 ¶ 6. The RMC is operated by the Florida Department of Corrections (FDC), which contracts out the provision of healthcare services to Defendant Centurion of Florida, LLC, a company headquartered in St. Louis, Missouri. ECF 12 ¶ 9. On January 23, 2018, Mr. Dettmann died at the RMC from pseudomembranous colitis, which resulted from a *Clostridium difficile* (C. diff) infection. ECF 12 ¶ 1.

Mr. Dettmann should not have died from this disease.  On January 10, 2018, he had undergone a routine surgery for an unrelated matter at a local hospital, ECF 12 ¶ 23, and upon being discharged on January 12, he was sent to an infirmary at the RMC to recover.  ECF 12 ¶ 24.  As part of his recovery, Mr. Dettmann was prescribed a course of antibiotics, a routine measure to prevent infection resulting from the surgery, to be taken for five days. *Id.*

A common and well-known complication among post-surgical patients on antibiotics is C. diff.  ECF 12 ¶ 29.  C. diff is a bacterium that causes inflammation of the colon.  ECF 12 ¶ 29. Antibiotics can kill "good" bacteria in the gut that protect against infections, which allows the C. diff bacterium to flourish.  ECF 12 ¶ 29.  The symptoms of C. diff, described below, are easy to recognize.  C. diff infections are easy to diagnose with a stool test, and indeed this test is frequently ordered by medical staff for any patient suffering diarrhea who is taking or has recently taken a course of antibiotics.  ECF 12 ¶ 29.  C. Diff infections are also easy to treat, by using particular classes of antibiotics that target the C. diff bacterium. ECF 12 ¶ 29. Left untreated, however, they can cause severe pseudomembranous colitis, which if it is not addressed can quickly lead to death.  ECF 12 ¶ 29.

For the first few days after arriving back in the RMC after his surgery, Mr. Dettmann's recovery was essentially normal.  ECF 12 ¶ 25.  On the morning of January 17, however, his health began to deteriorate.  He began vomiting, and complained to nurses and Dr. Gonzalez that he was vomiting and feeling nauseous.  ECF 12 ¶ 26.  What is more, his blood pressure was elevated, and a blood test showed that he had elevated white blood cell and monocyte counts— all signs of an active infection.  ECF 12 ¶ 26.  Dr. Gonzalez did not order a stool sample to rule out C. diff, however.  Instead he placed Mr. Dettmann on an antiemetic (a medicine to prevent vomiting).  ECF 12 ¶ 26.

3

The antiemetic did not relieve Mr. Dettmann's nausea and vomiting, however; to the contrary, by the next day he so sick that was unable to eat. ECF 12 ¶ 26. His temperature remained high, he began reporting abdominal pain and diarrhea, and he began to appear weak. ECF 12 ¶ 26. Mr. Dettmann consistently reported these symptoms to the Nursing Defendants who encountered him, to Dr. Gonzalez, and to other staff in the infirmary. ECF 12 ¶ 27. Indeed by February 18 Mr. Dettmann's diarrhea was so severe that the infirmary staff had put him in a diaper because he was unable to control his bowels. These symptoms were classic signs of C. diff. ECF 12 ¶ 29.

Mr. Dettmann's symptoms portended a deadly infection. But the medical staff in the infirmary did treat them as a serious matter. On January 18 Mr. Dettmann told Dr. Gonzalez that despite the antiemetic he was still suffering nausea and vomiting—but Dr. Gonzalez did not take further action. ECF 12 ¶ 30. On January 19, Mr. Dettmann told Dr. Gonzalez again that he was still suffering nausea, and told him about his other symptoms as well. ECF 12 ¶ 30. But Dr. Gonzalez did not examine Mr. Dettmann or perform any tests to determine the source of his weakness, nausea, inability to eat, or incontinence. ECF 12 ¶ 30. Instead, he simply reissued the ineffective antiemetic, prescribed a proton-pump inhibitor used to treat gastrointestinal reflux, and prescribed an over-the-counter probiotic supplement. ECF 12 ¶ 30. None of these items was designed to detect or treat C. diff. ECF 12 ¶ 30.

None of these medications relieved Mr. Dettmann's symptoms either. ECF 12 ¶ 32. On January 20 Mr. Dettmann reported this to another doctor in the infirmary, Dr. Rodriguez. ECF 12 ¶ 32. That report should have set off alarm bells, but Dr. Rodriguez took no steps to evaluate Mr. Dettmann, perform any diagnostic tests, or provide him with treatment. ECF 12 ¶ 32. By this point Mr. Dettmann could not even hold down water, and he had become so weak that he

could no longer walk and had to use a wheelchair instead.  ECF 12 ¶ 33.  In this condition, Mr. Dettmann was examined by another doctor as well, Dr. Pedroza.  ECF 12 ¶ 34.  But instead of ordering an evaluation to determine why Mr. Dettmann had deteriorated so precipitously, Dr. Pedroza simply ordered him to be placed on a liquid diet, and to follow up later with the outpatient prison doctors once he was discharged from the infirmary.  ECF 12 ¶ 34.

By January 21 Mr. Dettmann was so nauseous he could only consume ice chips, and he remained too weak to walk.  ECF 12 ¶ 35.  He was still wearing a diaper and vomited and defecated on himself repeatedly.  ECF 12 ¶ 37.  Dr. Rodriguez saw Mr. Dettmann again on January 21.  ECF 12 ¶ 38.  But even though Mr. Dettmann's symptoms had continued for days and had not been addressed by the medications he had been prescribed earlier, Dr. Rodriguez again took no action to evaluate Mr. Dettmann or determine why he was so sick—instead Dr. Rodriguez did nothing.  ECF 12 ¶ 38.  Nurse McCarter was also informed of Mr. Dettmann's symptoms on January 21, but she too did nothing to secure a diagnosis or treatment from him. ECF 12 ¶ 37.

On January 22 Mr. Dettmann saw Dr. Gonzalez again.  ECF 12 ¶ 39.  At this point Mr. Dettmann, who originally had weighed only 134 pounds, had lost nearly 20 pounds over the course of 10 days, and now weighed just 115 pounds.  ECF 12 ¶¶ 25, 39.  Dr. Gonzalez noted this precipitous weight loss, but instead of doing anything to address it or determine why it had occurred despite the medications Mr. Dettmann had been prescribed, Dr. Gonzalez discharged Mr. Dettmann from the infirmary and ordered him to return to general prison population in the RMC.  ECF 12 ¶ 39.  Mr. Dettmann was so weak that he had to be returned to general population in a wheelchair.  ECF 12 ¶ 40.

After ordering the discharge Dr. Gonzalez notified Dr. Sharma, RMC's medical director, of Mr. Dettmann's unresolved symptoms.  ECF 12 ¶ 41. Instead of treating it like the emergency that it obviously was, Drs. Sharma and Gonzalez decided to submit a non-emergent request for a consultation with a gastroenterologist to evaluate Mr. Dettmann down the road.  ECF 12 ¶ 41.

A few hours after being discharged, early in the morning of January 23, Mr. Dettmann reported to Nurse Morton to that effect that he was on "death's door."  ECF 12 ¶ 42.  He described his symptoms to Nurse Morton, explained that he had taken antibiotics, and told her he had severe pain throughout his abdomen.  ECF 12 ¶ 42.  Nurse Morton noted that Mr. Dettmann's abdomen appeared severely tender and that he now weighed 106 pounds, having lost 28 pounds since entering the infirmary 11 days earlier.  ECF 12 ¶ 42.  The protocol that Nurse Morton used to guide her evaluation of Curtis directed her to immediately notify a clinician. ECF 12 ¶ 42.  But Nurse Morton instead filled out a non-urgent/routine request form—for a *mental health* evaluation. ECF 12 ¶ 42.  Nurse Mahoney signed off on Nurse Morton's actions in the early morning hours of January 23. ECF 12 ¶ 42.

Between January 17 and 21 Mr. Dettmann had been visited by his sister, Plaintiff Sarah McCrimmon.  ECF 12 ¶¶ 18, 45, 46, 52.  Ms. McCrimmon, seeing that Mr. Dettmann's catastrophic decline was not being addressed by the infirmary's medical staff, contacted administrators at Centurion, including Defendants Priscilla Roberts and Tamara Taylor. ECF 12 ¶¶ 36, 45-55.  She explained Mr. Dettmann's dire, undiagnosed condition, and asked for help. ECF 12 ¶¶ 36, 45-55.  Despite receiving this information, however, neither of the Centurion administrators attempted to intervene to determine whether Mr. Dettmann was receiving adequate care.  ECF 12 ¶¶ 46, 53, 55.

A few hours after speaking with Nurse Morton on January 23, Mr. Dettmann died.  ECF 12 ¶ 42.  He was found unresponsive in his cell, and after efforts to revive him were unsuccessful, he was pronounced dead.  ECF 12 ¶ 43.  An autopsy determined that he had died as a result of C. diff.  ECF 12 ¶ 44.

## STANDARD OF REVIEW

To survive a 12(b)(6) motion to dismiss, a plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action," but she "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). Instead, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quotation omitted). This "is not akin to a 'probability requirement'"—the plaintiff must merely allege "'enough fact to raise a reasonable expectation that the discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

The Eleventh Circuit thus applies a "two-pronged approach" in evaluating motions to dismiss: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal,* 556 U.S. at 679).  This approach applies to all Rule 8(a) pleadings—no heightened pleading standard exists for civil right or municipal liability claims. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)

**DISCUSSION**

Plaintiffs have alleged sufficient facts to sustain claims for deliberate indifference to Mr. Dettmann's serious medical needs in violation of the Eighth Amendment. The Amended Complaint adequately pleads claims against both Centurion and the Individual Defendants for denial of adequate medical care leading to Mr. Dettmann's death. Defendants, as employees of a private corporation, are not entitled to qualified immunity. Plaintiffs have also pled facts sufficient to establish state law claims for intentional infliction of emotional distress and wrongful death, and establish Centurion's *respondeat superior* liability for these claims. Defendants are not entitled to sovereign immunity under state law.

**I.  Plaintiffs have adequately pled claims for denial of constitutionally adequate medical care that caused Curtis Dettmann's death.**

The Amended Complaint meets the liberal standard to state a claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment. Plaintiffs have alleged facts sufficient to establish Centurion's liability for these constitutional violations— leading to Mr. Dettmann's death—under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiffs alleged facts showing that Centurion's customs and practices of inadequate care, its failure to adequately supervise provision of medical care, and the deficient decisions of its final policymakers directly caused violations of Mr. Dettmann's constitutional rights. The Plaintiffs' complaint also sets out sufficient facts to establish the deliberate indifference of each individual defendant in the face of Mr. Dettmann's urgent, deadly medical condition. Plaintiffs thus adequately alleged both municipal and individual liability for denial of constitutionally required medical care.

A.      **Plaintiffs have adequately pleaded a *Monell* claim against Centurion.**

The Amended Complaint satisfies the requirements to state a claim against Centurion for

relief under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[2]  "A municipality can

be sued directly under § 1983 when one of its customs, practices, or policies causes a

constitutional injury." *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020).  "To state a

*Monell* claim, a plaintiff must allege facts showing: '(1) that his constitutional rights were

violated; (2) that the municipality had a custom or policy that constituted deliberate indifference

to that constitutional right; and (3) that the policy or custom caused the violation.'" *Marantes v.

Miami-Dade Cty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (quoting *McDowell v. Brown,* 392

F.3d 1283, 1289 (11th Cir. 2004)).

*Monell* liability can also be established based on a failure to adequately train employees

where such a failure, "evidences a deliberate indifference to the rights of its inhabitants [that] can

be properly thought of as a . . . policy or custom" *City of Canton v. Harris,* 489 U.S. 378, 389,

(1989). "[A] municipality's failure to correct the constitutionally offensive actions of its

employees can rise to the level of a custom or policy if the municipality tacitly authorizes these

actions or displays deliberate indifference towards the misconduct." *Griffin v. City of Opa-

Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001).  Further, municipal "liability on the basis of

ratification exists when a subordinate public official makes an unconstitutional decision and

when that decision is then adopted by someone who does have final policymaking authority."

*Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002).

---

[2]   Centurion takes on the position of a municipality for the purpose of liability here, because
"[w]hen a private entity . . . contracts with a [municipality] to provide medical services to
inmates, it performs a function traditionally within the exclusive prerogative of the state and
'becomes the functional equivalent of the municipality' under section 1983." *Craig v. Floyd
Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011).

Notably, these pleading requirements are governed by Federal Rule of Civil Procedure 8, which only requires *notice* of a party's claims—not factual detail.  The Supreme Court and the Eleventh Circuit, moreover, have made clear that there is no heightened pleading standard under Rule 8(a)(2) for *Monell* claims. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("[A] federal court may not apply a standard 'more stringent than the usual pleading requirements of Rule 8(a)' in 'civil rights cases alleging municipal liability[.]'") (quoting *Leatherman*, 507 U.S. at 164); *Hoefling v. City of Miami*, 811 F.3d 1271, 1275-76 (11th Cir. 2016) (finding no heightened pleading standard for a *Monell* claim); *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) ("After *Ashcroft v. Iqbal,* [] which applied the *Twombly* pleading standard in a civil rights/qualified immunity context, there is no longer a heightened pleading standard in cases governed by Rule 8(a)(2), including civil rights [cases] under § 1983[.]" (quotations omitted)); *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010) ("After *Iqbal* it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints.").

"Neither 'notice pleading' requirements (Fed. R. Civ. P. 8(a)(2)) nor the standards which govern dismissals under Rule 12(b)(6) require a claimant to set out in detail the facts upon which he bases his claim." *Williams v. United Credit Plan of Chalmette, Inc.*, 526 F.2d 713, 714 (5th Cir. 1976).  Instead, once a complaint notifies a defendant of the allegations against him or her, "[d]iscovery is the more appropriate mechanism for the Defendant to obtain the evidentiary detail he requests."  *United States v. Aberle*, No. 3:08-cv-010, 2008 WL 11337768, at *2 (N.D. Ga. Aug. 28, 2008) (citing *Williams*).

The Amended Complaint satisfies this pleading standard in alleging *Monell* liability against Centurion.  Plaintiffs allege that under Centurion's management of healthcare delivery within the FDC, there exist widespread policies pursuant to which

> (1) healthcare staff commonly disregard reports by patients of objectively serious symptoms; (2) healthcare staff refuse to provide adequate treatment to patients that they perceive as difficult; (3) healthcare staff refuse to conduct or obtain diagnostic testing for patients; (4) healthcare staff fail to create a sensible treatment plan for patients whose health status require the creation of a treatment plan; (5) healthcare staff fail to ensure continuity of care among healthcare staff; (6) employees prioritize profits at the expense of constitutionally adequate care; (7) inadequate levels of health care staffing are maintained; and (8) healthcare staff fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

ECF 12 ¶ 59.  The First Amended Complaint further alleges that these practices were allowed to flourish because Centurion "directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct."  ECF 12 ¶ 60.

Centurion argues that in order to prevail on a *Monell* claim against it, Plaintiffs would need to allege that Centurion had policies and practices "related to the treatment of C. diff" specifically.  MTD at 7.  That is simply not so.  The relevant question is whether it can reasonably be inferred that the specific widespread practices that Plaintiffs allege that Centurion has allowed to flourish—set out in Paragraph 59 of their complaint, which is excerpted above— were a proximate cause of Mr. Dettmann's inadequate medical care and death.  And they can. As summarized in Plaintiffs' discussion of the facts, *supra*, and bearing the numbered items of Paragraph 59 in mind the individual medical providers in the RMC's infirmary exhibited precisely the conduct that Paragraph 59 alleges Centurion has allowed to flourish:  they [1] disregarded reports by Mr. Dettmann that he had objectively serious medical symptoms that were not being addressed; [2] the more Mr. Dettmann complained about his medical condition, the

less staff seemed willing to provide adequate care, even as his symptoms worsened; [3] healthcare staff consistently refused to obtain diagnostic testing for Mr. Dettmann, even after the failure of multiple treatments cried out for a diagnosis of his condition; and [4,5] the multiple, different, and ineffective treatments for Mr. Dettmann, indicate that no treatment plan had been developed and no continuity of care existed to address Mr. Dettmann's condition, even after he lost 15 percent of his body weigh in the space of 10 days.  The failure of the infirmary staff to take time to assess and diagnose Mr. Dettmann's condition also [6, 7] speaks to an infirmary that is understaffed to save money; and the failure to make an emergency referral despite Mr. Dettmann's catastrophic decline [8] speaks of a practice in which referrals to expensive, outside specialists are avoided.  Plaintiffs' specific allegations about Mr. Dettmann's care, in other words, are closely connected to their factual allegations about the practices and misconduct that Centurion allowed to flourish at the RMC.  Contrary to Centurion's contention, at the pleading stage, that is what Rule 8 requires.  The Rules provide for discovery to narrow—or broaden— these allegations as the case moves forward.

Plaintiffs have alleged facts indicating that More than a dozen healthcare employees— ranging from nurses to doctors to medical supervisors to healthcare administrators—repeatedly disregarded Mr. Dettmann's reports of his objectively serious symptoms, and instead providing treatment that was "so grossly incompetent, inadequate, or excessive as to shock the conscience[,]" as well as being "intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted)).  Plaintiffs' *Monell* allegations sufficiently allege that Centurion encouraged and ratified these behaviors, making it liable for them.

Separately and apart from Pleading that Centurion's widespread practices make it liable under *Monell*, Centurion is additionally liable for the failure of its final policymakers to

implement policies ensuring a constitutionally sound response to serious medical needs. "[A municipality] is responsible for any actions taken by the particular official who 'possesses final authority to establish municipal policy with respect to the action ordered[.]'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "Whether a particular official has final policymaking authority is a question of state law" *Id.* (citing *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701 (1989). As set forth in Plaintiffs' recitation of the facts, above, Mr. Dettmann's sister repeatedly alerted such authorities for Centurion to Mr. Dettmann's dire condition, yet they did nothing to ensure that he received proper treatment. Their failure to implement a policy sufficient to ensure an adequate response to a common complication to antibiotic treatment was directly responsible for the series of constitutional violations leading to Mr. Dettmann's death.

Plaintiffs have also sufficiently alleged that Individual Centurion defendants were final policymakers for purposes of implementing medical policies at RMC. As the Amended Complaint alleges, Dr. Sharma was the Medical Director "responsible for the implementation, oversight, and supervision of policies and practices at RMC." ECF 12 ¶ 10. He reviewed Mr. Dettmann's symptoms with Dr. Gonzalez and, despite Mr. Dettmann's clearly emergent condition, did no more than order a non-emergent consultation. ECF 12 ¶ 41. When Ms. McCrimmon requested that she take action to protect her brother's life, Dr. Sharma refused. ECF 12 ¶ 54. Priscilla Roberts was the Health Services Administrator "responsible for the implementation, oversight, and supervision of policies and practices at RMC." ECF 12 ¶ 11. Ms. McCrimmon contacted her on multiple occasions. Yet, despite assuring Ms. McCrimmon that she would investigate, she took no action beyond escorting Ms. McCrimmon out of RMC when Ms. McCrimmon attempted to advocate for her brother's life.  ECF 12 ¶¶ 46, 49. Ms. Taylor was

a Regional Director for Centurion, ECF 12 ¶ 12. Ms. McCrimmon also contacted her regarding

Mr. Dettmann's condition; despite promising to "investigate and intervene," she took no action.

ECF 12 ¶ 53. The Amended Complaint alleges sufficient facts to establish that these individuals

were final policymakers, that they neglected to establish or implement necessary policies, that

they ratified the rampant medical misconduct at RMC, and that Centurion is liable for their

failures leading to Mr. Dettmann's death.

### B. Plaintiffs have adequately pled claims against the Individual Defendants for denying Curtis Dettmann constitutionally adequate medical care.

The Individual Defendants[3] argue that the First Amended Complaint fails to state a claim

for deliberate indifference to a serious medical need.  *See* MTD at 16-17.  They do not dispute

that Mr. Dettmann had a serious medical need.  Instead, they argue that Plaintiffs have not

alleged that any of them were deliberately indifferent to his recognized serious medical need; or

that indifference on their part caused his death. This argument misstates the requirements for

deliberate indifference liability and mischaracterizes the allegations in Plaintiffs' amended

complaint.

The Eleventh Circuit has held that "deliberate indifference has three components: (1)

subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is

more than mere negligence."  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).  In

turn, conduct is "more than mere negligence" when an official "'knows that an inmate is in

serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.'"

*Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (quoting *Lancaster v. Monroe County*,

116 F.3d 1419, 1425 (11th Cir. 1997)).  A prison official also "act[s] with deliberate indifference

---

[3]   By "Individual Defendants" Plaintiff refers to the all the defendants other than Centurion
that have moved to dismiss in each of the three motions, ECF 63, 64, and 68.

by delaying the treatment of serious medical needs, even for a period of hours," if the condition

is sufficiently serious and warrants immediate attention.  *Id.*

Indeed, even where some care is provided, prison officials are deliberately indifferent if

they are "aware of the [serious] medical condition and the need for effective treatment and then

callously or recklessly disregard it." *McAdams v. Pelt*, No. 5:15-cv-312, 2018 WL 5850945, at

*2 (N.D. Fla. Apr. 27, 2018) (*citing McElligott*, 182 F.3d at 1257-58).  It is enough to establish

deliberate indifference that whatever medical care was given obviously was insufficient given

the serious medical need. As the Court of Appeals put it in *Taylor v. Adams*, 221 F.3d 1254,

1258 (11th Cir. 2000).  "Ultimately, there are . . . four requirements [for deliberate indifference]:

an objectively serious need, an objectively insufficient response to that need, subjective

awareness of facts signaling the need, and an actual inference of required action from those

facts." 221 F.3d at 1258.

The First Amended Complaint alleges that C. diff. is a common, well-known

complication of patients who undergo a course of antibiotics after surgery.  ECF 12 ¶ 29.  C. diff.

is at the same time easy to diagnose, easy to cure—and deadly if left untreated.  ECF 12 ¶ 29.

Plaintiffs have alleged sufficient facts form which it can be inferred that it was obvious to any

medical professional in the RMC infirmary—like the Individual Defendants—that Mr. Dettmann

was at risk for C. diff.—he was still in the infirmary recovering from a surgery and on a course

of antibiotics, the specific precursor of a C. diff. infection.  ECF 12 ¶¶ 24-25.  As Mr.

Dettmann's health began to deteriorate several days after his surgery, his various symptoms—

vomiting, fever and high blood pressure, elevated white blood cell counts, and low lymphocyte

counts—were all classic signs of an active infection.  ECF 12 ¶ 27.  And the First Amended

Complaint alleges that when he deteriorated further, with abdominal pain, diarrhea, and

considerable weight loss, ECF 12 ¶¶ 27-28, he was exhibiting all the signs of a C. diff. infection. ECF 12 ¶ 29.  Plaintiffs have alleged sufficient facts to establish that the individual defendants were aware of Mr. Dettmann's risk of developing C. diff and that his symptoms were consistent with that condition.   Plaintiffs allege that all of the Individual Defendants knew that Mr. Dettmann had these dire symptoms—because they encountered him, evaluated him, read his charts, or were told that he was in dire medical need—and either did nothing to help him, provided "remedies" that were demonstrably inadequate, or scheduled him for unhurried, if not irrelevant, follow-ups when he was on death's door.

The Defendants argue that these allegations fail to show that they were *subjectively* deliberately indifferent to Mr. Dettmann's dire condition.  But "an Eighth Amendment claimant need not show that a prison official acted or failed to act *believing* that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added).  Moreover, "[w]hether a prison official had the requisite [subjective] knowledge of a substantial risk is a question of fact subject to demonstration . . . from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*.

The Eleventh Circuit has held that much milder facts satisfy these criteria.  In *Estrada v. Stewart*, 703 F. App'x 755 (11th Cir. 2017), for example, a prisoner alleged that he had gallstones, but doctors did not try to diagnose his condition for a year and instead prescribed a generic painkiller "which had proved ineffective at treating his underlying condition or relieving his pain.  When those defendants did finally change course—by conducting an ultrasound [which revealed the gallstones] and prescribing [an effective painkiller]—[the prisoner's] condition

16

improved 'immediately.'" *Id.* at 759-60.  The Court of Appeals held that the doctors exhibited deliberate indifference by continuing a treatment that was ineffective, without an effort to diagnose the problem, *i.e.*, to figure out why their treatment was ineffective. *Id.*  Importantly, the Court affirmed that "prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Estrada*, 703 F. App'x at 759 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999)).

The misconduct by the doctors in *Estrada* pales next to actions of the Individual Defendants here.  For the last few days of his life—from January 17 to 23, 2018—Mr. Dettmann had all the symptoms of a common, well-known, easily diagnosable, easily treatable, deadly disease.  It is reasonable to infer that any trained medical professional who encountered him during this period would have recognized that he had a serious medical need that was not being met; and they charge that it was incumbent on every medical professional who encountered him to take steps that would appropriately respond to his urgent need.  But, Plaintiffs allege, the Individual Defendants all either did nothing in the face of Mr. Dettmann's dire condition, or took steps that were demonstrably ineffective or dawdling in the face of an obvious medical emergency.  Given the facts that Plaintiffs have alleged were available to each of the individual defendants, *Farmer* teaches that the defendants' deliberate indifference to Mr. Dettmann's medical condition may reasonably be inferred. *Farmer*, 511 U.S. at 837.  As such, the Individual Defendants are simply wrong to claim that allegations that they "did nothing" in the face of Mr. Dettmann's obvious, critical medical needs are insufficient to show that they were subjectively indifferent to it. *See* ECF 63 at 17.  Defendants' alleged inaction in the face of Mr. Dettmann's

obvious, serious medical needs is precisely the type of allegation which permits the inference that Defendants were deliberately indifferent to those needs.

Besides arguing that Plaintiffs have not pled deliberate indifference as a general matter, the Individual Defendants make three additional arguments.

*First*, the "Nursing Defendants," who are gathered up in Paragraph 14 of the First Amended Complaint, argue that Plaintiffs have not pleaded sufficiently individualized facts against them, because the allegations against each of the Nursing Defendants are all the same. *See* ECF 63 at 16.  This argument misunderstands the pleading requirements at this stage of the case.  Notably, in addition to making these allegations against the Nursing Defendants in Paragraph 14, the First Amended Complaint makes substantially similar allegations against each of the Nursing Defendants, separately and individually, in the counts against them. (*See* ECF 12 ¶¶ 76-141, Counts 6-27.)

The Nursing Defendants seem to argue that these allegations are insufficient because they are "speculative," "generalized," or, as Defendant Cooper argues, "do not give [her] fair notice of what the claim is and the grounds upon which it rests,"  and thus "do not rise" to the required "pleading standards." (ECF 64 at 6.)   A quick examination of Paragraph 14—or any of the Count paragraphs charging each of the individual nurses—shows that this simply is not so.

"At the pleading stage, the relevant question is whether the complaint provides a short and plain statement of the claim that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quotation omitted).  The allegations against each of the defendants, including the Nursing Defendants, provide precisely that information.

First, Paragraph 14, and each of the "Count" paragraphs, alleges that

> "*Each* of these Nursing Defendants encountered and attended to Curtis in the RMC between January 17 and January 23, 2018 during the time that he was exhibiting the clear and obvious symptoms of his serious medical illness."

ECF 12 ¶ 14.  That is not a "speculative" or "general" allegation, as the Defendants argue; it is a factual one.  Plaintiffs have alleged that between January 17 and 23, Mr. Dettmann was showing signs of severe medical distress that would have been obvious to any medical professional.  And, Plaintiffs allege—in Paragraph 14 and separately in each of the counts against the Nursing Defendants—each one of the Nursing Defendants encountered Mr. Dettmann when he was in these desperate straits.  Again, this claim is not speculative or general; it makes a specific allegation about where each of the Nursing Defendants was, what they encountered, and when.

Next, Paragraph 14 alleges that

> "As such, *each* of these Nursing Defendants saw Curtis's symptoms, and recognized that he was in dire need of medical care."

ECF 12 ¶ 14.  This, too, is not a speculative or conclusory allegation; indeed *Farmer* specifically holds that a defendant's knowledge can be inferred.  *Farmer*, 511 U.S. at 837.  Here, Plaintiffs permissibly draw the inference that having encountered Mr. Dettmann between January 17 and 23, each of the defendants saw his severe symptoms, and each of them, having seen those symptoms, recognized that Mr. Dettmann was in dire need of medical care.  That is specifically the type of inference that *Farmer* endorses.

Finally, Plaintiffs allege,

> "Despite these encounters, however, *none* of these Nursing Defendants took steps or intervened to secure appropriate medical treatment for Curtis, including securing the simple testing for and treatment of C. diff."

ECF 12 ¶ 14.  This allegation too is neither speculative nor conclusory—it is plain to see that no such steps were taken, nor interventions made, by anyone in the infirmary.  The steps would

have been easy to take, and had any of the Nursing Defendants taken them, Mr. Dettmann might have survived.

Paragraph 14, in short, notifies each one of the Nursing Defendants what Plaintiffs claim they did and failed to do.  That is all that is required at the pleading stage.  It is of no import that each Nursing Defendant violated Mr. Dettmann's rights in a substantially similar way.  Each one of the Nursing Defendants knows what he or she did or did not do, and each can admit or deny every one of the specific allegations that Plaintiffs have pled based on that knowledge and consistent with that particular defendant's view of the truth.  The case can then move to discovery, where both parties can gather facts to test the truth of Plaintiffs' allegations.

*Second*, the defendants argue that Plaintiffs have "failed to plead a factual causal connection between the individual actions of . . . individual providers and Dettmann's injuries." *See, e.g.*, ECF 63 at 18.  This argument is undeveloped, but in any event it has no merit. Plaintiffs charge that Mr. Dettmann showed obvious symptoms of a common, deadly, treatable disease.  The cure for this disease was obvious and well-known: a simple test, followed by treatment with an appropriate antibiotic.  Plaintiffs charge that upon becoming aware of Mr. Dettmann's alarming symptoms, each one of the individual defendants—who were medical professionals or supervisors of medical professionals—should have, but did not, take Mr. Dettmann's condition seriously and take appropriate steps to get him diagnosed and treated.  In other words, Plaintiffs allege that *any* of the individual defendants could have taken steps to ensure that Mr. Dettmann was diagnosed, but that none of them did.  That is certainly sufficient to inform each of the Individual Defendants how their individual failure to address Plaintiffs' desperate medical—*i.e.*, their deliberate indifference to that need—caused his death from C. diff. It is axiomatic that under Section 1983 an injury "'it is common for [Section 1983] injuries to

20

have multiple proximate causes.'" *Mendez v. Cty. of Los Angeles*, 897 F.3d 1067, 1078 (9th Cir.

2018) (*quoting Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). *Accord Moulds v. Bullard*,

345 F. App'x 387, 391 (11th Cir. 2009) ("A substantial risk to a prisoner's safety . . . may come

from single or multiple sources."). That is what Plaintiffs allege.

*Third*, the Plaintiffs allege that in the days before his death, Mr. Dettmann's sister alerted

two Centurion managers, Roberts and Taylor, that Mr. Dettmann was receiving disastrously

inadequate care. ECF 12 ¶¶ 46, 53. Plaintiffs allege that both managers promised to investigate

the care Mr. Dettmann was receiving, but both did nothing. *Id.* Defendants claim that Roberts

and Taylor could not have been deliberately indifferent to Mr. Dettmann, since they are not

medical care providers. ECF 63 at 18. The defendants do not develop this argument, and it is

not clear exactly what they mean by it. It is well established that while non-medical

administrators may rely on the judgment of medical professionals, that reliance is appropriate

only "in the absence of a reason to believe, or actual knowledge, that medical staff is

administering inadequate medical care . . . ." *Kelly v. Ambroski*, 97 F. Supp. 3d 1320, 1343

(N.D. Ala. 2015) (citation omitted). Here, Plaintiffs allege that Mr. Dettmann's sister gave

Roberts and Taylor dire warnings that he was receiving grossly inadequate medical care and was

at risk of dying—yet they did nothing to investigate, much less intervene. Those allegations are

sufficient to state a claim for deliberate indifference against them.

## II. Defendants Are Not Entitled to Qualified Immunity Because Curtis Dettmann's Right to Constitutionally Adequate Medical Care Was Clearly Established.

The Individual Defendants all assert that they are entitled to qualified immunity. *See*

ECF 63 at 18; ECF 64 at 6-7.

As to Centurion's employees, this argument is a nonstarter: they are not entitled to assert

qualified immunity because they are employed by a private corporation. In *Richardson v.*

21

*McKnight,* the Supreme Court held that "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case." 521 U.S. 399, 412 (1997). The Eleventh Circuit subsequently confirmed that this rule extends to privately employed prison medical personnel, holding that "no strong reason appears . . . to distinguish between privately employed prison guards and privately employed prison physicians. Therefore, [a privately-employed prison physician] is not entitled to advance the defense of qualified immunity." *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999), *amended,* 205 F.3d 1264 (11th Cir. 2000).  *See also Scott v. Campbell*, No. 4:08-cv-205, 2009 WL 3028306, at *4 (N.D. Fla. Sept. 17, 2009) (finding that medical and administrative employees of a prison medical contractor "were not public officials or employees eligible to assert qualified immunity"). Qualified immunity is not available to the Centurion employees.

Qualified immunity is not available to any other defendant either, because the rights at issue here are clearly established.  The Court of Appeals has explained the qualified immunity defense for cases of deliberate indifference to serious medical needs in stark terms—there is none.  *See Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." (quotation omitted)). Even before than *Hill*, the Court of Appeals held that the "failure to provide diagnostic care and medical treatment known to be necessary . . . establishe[s] deliberate indifference sufficient to establish a constitutional violation."  *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986).  None of the defendants in this case enjoy qualified immunity against Plaintiffs' claims.

III.    **Plaintiffs have adequately pled claims for intentional infliction of emotional distress and wrongful death.**

A.    **Plaintiffs have adequately pled claims against Defendants for intentional infliction of emotional distress.**

The Defendants also claim that they are not liable for intentional infliction of emotional distress (IIED).  (ECF 63 at 19-20; ECF 64 at 8-10; ECF 68 at 8.)  A cause of action for IIED was recognized by the Florida Supreme Court in *Metropolitan Life Insurance Co. v. McCarson,* 467 So.2d 277 (Fla. 1985). To state an IIED claim, a plaintiff must demonstrate: (1) the defendant acted recklessly or intentionally; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff's emotional distress; and (4) the emotional distress was severe.  *Johnson v. Thigpen,* 788 So. 2d 410, 412 (Fla. 1st DCA 2001). In *McCarson,* the Florida Supreme Court relied on the definition of extreme and outrageous conduct set forth in Section 46, Restatement (Second) of Torts:

> Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds and decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of facts to an average member of the community would arouse his sentiment against the actor, and lead him to exclaim, "Outrageous!"

*McCarson,* 467 So. 2d at 278-79.  Notably, "[t]he viability of a claim for intentional infliction of emotional distress is highly fact-dependent and turns on the sum of the allegations in the specific case at bar." *Id.*

As to the first element of this claim, courts have made clear that the plaintiff is not required to show that the defendant intended to inflict severe emotional distress. *See Dominguez v. Equitable Life Assur. Soc. of U.S.,* 438 So.2d 58, 59 n.1 (Fla. 3d DCA 1983). Rather, "all that need be shown is that he intended his specific behavior and knew or should have known that that the distress would follow." *Id.* In this case, the same allegations supporting a finding of

23

deliberate indifference on the part of his caregivers also demonstrate that they acted with the requisite intent to meet the first element of an IIED claim. Specifically, the Complaint alleges that Mr. Dettmann's healthcare providers were aware of symptoms that were a classic sign of a C. Diff infection. ECF 12 ¶ 29. Furthermore, Mr. Dettmann begged medical staff to refer him to a hospital as his condition deteriorated over the course of ten days, during which he lost 28 pounds, lost the ability to eat, control his bowels, and walk. ECF 12 ¶¶ 28, 33, 25 37. Mr. Dettmann's sister also repeatedly informed prison staff and administration of the seriousness of his medical situation and begged them to refer Mr. Dettmann to a hospital for proper medical evaluation and treatment. *Id.* at ¶¶ 31, 45–47. Given Defendants' awareness of these facts, their choice not to diagnose or treat the medical issues causing the rapid deterioration of Mr. Dettmann's medical condition was an intentional decision that they knew or should have known would have caused Mr. Dettmann severe emotional distress.

As to the second element, the Restatement of Torts (Second) explains that "the extreme and outrageous character of conduct may arise from an abuse by the actor of a position, or relation with the other, which gives him actual or apparent authority of the other, or power to effect his interests." Section 46, Restatement (Second) of Torts Cmt. E. Applying this principle, Florida courts have held a person with authority over an individual's medical care engages in outrageous or extreme behavior if they unjustifiably fail to authorize life-saving medical treatment. *See Liberty Mut. Ins. Co. v. Steadman*, 968 So.2d 592 (Fla. 2d DCA 2007) (finding allegations defendant had unjustifiably delayed plaintiff's lung transplant stated claim for IIED where defendant's actions hastened plaintiff's death).

Here, Defendants observed Mr. Dettmann's deteriorating condition and failed to provide readily-obtainable medical treatment are sufficiently extreme and outrageous to state a claim for

IIED.  Mr. Dettmann was powerless to seek medical treatment or hospitalization on his own volition. Thus, the healthcare providers held a unique position of power over Mr. Dettmann as the sole authorities who could determine whether he would receive life-saving treatment.[4]  Their failure to provide this treatment despite Mr. Dettmann's deteriorating condition and literal pleas for help over the course of multiple days both hastened (and in fact, caused) his preventable death and needlessly inflicted severe pain and suffering as Mr. Dettmann lost the ability to walk, eat, and control his bowels and slowly died in front of them over the course of several days.

As to the third IIED element, the Complaint alleges facts showing Defendants' failure to act was the actual and legal cause of Mr. Dettmann's emotional distress. Specifically, it alleges the C. Diff. infection that caused Mr. Dettmann's death was a "common and well-known complication for post-surgical patients" on antibiotics, and one that is "easily treated by particular classes of antibiotics that target the C. Diff bacterium" and "easily diagnosed with a stool test, which is frequently ordered by medical staff for any patient with diarrhea who is easily or has recently taken a course of antibiotics." ECF 12 at ¶ 29. Even a routine diagnostic evaluation would have saved Mr. Dettmann's life. Thus, the Defendants' failure to provide this basic medical treatment caused his death and the severe emotional distress that preceded it.

The final element simply requires an allegation of "severe and continuing emotional distress." *Anthony Sterling M.D. v. Provident Life and Acc. Ins. Co.*, 519 F. Supp. 2d 1195, 1213 (M.D. Fla. 2007) (holding allegation of severe and continuing emotional distress arising from

---

[4]  Defendants Purvis, Brown, and Swanson argue that the Complaint is devoid of allegations showing why they should have ordered treatment or had the authority to order treatment. However, the Complaint alleges that all of the medical staff who encountered Mr. Dettmann during the days it took for his C. Diff infection to kill him did so while Mr. Dettmann was exhibiting "clear and obvious symptoms of serious medical illness" and that these healthcare providers "recognized he was in dire need of medical care." ECF 12 ¶ 14.

denial of disability benefits stated a claim sufficient to survive a motion to dismiss). Here, the Complaint alleges Mr. Dettmann suffered severe emotional distress as a result of the infection that caused his death. ECF 12 ¶174. Furthermore, the complaint alleges that the pain Mr. Dettmann experienced prior to his death was so severe that he called his sister "crying and begging her to help him" and "repeatedly begged medical staff to refer him to a hospital for proper treatment." As such, the Complaint sufficiently alleges the elements necessary to state a claim for IIED under Florida law.

### B.   Plaintiffs have adequately pled a claim against Centurion for *respondeat superior* liability.

Under Florida Law,[5] "an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of employment and to further a purpose or interest, however excessive or misguided, of the employer." *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.,* 783 So. 2d 353 (Fla. 3d DCA 2001). An employee's conduct is within the scope of their employment where "(1) the conduct is of the kind he was employed to perform, the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master." *Id.* Here, the allegations at issue in Plaintiff's state law claims involve the conduct of nurses and physicians who were employed by Centurion to work at RMC. ECF 12 at ¶ 14. All of the allegations in the Complaint involve conduct at RMC while Defendants were

---

[5] The FAC asserts a in the *respondeat superior* claim against Centurion sounding in § 1983, in addition to state law.  *See* ECF 12 ¶ 178.  Plaintiffs recognize that Section 1983 currently does not impose respondeat superior liability on private entities.  However, other courts of appeal have criticized this doctrine and have suggested that it be changed.  *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 792–96 (7th Cir. 2014).  Plaintiffs therefore assert this respondeat superior claim to preserve this claim.

performing those duties. As such, Centurion is liable for the tortious acts of the Defendants it employed under the doctrine of *respondeat superior*.

C. **The notice requirements of Fla. Stat. Section 766-106 does not bar Plaintiffs' state-law claims.**

The Defendants argue that several of Plaintiffs' state law claims are barred by the notice requirement for medical malpractice lawsuits set out in Fla. Stat. § 766-106.  These arguments are incorrect.

Both Centurion and the individual nurses employed by the Department of Corrections contend that Plaintiffs' wrongful death claims cannot proceed because Plaintiffs' pre-suit notice letter was sent contemporaneously with the Complaint. The Florida Supreme Court, however, has held that service of a notice letter contemporaneous with the filing a complaint is not fatal to a plaintiff's cause of action. *See Hosp. Corp. of Am. v. Lindberg*, 571 So. 2d 446, 449 (Fla. 1990).  Florida courts have applied *Lindberg*'s holding to facts identical to those here:

> In *Lindberg*, the Florida Supreme Court was faced with essentially the same question which confronts us here: Is a medical malpractice plaintiff's failure to comply with the presuit screening process provided by Chapter 766 within the applicable statute of limitations fatal, as a matter of law, to the plaintiff's cause of action? The supreme court held in Lindberg that the answer to that question is no. It held that the plaintiff could proceed so long as the notice of intent and the complaint were filed within the statutory period.
>
> In that case, the plaintiffs had failed to allege compliance with presuit notice investigation requirements, and the defendants contended that upon expiration of the statute of limitations, the trial court was without subject matter jurisdiction to allow amendment of the complaint to include allegations of compliance with the statutory requirements. The supreme court disagreed with that conclusion, and held that where a complaint and presuit notice are simultaneously filed and served within the applicable statute of limitations, the plaintiff may subsequently (even after expiration of the statutory period) file an amended complaint asserting compliance with the presuit screening process.

*Stebilla v. Mussallem*, 595 So. 2d 136, 139 (Fla. 5th DCA 1992).

By the Defendants' own admission, the pre-suit notice letter was served within the Florida's two-year statute of limitations for medical malpractice claims. *See* § 95.11(4)(a) Fla. Stat. (2020). Thus, even if Defendants had sought dismissal at the time the Complaint was filed, the only remedy to which they would be entitled would be a dismissal of those claims without prejudice so Plaintiffs could re-file their Complaint once the notice period had run. Given that the notice period has already run, dismissal of any kind for failing to adhere to the notice provision is also inappropriate. *See Groover v. Polk County Bd. of Cnty. Comm'rs,* 8:18-cv-02454, 2020 WL 2307558 at *10 (M.D. Fla. May 8, 2020) (holding that plaintiffs had complied with necessary pre-suit notice requirements even if they had not served the notice when the original lawsuit was filed, because they provided a notice within the statute of limitations and notice period had already run when the court ruled on a motion to dismiss the plaintiffs' second amended complaint).

Defendants Purvis, Brown, and Swanson also take issue with not receiving notice under § 766.106 on Plaintiff's intentional infliction of emotional distress claims.  ECF 68 at 8.  Florida Rule of Civil Procedure 1.650(b)(1) provides: "notice of intent to initiate litigation sent by certified mail to and received by any prospective defendant shall operate as notice to the person and any other prospective defendant who bears a legal relationship to the prospective defendant receiving the notice." Contracts for the provision of medical care constitute a "legal relationship" sufficient to meet the requirements of his rule. *See Young v. Naples Comm. Hosp., Inc.*, 129 So.3d 456 (Fla. 2d DCA 2014). In *Young*, a patient brought medical malpractice claims arising out of the misreading of her CT scan. *Id.* at 457. Her lawsuit named the doctor who had misread the scan, his employer (Nighthawk Radiology), as well as the company with whom his employer contracted to provide medical services (Naples Radiologists). *Id.* at 457-58. However, the patient

only sent a notice letter to Naples Radiologists, the company who was within contract with the providers who actually misread the CT scan. *Id.* at 460.

The defendants who were not served a notice letter argued the plaintiff had failed to comply with the notice provision as to them and that they did not have a "legal relationship" with Naples Radiologists because that term only applied to employees or servants. *Id.* at 460. The court disagreed:

> First, there is no definition of "legal relationship" included in the rule. And second, in their answer to the Youngs' amended complaint, Nighthawk and Dr. Grennan admitted that Nighthawk was in a written contractual relationship with Naples Radiologists and that Dr. Grennan was an independent contractor for Nighthawk. These are both business relationships defined by the law of contracts that bestow legal rights and legal obligations upon the parties to the relationships. As such, notice to prospective defendant Naples Radiologists was notice to prospective defendants Nighthawk and Dr. Grennan, rendering summary judgment improper as a matter of law.

*Id.* at 460–61.

Similarly, here, the complaint alleges—and Defendants admit—that Centurion and the FDC were in a contractual relationship to provide medical care to prisoners in Florida.  (ECF ¶ 9; ECF 68 at 11.) Given this contractual relationship, notice to Centurion constituted notice the FDC and its employees under Florida Rule of Civil Procedure 1.650(b)(1).[6]

## IV.    Defendants are not entitled to sovereign immunity on plaintiffs' state law claims.

Defendants claim sovereign immunity bars Plaintiff's state law claims. However, the Florida Legislature has provided a limited waiver of the State's sovereign immunity for claims against the State and its agencies or subdivisions of up to $200,000 per individual and $300,000 per occurrence for the negligent or wrongful acts or omissions of its employees if such acts,

---

[6]  Furthermore, the notice letter was also sent to the Florida Department of Corrections, who unquestionably had a "legal relationship" with these individual Defendants.

when committed by a private person, would cause that person to be liable under the general laws

of the state. *See* § 768.28 (1)(5), Fla. Stat. (2020). "[C]orporations primarily acting as

instrumentalities or agencies of the state" are included among the list of entities considered to be

"state agencies or subdivisions" under this section. *Id.* at § 768.28(2).

Florida's sovereign immunity statute recognizes two mutually exclusive standards for

when sovereign immunity applies depending on whether the person or entity sued is considered

an agency of the state or an individual employee. §768.28(9)(a) provides "no officer, employee,

or agent of the state . . . shall be held *personally liable* . . . for any injury or damage suffered as a

result of any act, event, or omission of action in the scope of her or his employment or function,

*unless* such officer, employee, or agent acted in bad faith or with malicious purpose or in a

manner exhibiting wanting and willful disregard of human rights, safety, or property." (emphasis

added). In other words, an officer may not be held personally liable unless it is shown he acted

"in bad faith or malicious purpose."  On the other hand, that section also provides:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or
> omission of an officer, employee, or agent of the state or any of its subdivisions or
> constitutional officers shall be by action against the governmental entity, or the
> head of such entity in her or his official capacity, or the constitutional officer of
> which the officer, employee, or agent is an employee, unless such act or omission
> was committed in bad faith or with malicious purpose or in a manner exhibiting
> wanton and willful disregard of human rights, safety, or property. The state or its
> subdivisions shall not be liable in tort for the acts or omissions of an officer,
> employee, or agent committed while acting outside the course and scope of her or
> his employment or committed in bad faith or with malicious purpose or in a manner
> exhibiting wanton and willful disregard of human rights, safety, or property.

*Id.*

Thus, under Florida's sovereign immunity framework, claims with allegations that

involve "bad faith or malicious purpose" by a government employee must be brought against that

employee personally, whereas claims that do *not* involve those allegations must be brought

against the employer-entity itself. *See Tierney v. Jones*, 4:17-cv-05; 2018 WL 4212431 (N.D. Fla. July 26, 2018) (noting that Florida's sovereign immunity statute did not preclude claims for medical negligence against FDC medical contractor Corizon and rejecting its argument that the plaintiff was required to show Corizon acted based on bad faith or malice in order to bring a claim against it). Here, the Complaint properly alleges a claim against Centurion based on its agents' failure to provide adequate medical care to Mr. Dettmann while he was incarcerated at RMC. ECF 12  ¶¶ 179-183. This Count does not require or contain allegations that these employees acted with bad faith or malice. *Id.*

On the other side of the coin, the claims against those employees personally are based on a theory of IIED and allege that their actions were "undertaken intentionally, with malice, and/or reckless indifference to Mr. Dettmann's rights." ECF 12 ¶ 173. Because IIED claims require a showing of bad faith or malice, they are an appropriate cause of action for a claim against a state employee or agent personally under Florida's sovereign immunity framework. *See City of Boynton Beach v. Weiss*, 120 So. 3d 606, 610-612 (Fla. 4th DCA 2013) (holding sovereign immunity did not bar claim for intentional infliction of emotional distress arising from battery and false arrest committed by police officer). Indeed in other contexts, Florida courts have found the threshold necessary to state a claim for intentional infliction of emotional distress is synonymous with the malice standard under §768.28(9)(a). *See Kirker v. Orange County*, 519 So. 2d 682, 684 (Fla. 5th DCA 1988) (noting that claim for intentional infliction of emotional distress arising out of trespass on dead body was, by definition, non-actionable against a county because those claims required a showing of bad faith, malicious purpose, or exhibiting wanton and willful disregard of human rights, safety, and property). As such, sovereign immunity does not bar Plaintiff's negligence claims against Centurion, nor does it bar the IIED claims against

the individual Defendants.  To the extent these claims are deemed inconsistent, the Federal Rules

permit Plaintiffs to assert both these claims, in the alternative.  *Groover*, 2020 WL 2307558 at *4

(noting plaintiffs could plead state employees were both "merely negligent" and "acting in bad

faith, or with malicious purpose" at the pleading stage, even if the individuals and state agency

could not both be held liable for the same claim).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that this Court should deny

Defendants' motions to dismiss in their entirety.


Respectfully submitted,


/s/ *Stephen H. Weil*
Stephen H. Weil

Attorney for Plaintiffs

Arthur Loevy
Sarah Grady
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
weil@loevy.com

Jesse Wilkison
SHEPPARD, WHITE, KACHERGUS & DEMAGGIOA, P.A.
215 North Washington St.
Jacksonville, FL 32202
T: (904) 356-9661

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen H. Weil, hereby certify that on July 21, 2020 I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

<u>/s/ *Stephen H. Weil*</u>
Stephen H. Weil
Attorney for Plaintiffs