UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SARAH MCCRIMMON and CARON
DETTMANN, as Co-Administrators
of the Estate of Curtis
Dettmann,

    Plaintiffs,

v.             Case No. 3:20-cv-36-BJD-JRK

CENTURION OF FLORIDA, LLC,
et al.,

    Defendants.

_____

## **ORDER**

### **I. Status & Background**

Plaintiffs, co-administrators of Curtis Dettmann's estate, bring this action against thirty-six Defendants arising out of medical care Mr. Dettmann received when he was an inmate of the Florida Department of Corrections (FDOC). The Court struck Plaintiff's initial complaint, finding it constituted an impermissible shotgun pleading. See Order (Doc. 10). On February 3, 2020, Plaintiffs filed an amended complaint (Doc. 12; Am. Compl.), asserting thirty-nine causes of action. The Court entered a case management and scheduling order on May 29, 2020. See Order (Doc. 48). Discovery is set to close on March 12, 2021. Id.

The following Defendants have filed answers: Jones (Doc. 25); Allen (Doc. 26); Hummel (Doc. 27); Whalen (Doc. 28); Reimers (Doc. 31); and R. Smith (Doc. 74). Before the Court are three motions to dismiss (Docs. 63, 64, 68), which Plaintiffs oppose in a consolidated response (Doc. 72; Pl. Resp.).[1]

## II. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>see also</u> <u>Lotierzo v. Woman's World Med. Ctr., Inc.</u>, 278 F.3d 1180, 1182 (11th Cir. 2002). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. A plaintiff should allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claims. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007).

Though detailed factual allegations are not required, Federal Rule of Civil Procedure 8(a) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 556 U.S. at 678. As such, a plaintiff

---

[1] One Defendant has not responded to the complaint at all: Maurice Radford.

may not rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Gill as Next Friend of K.C.R. v. Judd, 941 F.3d 504, 511 (11th Cir. 2019) (quoting Iqbal, 556 U.S. at 678). Rather, the well-pled allegations must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570. In assessing the sufficiency of a complaint, all reasonable inferences should be drawn in favor of the plaintiff. See Iqbal, 556 U.S. at 678.

### III. Complaint Allegations

Mr. Dettmann died on January 23, 2018, at the Reception and Medical Center (RMC). See Am. Compl. ¶¶ 1, 2, 6. Mr. Dettmann was housed at RMC because he had serious medical needs, including hidradenitis, a chronic skin condition. Id. ¶ 22. On January 10, 2018, Mr. Dettmann had surgery at Memorial Hospital Jacksonville to resolve an outbreak near his anus. Id. ¶ 23. He returned to RMC two days later with various medications, including a course of antibiotics, which RMC medical providers gave him. Id. ¶¶ 24, 25.

Plaintiffs allege that Mr. Dettmann's health began to deteriorate on January 17, 2018, five days after his release from the hospital. Id. ¶ 26. He became nauseous and was vomiting. Additionally, Plaintiffs allege, he showed signs of an active infection: his blood pressure, temperature, and white blood cell counts were elevated, and his lymphocyte counts were low. Id. Mr.

Dettmann complained to Dr. Gonzalez and Nurse Quintino that he was nauseous and vomiting. Id. Dr. Gonzalez ordered intravenous Zofran to address those symptoms. Id.

The following day, January 18, 2018, Mr. Dettmann was unable to eat. Id. ¶ 27. He still had a temperature, and he reported abdominal pain and diarrhea. Unspecified nurses noted that Mr. Dettmann appeared weak. Id. According to Plaintiffs, Mr. Dettmann "consistently reported [his] symptoms to Defendant Nurses, Dr. Gonzalez, and other staff in the infirmary," and he told Dr. Gonzalez the Zofran did not relieve his symptoms. Id. ¶¶ 27, 30. Mr. Dettmann also spoke with his sister, Sarah McCrimmon, on January 18, 2018. Id. ¶ 29. Crying, Mr. Dettmann begged Ms. McCrimmon to help him. He told her that he had become incontinent and was placed in a diaper. Id.

On January 19, 2018, Mr. Dettmann again saw Dr. Gonzalez. Id. ¶ 30. Dr. Gonzalez ordered no tests, but ordered that Mr. Dettmann continue receiving Zofran and prescribed Protonix, Imodium, and a probiotic supplement. Id. Mr. Dettmann begged to be sent to the hospital. Id. ¶ 31. "The Nursing Defendants notified Dr. Gonzalez" of Mr. Dettmann's requests. Id.

On January 20, 2018, two doctors checked on Mr. Dettmann: Dr. Rodriguez and Dr. Pedroza. Id. ¶¶ 32, 34. Despite Mr. Dettmann's continued or worsening condition, the doctors did not evaluate him or perform any tests.

4

Id. Dr. Pedroza noted Mr. Dettmann was dehydrated and ordered that he "begin a full liquid diet and follow up with his primary care doctor." Id. ¶ 34. Dr. Rodriguez saw Mr. Dettmann again the following day, on January 21, 2018. Id. ¶ 38. Again, Dr. Rodriguez did not evaluate Mr. Dettmann or perform any tests. Id.

Mr. Dettmann's condition became so extreme that he could not drink water without vomiting, and he became dependent on a wheelchair because he was too weak to walk. Id. ¶¶ 33, 35. "[H]e defecated on himself repeatedly throughout January 21 and 22." Id. ¶ 37. Mr. Dettmann's incontinence was reported to Nurse McCarter, "who did nothing in response." Id. On January 21, 2018, Mr. Dettmann's sister visited him at RMC. Id. ¶ 36. He was in a wheelchair, wore a diaper, and "spent a significant portion of the visit vomiting." Id.

By January 22, 2018, Mr. Dettmann had lost nearly 20 pounds, which Dr. Gonzalez noted. Id. ¶ 39. Even though Mr. Dettmann's condition had not improved, Dr. Gonzalez discharged him to general population. Id. He was returned to K dorm via wheelchair on January 22, 2018. Id. ¶ 40. That same day, Dr. Gonzalez consulted with RMC's medical director, Dr. Sharma, regarding Mr. Dettmann's "unresolved symptoms." Id. ¶ 41. The two agreed to submit a non-emergent gastro consult. Id.

5

At 3:40 a.m. on January 23, 2018, Mr. Dettmann told Nurse Morton he thought he was close to death. Id. ¶ 42. Nurse Morton recorded the symptoms Mr. Dettmann reported to her. Nurse Morton's physical evaluation revealed the following: low weight of 106 pounds;[2] tender abdomen; and hypoactive bowel sounds. Id. Nurse Morton completed a "non-urgent/routine request form to mental health." Id. She did not alert a physician. "Nurse Mahoney signed off on Nurse Morton's actions." Id. A few hours later, Mr. Dettmann was found unresponsive in his cell. Id. ¶ 43.

Plaintiff died from pseudomembranous colitis, caused by an infection called Clostridium difficile (C. diff). Id. ¶¶ 29, 44. According to Plaintiffs, C. diff infections commonly occur in patients who take antibiotics after surgery. The infection can be detected with a stool test. Id. ¶ 29.

Although unclear precisely when but before Mr. Dettmann died, Ms. McCrimmon sent an email to Centurion, the regional medical provider for the FDOC. Id. ¶ 46. A Centurion representative responded, acknowledging receipt of the email and informing Ms. McCrimmon her concerns were forwarded to Defendant Roberts, an administrator working at RMC. Id. Defendant Roberts, in turn, promised Ms. McCrimmon she would investigate Mr. Dettmann's

---

[2] This is a 28-pound decrease from eleven days earlier. See Am. Compl. ¶ 42.

health status the next day. Id. Ms. McCrimmon also personally spoke with Defendant Roberts after she visited Mr. Dettmann on January 21, 2018. Id. ¶ 49. Plaintiffs allege, "Roberts refused to take further action to ensure that [Mr. Dettmann] received proper treatment, and instead had Ms. McCrimmon escorted out of RMC." Id.[3]

In counts one through thirty-six, Plaintiffs assert each Defendant was deliberately indifferent to Mr. Dettmann's medical condition, in violation of the Eighth Amendment. In count thirty-seven, Plaintiffs assert the actions of the individual Centurion Defendants and other Defendants (doctors, nurses, and administrators) constitute intentional infliction of emotional distress under Florida law. In count thirty-eight, Plaintiffs assert Centurion should be held vicariously liable for the actions of its employees under § 1983 and state law. Finally, in count thirty-nine, Plaintiffs assert a wrongful death claim against Centurion.

---

[3] Ms. McCrimmon contacted countless other FDOC administrators as well, including then-Secretary of the FDOC, Julie Jones; the Warden, Robert Smith; the FDOC's Regional Director, Erich Hummel; the Health Services Director and Clinical Advisor of the FDOC Office of Health Services, Thomas Reimers and Timothy Whalen; an employee of the Inspector General's Office, Maurice Radford; Centurion's Regional Director, Tamara Taylor; and Dr. Sharma. See Am. Compl. ¶¶ 47, 50-54. These allegations are not summarized because most of these Defendants have answered the amended complaint.

## IV. Analysis & Conclusions

### A. Centurion Defendants' Motion

Centurion and the individual Defendants who worked for Centurion at the relevant times (Centurion Defendants) jointly move to dismiss the claims against them (Doc. 63; Centurion Motion).[4] They argue Plaintiffs fail to state plausible claims for deliberate indifference (against all Centurion Defendants), respondeat superior (against Centurion), intentional infliction of emotional distress (against the Centurion Doctors, Nurses, and P. Roberts), and wrongful death (against Centurion).

### i. Deliberate Indifference

Plaintiffs allege the Centurion Defendants were deliberately indifferent to Mr. Dettmann's serious medical needs. A claim for deliberate indifference to a serious illness or injury is cognizable under § 1983. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim, a plaintiff first must allege he had a

---

[4] Four doctors join the motion: Rakesh Sharma; Marinette Gonzalez Morales; David E. Rodriguez; and Gerardo A. Pedroza-Sierra (collectively, "Centurion Doctors"). Sixteen nurses join the motion: John R. Quintino; Luz Cruz, Kimberly A. Nielson, Linda Roberts, Alex Renelus, Cayman Smith, Kayla McCarter, Tanesha L. Adkins, Shenka Jackson, Nikki N. Richardson (deceased); April A. Mason; Elizabeth Morton; Clarissa C. Moody; Tabatha L. Mahoney; Michael J. Roth; and Ashley Harvey/Hawkins (collectively, "Centurion Nurses"). Two Centurion administrators join the motion: Pricilla L. Roberts and Tamara Taylor (together, "Centurion Administrators"). As addressed later in this Order, Plaintiffs mis-identify some of the Centurion Nurses in their complaint.

serious medical need. <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004). Next, the plaintiff must "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." <u>Richardson v. Johnson</u>, 598 F.3d 734, 737 (11th Cir. 2010) (describing the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence").

"Where a prisoner has received … medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." <u>Hamm v. DeKalb Cty.</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) (quoting with alteration <u>Westlake v. Lucas</u>, 537 F.2d 857, 860 n.5 (1st Cir. 1981)). As such, allegations of medical negligence are not cognizable under § 1983. <u>Estelle</u>, 429 U.S. at 106.

However, the Eleventh Circuit has not held an Eighth Amendment claim is never plausible when an inmate receives some medical care. On the contrary, even when a prisoner receives some medical care, a plaintiff states a claim for deliberate indifference if he alleges the care he received was "so cursory as to amount to no treatment at all," was grossly inadequate, or was guided by a "decision to take an easier but less efficacious course of treatment." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999). <u>See also</u> <u>Harris v. Thigpen</u>, 941

9

F.2d 1495, 1505 (11th Cir. 1991) ("Medical treatment violates the [E]ighth [A]mendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'").

The Eleventh Circuit has "repeatedly found that 'an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.'" McElligott, 182 F.3d at 1255. "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." Id. at 1257. Delaying treatment for non-life-threatening injuries that cause pain, even if momentary, can give rise to a cognizable constitutional claim. See, e.g., id. (citing cases).

As to the objective component of Plaintiffs' deliberate indifference claims, the Centurion Defendants do not dispute Mr. Dettmann had a serious medical need. See Centurion Motion at 16. They argue Plaintiffs fail to state a plausible claim for relief, however, because Plaintiffs do not to levy independent allegations against some of the Centurion Nurses (Nielson, Adkins, Richardson, Mason, Moody, Roth, Roberts, Smith, Hawkins, Renelus, Cruz, and Jackson); Plaintiffs allege no facts to satisfy the subjective component of a

10

deliberate indifference claim against the other Defendants; Plaintiffs do not sufficiently allege Centurion maintained policies or practices that caused Mr. Dettmann's injuries; and the allegations as to individual Defendants do not establish a causal connection between Defendants' actions and Mr. Dettmann's injuries. Id. at 17-18. The individual Centurion Defendants also invoke qualified immunity. Id. at 18.

The individual Centurion Defendants—the Centurion Doctors, Nurses, and Administrators—were not employed by the FDOC at the relevant times. Id. at 3. They were Centurion employees under contract to provide medical care for FDOC inmates. Id. Accordingly, they may not invoke qualified immunity. See, e.g., Richardson v. McKnight, 521 U.S. 399, 412 (1997) (holding private prison guards "do not enjoy qualified immunity from suit in a § 1983 case"). See also Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) ("[A] privately employed prison physician[] is ineligible to advance the defense of qualified immunity.").

Accepting Plaintiffs' allegations as true, after Mr. Dettmann was released from the hospital to RMC, he developed a life-threatening infection that medical providers should have detected but did not. Additionally, Mr. Dettmann suffered in pain and humiliating circumstances for days, and his condition steadily and obviously worsened until he died. Such allegations could

11

be described as consistent with negligence, but they also could constitute deliberate indifference.

The problem with Plaintiffs' amended complaint, however, is that they still do not explain what each of the Centurion Nurses did or did not do, with two exceptions discussed below. With respect to the following fourteen Centurion Nurses, Plaintiffs' allegations are vague and fall closer to describing conduct that constitutes negligence rather than deliberate indifference: Quintino (count six); C.S./Smith (counts eight and fourteen); L.C./Cruz (count nine); Nielson (count ten); L. Roberts (count twelve); Renelus/LPN A.R. (counts thirteen and twenty); McCarter (count fifteen); Adkins (count seventeen); Jackson (count nineteen); Richardson (count twenty-one); Mason (count twenty-two); Moody (count twenty-four); Roth (count twenty-six); and Harvey (count twenty-seven).[5]

---

[5] Defendants clarify in their motion that Plaintiffs mis-identify the following nurses: Nurse Smith, who is referenced as both "C.S." and "C. Smith" in the complaint; Nurse Cruz, who is referenced as "L.C." in the complaint; and Nurse Renelus, who is referenced as "LPN A.R." in the complaint. See Centurion Motion at 2 n.1. The last name "Renelus" does not appear in the complaint, though it could be the name Plaintiffs have hand-written in the caption, the list of parties, and in counts thirteen and thirty-seven. If that is the case, Plaintiff have lodged two separate deliberate indifference counts against this one Defendant, who is identified by illegible handwriting in count thirteen and as "LPN A.R." in count twenty. See Am. Compl. ¶¶ 98, 119. Another Defendant, Nurse Smith, who is referenced as both "C.S." and "C. Smith" in the complaint, also has duplicative counts asserted against him or

As to these Defendants, Plaintiffs allege the following:

> Each of these Nursing Defendants encountered and attended to [Mr. Dettmann] in the RMC [one or more times] between January 17 and January 23, 2018 during the time Mr. Dettmann was exhibiting the clear and obvious symptoms of his serious medical illness. As such, each of these Nursing Defendants saw [Mr. Dettmann's] symptoms, and recognized that he was in dire need of medical care. Despite these encounters, however, none of these Nursing Defendants took steps or intervened to secure appropriate medical treatment for [Mr. Dettmann], including securing the simple testing for and treatment of C. diff.

See, e.g., Am. Compl. ¶¶ 14, 83. As to Defendant Quintino, Plaintiffs further allege, "Mr. Dettmann complained directly to nurse Quintino on January 17 that he was feeling nauseous and vomiting." Id. ¶ 77. And Plaintiffs allege Nurse McCarter, "[i]n addition to her encounters [with Mr. Dettmann]," learned from unidentified "staff" that Mr. Dettmann became incontinent but did nothing in response. Id. ¶¶ 37, 104. Plaintiffs do not say when Nurse McCarter received such information, nor do Plaintiffs allege Nurse McCarter personally evaluated or treated Mr. Dettmann.

Plaintiffs' bare allegations that these fourteen Nursing Defendants "encountered" Mr. Dettmann "one or more times" do not sufficiently

---

her. Overall, Plaintiffs identify eighteen Centurion Nurses in their complaint, though it appears there are only sixteen.

13

demonstrate they had knowledge of Mr. Dettmann's serious medical need or, with such knowledge, were deliberately indifferent to Mr. Dettmann's condition. Other than as to Nurse Quintino, Plaintiffs do not explain the nature of the "encounters" these Nursing Defendants had with Mr. Dettmann. Some of them may have only made an entry in Mr. Dettmann's medical record, administered a medication, checked his temperature or vital signs, or changed a bed pan. Or, they could have merely been present in the infirmary attending to other patients.

Importantly, to the extent these Nursing Defendants did in fact "encounter" Mr. Dettmann and could have observed his medical condition, they did so when Mr. Dettmann was in the infirmary and under the care of RMC doctors. As such, simply alleging they "encountered" Mr. Dettmann does nothing to explain whether or how they each knew he needed better or more care. And Plaintiffs do not allege these Nursing Defendants, even if they were concerned about the level of care Mr. Dettmann was receiving, had the ability to do anything about it other than to report Mr. Dettmann's symptoms to the doctors, which Plaintiffs allege some nurses did: "The Nursing Defendants notified Dr. Gonzalez . . . of [Mr. Dettmann's] concerns and request [to be sent to the hospital]." Id. ¶ 31.

Any failure by these Nursing Defendants to properly communicate Mr.

Dettmann's condition to the doctors, which perhaps can be inferred from Plaintiffs' allegations, suggests negligence. Additionally, assuming these Nursing Defendants were privy to Mr. Dettmann's medical chart and should have known or suspected the care he was receiving was inadequate, such a failure amounts to negligence, not deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 838 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). It also is not enough for Plaintiffs to allege facts showing that some Centurion Defendants knew Mr. Dettmann had a serious medical need because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." See Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).

Moreover, as Defendants point out, Plaintiffs do not mention these Nursing Defendants at all in their general factual allegations, save for one reference to Nurse Quintino and one reference to Nurse McCarter. These single references do not permit the reasonable inference Nurses Quintino or McCarter were deliberately indifferent to Mr. Dettmann's condition. As to Nurse Quintino, Plaintiffs allege Mr. Dettmann reported to Quintino that he was nauseous on January 17, 2018, which Plaintiffs allege is the day Mr.

Dettmann's condition began to deteriorate. Mr. Dettmann also voiced his symptoms to Dr. Gonzalez that same day and, in response, Dr. Gonzalez ordered Zofran. Id. ¶ 26. Plaintiffs do not mention Nurse Quintino having "encountered" Mr. Dettmann again. Accordingly, a fair reading of Plaintiffs' allegations is that Nurse Quintino knew Mr. Dettmann was nauseous on one day, January 17, which prompted the doctor to take some action to address those complaints. While the Zofran Dr. Gonzalez ordered ultimately proved ineffective and Mr. Dettmann's symptoms persisted and worsened, Plaintiffs do not allege Nurse Quintino had knowledge of such.

As to Nurse McCarter, aside from a vague allegation that she "encountered" Mr. Dettmann, Plaintiffs allege, "Staff reported [Mr. Dettmann's] incontinence to Nurse McCarter, who did nothing in response." Id. ¶ 37. As with the other Nursing Defendants, Plaintiffs do not allege the nature of the "encounters" Nurse McCarter had with Mr. Dettmann, nor do they allege Nurse McCarter was responsible for Mr. Dettmann's plan of care. Even if Nurse McCarter "did nothing" in response to learning Mr. Dettmann was incontinent, these allegations, standing alone, do not permit the reasonable inference that Nurse McCarter knew doctors in charge of Mr. Dettmann's care were not adequately handling the situation.

As to the remaining Centurion Defendants, Plaintiffs' allegations are

16

more developed. Plaintiffs allege the Centurion Doctors, Nurses Morton and Mahoney, and the Centurion Administrators either personally evaluated Mr. Dettmann or learned of Mr. Dettmann's severe, deteriorating condition and, therefore, knew of his surgical history and medications, his symptoms, and that the plan of treatment was proving ineffective. Plaintiffs allege the following facts that permit the reasonable inference the Centurion Doctors, Nurses Morton and Mahoney, and the Centurion Administrators knew of Mr. Dettmann's serious condition: Mr. Dettmann recently had surgery and was taking antibiotics; he became unable to eat, drink, walk, or control his bowels; his white blood cell count became elevated, as did his temperature and blood pressure; his lymphocyte counts were low; medications prescribed to address his symptoms did not prove effective; he reported abdominal pain; he begged to be sent to the hospital; his sister contacted multiple Centurion and FDOC employees about his condition; and he lost nearly twenty-eight pounds between January 12, 2018, and January 23, 2018.

Additionally, Plaintiffs allege that in response to the knowledge of Mr. Dettmann's serious medical condition, the Centurion Doctors, Nurses Morton and Mahoney, or the Centurion Administrators did the following: prescribed and administered medications to address isolated symptoms instead of attempting to diagnose the problem; continued medications that proved

17

ineffective; delayed necessary consultations and referrals; ignored Mr. Dettmann's and his sister's pleas for help; failed to ensure Mr. Dettmann was receiving proper care; ordered Mr. Dettmann to be placed on a liquid diet despite the fact Mr. Dettmann could not keep anything down; told Mr. Dettmann to follow up with his "primary care provider";[6] ordered or permitted Mr. Dettmann to be returned to the general population despite his obvious worsening condition, including an inability to eat or drink, hold his bowels, or walk; and, on the day Mr. Dettmann died, referred him to mental health instead of immediately notifying a physician even though Mr. Dettmann said he thought he was about to die and a physical evaluation appeared consistent with the symptoms he reported. Accepted as true, these allegations nudge the claim closer to deliberate indifference, as a failure to provide constitutionally adequate care, rather than medical malpractice, as a negligent failure to diagnose or treat a condition.

The facts Plaintiffs allege against the Centurion Doctors, Nurses Morton and Mahoney, and the Centurion Administrators are very similar to those the Eleventh Circuit held in <u>McElligott</u> demonstrated a genuine issue of material fact whether the defendants acted with deliberate indifference. <u>See</u> 182 F.3d at 1257-58. In <u>McElligott</u>, the appellate court reversed the district court's entry

---

[6] It is unclear who Mr. Dettmann's "primary care provider" was.

of summary judgment in favor of two medical providers who knew the plaintiff's medical condition was worsening but "still did nothing to treat [his] deteriorating state" or diagnose the plaintiff's condition other than to prescribe medications that were ineffective. Id. at 1287, 1259.  See also Estrada v. Stewart, 703 F. App'x 755, 760 (11th Cir. 2017) (holding the plaintiff-prisoner stated a plausible Eighth Amendment claim against medical providers and a prison administrator who knew the extent of the plaintiff's pain, "knew that the course of treatment was largely ineffective," yet took no action to improve the plaintiff's condition).

Plaintiffs allege facts that, if true, permit the reasonable inference the Centurion Doctors, Nurses Morton and Mahoney, and the Centurion Administrators, who either directly evaluated or spoke with Mr. Dettmann, monitored or recorded his condition as it deteriorated over days, or otherwise learned of the severity of his condition, ignored Mr. Dettmann's serious medical needs by conduct that amounted to more than mere negligence. While the facts ultimately may show that some of these Defendants' actions constitute negligence, such an inquiry is better addressed on summary judgment.

Plaintiffs also assert Centurion was deliberately indifferent to Mr. Dettmann's serious medical needs by "maintain[ing] policies and practices pursuant to which prisoners . . . with serious medical needs were routinely

19

denied medical care," which were the proximate cause of Mr. Dettmann's injuries. <u>See</u> Am. Compl. ¶¶ 57, 58. Centurion argues Plaintiff's allegations are merely conclusory, "devoid of any factual development." <u>See</u> Centurion Motion at 7-8. The Court cannot agree.

Plaintiffs go beyond reciting boilerplate language. They identify seven policies or practices Centurion maintained in treating inmates at FDOC institutions: ignoring obvious symptoms of serious medical conditions; refusing to order necessary diagnostic tests or creating a sensible treatment plan for patients; prioritizing profits over care; failing to ensure a continuity of care for patients; failing to ensure adequate staffing; refusing to provide proper treatment for difficult patients; and refusing to send patients to outside facilities. <u>See</u> Am. Compl. ¶ 59.

Accepting Plaintiffs' allegations as true, it appears something went horribly wrong with Mr. Dettmann's treatment. Given multiple doctors and medical staff evaluated him and failed to diagnose the C. diff infection, a reasonable inference to be drawn from the allegations is that a policy or practice of Centurion's played a role in the level of care Mr. Dettmann received. Contrary to Centurion's suggestion in its motion, Plaintiffs do not have to "establish" a policy or practice in their complaint. <u>See</u> Centurion Motion at 8. They merely must allege facts that permit the reasonable inference Centurion

20

was the moving force behind a constitutional violation. This, they have done.

See Hoefling v. City of Miami, 811 F.3d 1271, 1281 (11th Cir. 2016) (holding

the plaintiff alleged enough facts to "permit 'the reasonable inference that [the

municipality] [was] liable for the misconduct alleged'" (quoting Iqbal, 556 U.S.

at 678)).

Accordingly, count one against Centurion survives dismissal, as do the

following counts against individual Centurion Defendants: count two (Dr.

Sharma); count three (Dr. Gonzalez); count four (Dr. Rodriguez); count five (Dr.

Pedroza); count twenty-three (Nurse Morton); count twenty-five (Nurse

Mahoney); count twenty-eight (Priscilla Roberts); and county twenty-nine

(Tamara Taylor). The deliberate indifference counts against the other fourteen

individual Centurion Nurses are due to be dismissed.

### ii. Intentional Infliction of Emotional Distress

In count thirty-seven, Plaintiffs allege the individual Centurion

Defendants' conduct was extreme and outrageous, "undertaken with intent or

knowledge that there was a high probability that the conduct would inflict

severe emotional distress and with reckless disregard of that probability." See

Am. Compl. ¶¶ 170, 172.[7] They further allege Defendants' conduct "was

---

[7] Plaintiffs assert this claim against the Centurion Doctors, Centurion
Nurses, and P. Roberts, along with other nurses whose motions are addressed

undertaken intentionally, with malice, and/or reckless indifference to Mr. Dettmann's rights," and caused Mr. Dettmann to suffer injuries and emotional distress before he died. Id. ¶¶ 173-74.

To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." Williams v. Worldwide Flight SVCS., Inc., 877 So. 2d 869, 870 (Fla. 3d DCA 2004). Florida has adopted the Restatement (Second) of Torts, which defines "extreme and outrageous conduct" as that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Merely unkind words or insults do not constitute "outrageous" conduct. See Restatement (Second) of Torts § 46 cmt. d (2020 update). However, when the actor is in a position of authority over the victim or has the power to affect the victim's interests, the conduct may be deemed outrageous. Id. cmt. e.

"Whether the conduct is outrageous enough to rise to the level required

---

later in this Order. Plaintiffs do not name the other Centurion administrator, T. Taylor, in this count.

by the tort is a question of law; but where significant facts are disputed, or where differing inferences could reasonably be derived from undisputed facts, the question of outrageousness is for the jury to decide." Jones v. Jenne, No. 07-60839-CIV, 2008 WL 11402008, at *7 (S.D. Fla. Mar. 31, 2008) (citing Vance v. S. Bell Tel., 983 F.2d 1573 (11th Cir. 1993)). See also Restatement (Second) of Torts § 46 cmt. h (2020 update).

At this juncture, Plaintiffs do enough to state a plausible claim for relief against the Centurion Doctors, Nurses Morton and Mahoney, and P. Roberts. Accepting Plaintiffs' allegations as true, these Defendants knew Mr. Dettmann was suffering so much that he begged to be sent to the hospital and told Nurse Morton he thought he was going to die, yet they did nothing to investigate or address the cause of Mr. Dettmann's condition. These Defendants also knew Mr. Dettmann's weight markedly decreased and he was unable to walk because he could no longer eat or drink, and he was forced to wear a diaper, which he wore while visiting with this sister. Additionally, Mr. Dettmann was at the mercy of prison officials to ensure he had appropriate medical care, and he expressed that he believed he was going to die while in their care.

Not only did Mr. Dettmann suffer physically and emotionally during the time he was in the care of RMC medical staff, his sister observed his suffering. She visited with Mr. Dettmann in a condition that was obviously distressing

to both Mr. Dettmann and herself, and she spoke with him over the phone days before he died, at which time he was crying and begging her for help. Mr. Dettmann's condition was so severe that Ms. McCrimmon contacted numerous FDOC and Centurion officials seeking help for her brother. At this stage of the proceedings, the Court cannot say these facts, if true, do not state a plausible claim for intentional infliction of emotional distress under Florida law. See, e.g., Liberty Mut. Ins. Co. v. Steadman, 968 So. 2d 592, 596 (Fla. Dist. Ct. App. 2007) (holding the plaintiff, an insured, stated an "outrage" claim against her insurance company for unjustifiably delaying approval of a lung transplant, finding significant the "unequal position of the parties" and the plaintiff's allegation that the insurance company was waiting for her to die so the "problem would go away"); Haberski v. Bufano, 728 F. App'x 903, 909 (11th Cir. 2018) (affirming the district court's denial of statutory immunity for a police officer who used "constitutionally unreasonable force" against a female suspect, continuing to grip her arm even after hearing it pop when it broke, causing the suspect to scream out in pain and beg to be released).

In sum, Plaintiffs state a plausible claim for intentional infliction of emotional distress against the following individual Centurion Defendants: the Centurion Doctors, Nurses Morton and Mahoney, and P. Roberts. The claim fails as to all other individual Centurion Defendants named in this count

24

because the Plaintiffs do not sufficiently explain what those Defendants did or how their conduct caused Mr. Dettmann to suffer emotional distress.

### iii. Supervisory Liability

Centurion cannot be held liable under § 1983 solely for the actions of its employees, as alleged in count thirty-eight. In their response, Plaintiffs acknowledge as much but note they assert the claim to preserve it given other circuit courts have criticized the approach taken by the Eleventh Circuit. See Pl. Resp. at 26 n.5. This Court is obliged to follow binding Eleventh Circuit precedent, which makes clear that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted), abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010). As such, Centurion cannot be held liable for its employees' alleged deliberate indifference to Mr. Dettmann's serious medical needs.

Plaintiffs also seek to hold Centurion liable for the actions or omissions of its employees under state law. See Am. Compl. ¶ 177; Pl. Resp. at 26-27. Under Florida's sovereign immunity statute, the state and its agencies or subdivisions may be liable for an intentional act of an employee unless the employee "acted in bad faith or with malicious purpose or in a manner

25

exhibiting wanton and willful disregard of human rights, safety, or property," in which case the individual employee may be held liable. Fla. Stat. § 768.29(9)(a). When an employee of the state or any of its subdivisions causes an injury during the scope of that person's employment, the injured plaintiff's "exclusive remedy" is "by action against the governmental entity" absent allegations of bad faith or malicious purpose. Id.

In count thirty-eight against Centurion, Plaintiffs allege the individual Centurion Defendants were acting "within the scope of their employment." See Am. Compl. ¶ 176. Plaintiffs do not allege the individual Centurion Defendants acted with bad faith or malicious purpose. See Am. Compl. ¶ 175-177. However, the only state law claim Plaintiffs allege against the individual Centurion Defendants is one for intentional infliction of emotional distress, which carries an element of "intent." Indeed, Plaintiffs allege the individual Centurion Defendants' actions "were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Dettmann's rights."[8] Id. ¶ 173.

As Plaintiffs acknowledge in their response, if they succeed on their state law claim for intentional infliction of emotional distress against the individual Centurion Defendants (count thirty-seven), Centurion cannot be held

---

[8] In light of these allegations, the individual Centurion Defendants against whom Plaintiffs state a plausible claim for intentional infliction of emotional distress are subject to suit under Florida's sovereign immunity law.

vicariously liable for their conduct under Florida's sovereign immunity statute. See Pl. Resp. at 31-32. Even though the Federal Rules permit parties to plead alternative, inconsistent claims, Plaintiffs do not assert an alternative theory of liability under state law against the individual Centurion Defendants. For instance, Plaintiffs do not allege a state law negligence claim against the individual Centurion Defendants. See generally Am. Compl.   Accordingly, Plaintiffs' respondeat superior count (thirty-eight) is due to be dismissed in its entirety.

### iv. Wrongful Death

Plaintiffs also assert a claim for wrongful death against Centurion (count thirty-nine). Id. ¶¶ 179-83. Plaintiffs allege Centurion failed to provide adequate medical care for Mr. Dettmann, which proximately caused Mr. Dettmann's death. Id. ¶¶ 180, 182. Centurion moves to dismiss this count on the ground that Plaintiffs did not comply with the presuit notice requirements under Florida Statutes. See Centurion Motion at 11. Specifically, Centurion explains, Plaintiffs served their presuit notice contemporaneously with their complaint, instead of waiting the requisite ninety-day period before commencing the action. Id. at 12.

Plaintiffs concede to this sequence of events. See Pl. Resp. at 28. However, they argue the presuit notice defect has been cured because more

than ninety days have passed since they filed their original complaint, and they provided notice of their intent to sue before the statute of limitations ran. Id. (citing Groover v. Polk Cty. Bd. of Cty. Commissioners, 460 F. Supp. 3d 1242, 1257 (M.D. Fla. 2020)).

Plaintiffs served a notice of suit on January 16, 2020 (Doc. 63-1), the day they filed their original complaint (Doc. 1). Plaintiffs did not wait ninety days after serving the notice of suit before filing the complaint. Thus, their complaint was subject to dismissal with leave to amend. However, that ninety-day-period has now passed, meaning the defect has been cured. See Groover, 460 F. Supp. 3d at 1257. See also Hosp. Corp. of Am. v. Lindberg, 571 So. 2d 446, 449 (Fla. 1990) (holding that filing a presuit notice at the same time as the complaint is not fatal if the notice is filed within the limitations period). For these reasons, count thirty-nine is not subject to dismissal at this stage.

Centurion also contends sovereign immunity bars the wrongful death claim against it. See Centurion Motion at 13-14. This contention is incorrect. Plaintiffs do not allege in this count that the individual Centurion Defendants engaged in bad faith or with malice. Accordingly, Centurion can be held to account for their negligent conduct under Florida's sovereign immunity statute, as discussed previously in this Order. To the extent allegations of negligence are inconsistent with allegations of intentional conduct,

inconsistent claims may proceed. <u>See</u> Fed. R. Civ. P. 8(d)(3).

### B. Remaining Motions

In separate motions, Defendant Cooper (Doc. 64; Cooper Motion) and Defendants Brown, Purvis, and Swanson (Doc. 68; Brown Motion) move to dismiss the counts lodged against them—deliberate indifference (counts seven, eleven, sixteen, and eighteen) and intentional infliction of emotional distress (count thirty-seven)—for Plaintiffs' failure to state a plausible claim. In addition, Defendant Cooper invokes qualified immunity, <u>see</u> Cooper Motion at 8,[9] and Defendants Brown, Purvis, and Swanson argue the state-law claim is barred by Florida's sovereign immunity statute, and Plaintiff did not comply with presuit notice requirements, <u>see</u> Brown Motion at 7, 8.

As with the Centurion Nurses, Plaintiffs allege Defendants Cooper, Brown, Purvis, and Swanson "encountered and attended to [Mr. Dettmann] in

---

[9] These Defendants were nurses as well. Defendant Cooper clarifies in her motion that she was a nurse employed by CMS Professional Staffing and assigned to RMC. <u>See</u> Cooper Motion at 2. Because Defendant Cooper was employed by a private company not the FDOC, she may not invoke qualified immunity. <u>See</u> <u>Hinson</u>, 205 F.3d at 1265. It is unclear whether Defendants Brown, Purvis, and Swanson were employed by Centurion. Plaintiffs allege they were, <u>see</u> Am. Compl. ¶ 14, and they do not dispute those allegations in their motion. <u>See</u> Brown Motion at 7. However, in Centurion's motion, counsel states, "Defendants L. Swanson, L. Brown, B. Purvis, and S. Cooper . . . are not Centurion Providers." <u>See</u> Centurion Motion at 3. Regardless, because Defendants Brown, Purvis, and Swanson do not invoke qualified immunity, their employer is not material.

the RMC between January 17 and January 23, 2018," observed Mr. Dettmann's condition and symptoms, yet took no steps "to secure appropriate medical treatment for [him]." <u>See</u> Am. Compl. ¶ 14. Plaintiffs do not explain the nature of the encounters these Defendants had with Mr. Dettmann, nor do Plaintiffs mention these Defendants in the general factual allegations.

For the same reasons articulated previously regarding the fourteen Centurion Nurses, the Court finds Plaintiffs fail to state a plausible deliberate indifference claim against Defendants Cooper, Brown, Purvis, and Swanson. Similarly, Plaintiffs fail to allege facts that demonstrate Defendants' conduct was "outrageous." Indeed, Plaintiffs do not describe what actions the individual Defendants took other than to have "encountered" Mr. Dettmann while he was in the infirmary at RMC. As such, the state-law claim fails as well.[10]

Accordingly, it is now

**ORDERED:**

1.     The Centurion Defendants' Motion to Dismiss (Doc. 63) is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** to the extent count thirty-eight (Respondeat Superior) against Centurion is **dismissed**, and the following Centurion Nurses are **dismissed** for Plaintiffs'

---

[10] Given the Court finds Plaintiffs fail to state a plausible claim for relief against Defendants Brown, Purvis, and Swanson, their remaining arguments are moot.

failure to state a plausible claim for relief against them for deliberate indifference or intentional infliction of emotional distress: Quintino; C.S./Smith; L.C./Cruz; Nielson; L. Roberts; Renelus/LPN A.R.; McCarter; Adkins; Jackson; Richardson; Mason; Moody; Roth; and Harvey. The motion is **DENIED** to the extent the following claims proceed: deliberate indifference against Centurion, the Centurion Doctors (Sharma, Gonzalez, Rodriguez, and Pedroza), Nurses Morton and Mahoney, and the Centurion Administrators (P. Roberts and T. Taylor); intentional infliction of emotional distress against the Centurion Doctors (Sharma, Gonzalez, Rodriguez, and Pedroza), Nurses Morton and Mahoney, and P. Roberts; and wrongful death against Centurion.

2.     Defendant Cooper's Motion to Dismiss (Doc. 64) is **GRANTED**. Defendant Cooper is **dismissed** from this action.

3.     Defendants Brown, Purvis, and Swanson's Motion to Dismiss (Doc. 68) is **GRANTED**. Defendants Brown, Purvis, and Swanson are **dismissed** from this action.

4.     Defendants Centurion, Sharma, Gonzalez, Rodriguez, Pedroza, Morton, Mahoney, P. Roberts, and Taylor must answer the amended complaint within **twenty days** of the date of this Order.

5.     By **March 8, 2021**, Plaintiffs must notify the Court whether they intend to proceed against Defendant Radford, either by filing a notice of

voluntary dismissal or a motion for entry of Clerk's default.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of February 2021.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record

32