## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

SARAH MCCRIMMON and CARON )
DETTMANN, as Co-Administrators of the Estate )
of Curtis Dettmann, )
)
          Plaintiffs, )
)
          v. )      Case No. 3:20-cv-00036-BJD-JRK
)
CENTURION OF FLORIDA, LLC; RAKESH )
SHARMA; MARINETTE GONZALEZ; DAVID )      JURY TRIAL DEMANDED
RODRIGUEZ; GERARDO PEDROZA; ALEX )
RENELUS; KAYLA MCCARTER; SHARON )
COOPER; TANESHA ADKINS; ELIZABETH )
MORTON; CLARISSA MOODY; TABITHA )
MAHONEY; PRISCILLA ROBERTS; TAMARA )
TAYLOR; ROBERT E. SMITH, JR.; JULIE )
JONES; ERICH HUMMEL; THOMAS )
REIMERS; TIMOTHY WHALEN; DAVID )
ALLEN; and MAURICE RADFORD; )
)
          Defendants. )

## [PROPOSED] SECOND AMENDED COMPLAINT

Now come Plaintiffs, Sarah McCrimmon and Caron Dettmann, as Co-Administrators of

the Estate of Curtis Dettmann, by and through their attorneys, Loevy & Loevy and Sheppard,

White, Kachergus & DeMaggio, P.A., and hereby complain of Defendants Centurion of Florida,

LLC, Rakesh Sharma, Marinette Gonzalez, David Rodriguez, Gerardo Pedroza, Alex Renelus,

Kayla McCarter, Sharon Cooper, Tanesha Adkins, Elizabeth Morton, Clarissa Moody, Tabitha

Mahoney, Priscilla Roberts, Tamara Taylor, Robert E. Smith, Jr., Julie Jones, Erich Hummel,

Thomas Reimers, Timothy Whalen, David Allen, and Maurice Radford, stating as follows:

## INTRODUCTION

1.      On January 23, 2018, Curtis Dettmann died from pseudomembranous colitis as a result of Clostridium difficile (C. diff) infection. Curtis's death was entirely preventable, had Defendants provided even the most minimally adequate care.

2.      In the days before his death, Curtis was a prisoner at the Reception and Medical Center, and Defendants were responsible for his medical care. Rather than fulfill their responsibilities, however, Defendants instead watched as Curtis's health deteriorated in the infirmary under their watch. Over the course of a few days, Curtis constantly vomited, became unable to eat, lost control of his bowels, lost nearly 30 pounds, and became so weak that he could not ambulate without the use of a wheelchair. Rather than provide any diagnostic testing or treatment, though, he was discharged to the general population of the prison, where he was found dead a few hours later.

3.      Curtis's death was no isolated incident. To the contrary, medical staff at RMC and other FDC facilities, where Centurion of Florida, LLC have contracted to provide medical care, routinely ignore the serious medical needs of patients, prioritizing profits over care.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

5.      Venue is proper under 28 U.S.C. §1391(b). A substantial portion of the events giving rise to the claims asserted herein occurred within this district, and on information and belief, one or more Defendants reside in this judicial district.

## PARTIES

6.      Curtis Dettmann is the decedent in this case. At all times relevant to the events at issue in this case, he was in the custody of the Florida Department of Corrections (FDC) and was

housed at the Reception and Medical Center (RMC) in Lake Butler, Florida. Curtis is survived by his parents, Caron and William Dettmann, and his sister, Sarah McCrimmon.

7.     Plaintiff Sarah McCrimmon is the duly appointed Co-Administrator of the Estate of Curtis Dettmann. Ms. McCrimmon is Curtis's sister.

8.     Plaintiff Caron Dettmann is the duly appointed Co-Administrator of the Estate of Curtis Dettmann. Ms. Dettmann is Curtis's mother.

9.     Defendant Centurion of Florida, LLC is a corporation headquartered in St. Louis, Missouri doing business in Florida. Centurion of Florida, LLC pursuant to a contract with the State of Florida, is responsible for providing medical care to prisoners in FDC custody. At all times relevant to the events at issue in this case, Centurion of Florida, LLC was responsible for the implementation, oversight, and supervision of policies and practices at RMC and the FDC generally. At all times relevant to the events at issue in this case, Centurion of Florida, LLC was acting under color of law by and through its agents, including the individual defendants herein identified as working for Centurion of Florida, LLC and, on information and belief, other unknown employees.

10.     At all times relevant to his involvement in this case, Defendant Dr. Rakesh Sharma was the Medical Director at RMC, and was responsible for the implementation, oversight, and supervision of policies and practices at RMC. Defendant Rakesh is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Rakesh was acting under color of law and within the scope of his employment with Centurion of Florida, LLC.

11.     At all times relevant to her involvement in this case, Defendant Priscilla Roberts was the Health Services Administrator at RMC, and was responsible for the implementation,

oversight, and supervision of policies and practices at RMC. Defendant Priscilla Roberts is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Priscilla Roberts was acting under color of law and within the scope of her employment with Centurion of Florida, LLC.

12.     At all times relevant to their involvement in this case, Defendant Tamara Taylor was a Regional Director for Centurion of Florida, LLC. Defendant Taylor is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Taylor was acting under color of law and within the scope of her employment with Centurion of Florida, LLC.

13.     At all times relevant to their involvement in this case, Defendants Dr. Marinette Gonzalez, Dr. David Rodriguez, and Dr. Gerardo Pedroza were physicians employed by Centurion of Florida, LLC to work at RMC, including the infirmary. Defendants Gonzalez, Rodriguez, and Pedroza are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Gonzalez, Rodriguez, and Pedroza were acting under color of law and within the scope of their employment with Centurion of Florida, LLC.

14.     At all times relevant to their involvement in this case, Defendants Alex Renelus, Kayla McCarter, Sharon Cooper, Tanesha Adkins, Elizabeth Morton, Clarissa Moody, and Tabitha Mahoney were nurses assigned to work at RMC, including the infirmary.  Each of these Defendants encountered and attended to Curtis in the RMC between January 17 and January 23, 2018 during the time that he was exhibiting the clear and obvious symptoms of his serious medical illness. The Defendants are each sued here in their individual capacities.  At all times relevant to the events at issue in this case, Defendants Renelus, McCarter, Adkins, Morton, Mahoney, and Moody were acting under color of law and within the scope of their employment

4

with Centurion of Florida, LLC. Defendant Cooper was acting under color of law and within the scope of her employment as a nurse by CMS Professional Staffing and assigned to RMC.

15.     At all times relevant to her involvement in this case, Defendant Julie Jones was the Secretary of the Florida Department of Corrections. Defendant Jones is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Jones was acting under color of law and within the scope of her employment with the FDC.

16.     At all times relevant to his involvement in this case, Defendant Robert E. Smith, Jr. was the Warden at RMC. Defendant Robert Smith is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Robert Smith was acting under color of law and within the scope of his employment with the FDC.

17.     At all times relevant to his involvement in this case, Defendant Erich Hummel was the Regional Director for the FDC for Region 2, which includes RMC. Defendant Hummel is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Hummel was acting under color of law and within the scope of his employment with the FDC.

18.     At all times relevant to their involvement in this case, Defendants Thomas Reimers and Timothy Whalen worked for the FDC in the Office of Health Services as Health Services Director and Clinical Advisor, respectively. Defendants Reimers and Whalen are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Reimers and Whalen were acting under color of law and within the scope of their employment with the FDC.

19.     At all times relevant to their involvement in this case, Defendants David Allen and Maurice Radford worked for the FDC's Office of the Inspector General. Defendants Allen

and Radford are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Allen and Radford were acting under color of law and within the scope of their employment with the FDC.

## ALLEGATIONS

20.     Curtis Dettmann was 31 years old at the time of death. He was expecting to be released in the early months of 2020, and was planning to return to live with his sister, Sarah McCrimmon, or other family in the area. While in custody, he had worked hard toward earning his GED so that he could obtain a commercial driver's license and begin a career driving trucks.

21.     While in the custody of the Florida Department of Corrections, Curtis was housed at the Reception and Medical Center (RMC), a prison intended in part to provide care for prisoners with serious medical needs.

22.     Curtis was such a prisoner. He had a history of hidradenitis, a chronic skin condition that causes small, painful lumps to form beneath the skin. In the fall of 2017, Curtis suffered an outbreak of hidradenitis near his anus.

23.     On January 10, 2018, Curtis underwent surgery to address his hidradenitis.  Dr. Osvaldo Contarini surgically removed perianal hidradenitis from Curtis's buttocks at Memorial Hospital Jacksonville.

24.     On January 12, 2018, Memorial Hospital Jacksonville discharged Curtis to RMC in stable condition with instructions not to lift, sit, or do any strenuous activities for two weeks. As part of Curtis's surgical discharge, he was prescribed Augmentin (generically known as amoxicillin/clavulanate), an antibiotic prescription drug, to be administered twice daily for 5 days. He was also prescribed a stool softener once a day for two weeks, and multiple pain medications to be used as needed over the next several days to address the pain from his surgery.

25.     Curtis arrived back at RMC on January 12, 2018. At the time of his arrival, Curtis weighed 134 pounds. RMC staff gave Curtis his antibiotic medication as prescribed, and for the first few days after his surgery, Curtis's recovery was more or less normal.

26.     On the morning of January 17, however, Curtis's health began to deteriorate. He began to vomit and complained to Nurse Quintino and Dr. Gonzalez that he was feeling nauseous and was vomiting. Curtis's blood pressure and temperature were elevated, and a blood test showed that Curtis's white blood cell and monocyte counts were elevated and that his lymphocyte counts were low—all signs of an active infection. Dr. Gonzalez did not order a stool sample or other test to determine the source of Curtis's symptoms, however. Instead, Dr. Gonzalez ordered Zofran, an antiemetic, to be administered by IV.

27.     The Zofran did not relieve Curtis's nausea and vomiting, and by January 18, it was so severe that Curtis was unable to eat. Curtis's temperature remained elevated. Curtis began to report abdominal pain and diarrhea, and various nursing staff noted that Curtis began to appear weak. Curtis consistently reported these symptoms to Dr. Gonzalez.

28.     Curtis called his sister, Sarah McCrimmon, in the early evening hours of January 18, crying and begging her to help him. Curtis reported that infirmary staff had put him in a diaper because he was unable to control his bowels. During their conversation, Curtis defecated on himself.

29.     Curtis's symptoms were classic signs of a Clostridium difficile (C. diff) infection. C. diff is a bacterium that causes inflammation of the colon. C. diff infections are a common and well-known complication for post-surgical patients who, like Curtis, take a course of antibiotics, because the antibiotics can kill "good" bacteria in the gut that protect against infections, which allows the C. diff bacterium to flourish. C. diff infections are easily treated by particular classes

of antibiotics that target the C. diff bacterium. Left untreated, however, they can cause severe pseudomembranous colitis, which if not addressed, can quickly lead to death. C. diff is easily diagnosed with a stool test, which is frequently ordered by medical staff for any patient with diarrhea who is taking or has recently taken a course of antibiotics.

30.     Rather than take Curtis's symptoms seriously, however, Defendants disregarded his health. When Curtis told Dr. Gonzalez on January 18 that the Zofran did not relieve his nausea and vomiting, Dr. Gonzalez took no further action. On January 19, when Curtis told Dr. Gonzalez about the continued nausea and other symptoms that he was suffering, Dr. Gonzalez did not examine Curtis or perform any tests to determine the source of his weakness, nausea, inability to eat, or incontinence. Instead, he simply reissued the ineffective Zofran and prescribed Protonix, a proton-pump inhibitor used to treat gastroesophageal reflux disease that commonly causes *increased* nausea and abdominal pain. Dr. Gonzalez additionally ordered a short-term dose of Imodium and an over-the-counter probiotic supplement, neither of which would detect or address a C. diff infection at all.

31.     After being refused treatment by Defendants, Curtis became extremely worried about his health. He repeatedly begged medical staff to refer him to a hospital for proper evaluation and treatment. Dr. Gonzalez was notified of Curtis's concerns and request. But neither Dr. Gonzalez nor any of the other Defendants responded to Curtis's requests, and they further failed to take steps to perform the proper evaluations and treatment in the infirmary.

32.     On the night of January 19, Nurse Renelus was assigned to work in the infirmary with Curtis as one of the patients assigned to his caseload. On information and belief, Nurse Renelus was responsible for monitoring Curtis's health status, providing any prescribed

medication, and reporting any changes or concerns regarding Curtis's health status to one or more providers.

33.     At this point, Curtis's illness was so severe that it would have been obvious that he had a serious medical need.  Nevertheless, Nurse Renelus purported to assess that Curtis was forcing himself to vomit. This purported assessment was false.  It was beyond what assessments Nurse Renelus was permitted to make as a licensed practical nurse, and Nurse Renelus took no action to determine whether Curtis's vomiting was, in fact, a result of his severe nausea or instead due to a truly volitional act. Nurse Renelus noted his assessment that Curtis was forcing himself to vomit without documenting any of the observations that led him to this improper assessment.

34.     On the morning of January 20, Curtis saw Dr. Rodriguez. Curtis reported his symptoms and the fact that the medications he was prescribed did not relieve them. Dr. Rodriguez took no action to evaluate Curtis, perform any diagnostic tests, or to provide him proper treatment. Instead, he did nothing.

35.     Curtis's health continued to get worse. He continued to be unable to eat. A few hours after he saw Dr. Rodriguez, Curtis's nausea was so extreme that he could not even drink water without vomiting. Curtis continued to suffer from sharp abdominal pain, and he became so weak that he could no longer walk and had to use a wheelchair instead.

36.     Dr. Pedroza also evaluated Curtis on January 20. Curtis reported his symptoms to Dr. Pedroza, who additionally noted that Curtis was dehydrated. But like the other doctors, Dr. Pedroza took no action to properly evaluate Curtis, perform any diagnostic tests, or to provide him proper treatment. Instead, Dr. Pedroza simply ordered Curtis to begin a full liquid diet and follow up with his primary care provider. It is not clear that Curtis ever received the liquid meals.

37.     On January 21, Curtis's condition became even more severe. Curtis remained extremely nauseous, unable to consume anything other than ice chips. His abdominal pain continued, and he remained so weak that he could not ambulate without a wheelchair.

38.     At approximately 10:00 a.m. that day, Curtis saw his sister. Curtis remained in the wheelchair during their visit and was obviously weak. Curtis wore a diaper and spent a significant portion of the visit vomiting.

39.     On January 21, Nurse McCarter was assigned to work in the infirmary with Curtis as one of the patients assigned to her caseload. On information and belief, Nurse McCarter was responsible for monitoring Curtis's health status, providing any prescribed medication, and reporting any changes or concerns regarding Curtis's health status to one or more providers.

40.     Staff reported Curtis's incontinence to Nurse McCarter, who did nothing in response. Instead of appropriately documenting her observations, Nurse McCarter falsified medical records, including a record purporting to document that Curtis ate the entirety of his lunch and supper on January 21, and a record purporting to report that Curtis was not suffering any nausea, vomiting, bowel incontinence, or diarrhea.

41.     Nurse McCarter also made improper assessments. Like Nurse Renelus, Nurse McCarter purported to assess that Curtis was forcing himself to vomit. Nurse McCarter further purported to assess that Curtis was using a wheelchair unnecessarily and that he was defecating on himself voluntarily. Nurse McCarter's purported assessments were false.  They were beyond what she was permitted to do as a licensed practical nurse, and she took no action to determine whether Curtis's vomiting or bowel incontinence was, in fact, voluntary. Nurse McCarter noted her purported assessments about Curtis's purported voluntary vomiting and bowel incontinence in Curtis's medical records.

42.     On the night of January 21, Nurse Cooper was assigned to work in the infirmary with Curtis as one of the patients assigned to her caseload. On information and belief, Nurse Cooper was responsible for monitoring Curtis's health status, providing any prescribed medication, and reporting any changes or concerns regarding Curtis's health status to one or more providers.

43.     Nurse Cooper also falsified medical records on January 21, including a record falsely documenting that Curtis was not suffering any nausea, vomiting, bowel incontinence, diarrhea, or weakness, or required the use of a wheelchair.

44.     Curtis's incontinence continued, and he defecated on himself repeatedly throughout January 21 and 22.

45.     Dr. Rodriguez saw Curtis after his visit with his sister on January 21. Despite being aware of all of Curtis's symptoms, Dr. Rodriguez again took no action to evaluate Curtis, perform any diagnostic tests, or provide him proper treatment. Instead, Dr. Rodriguez did nothing.

46.     On January 22, Nurse Adkins was assigned to work in the infirmary with Curtis as one of the patients assigned to her caseload. On information and belief, Nurse Adkins was responsible for monitoring Curtis's health status, providing any prescribed medication, and reporting any changes or concerns regarding Curtis's health status to one or more providers. Nurse Adkins, a licensed practical nurse, falsely reported in Curtis's medical records that he was not suffering from any nausea, vomiting, bowel incontinence, or diarrhea.

47.     On the afternoon of January 22, Curtis saw Dr. Gonzalez again. By now, Curtis had lost nearly 20 pounds over the past 10 days, weighing just 115 pounds. Dr. Gonzalez noted Curtis's drastic weight loss but failed to take action to address it. Instead, despite knowing that

11

Curtis's obvious signs and symptoms of serious illness that had not resolved, Dr. Gonzalez discharged Curtis from the infirmary and ordered that he be returned to K dorm in general population at RMC.

48.     At approximately 6:00 p.m. on January 22, Nurse Clarissa Moody was tasked with evaluating Curtis for discharge from the infirmary. The form that Nurse Moody was tasked with completing expressly asked Nurse Moody to assess whether Curtis suffered from any apparent medical issues that precluded placement in housing outside of the infirmary. If she completed the form in the affirmative—that he did have such symptoms—the form expressly instructed her to provide an explanation and refer the inmate back to the clinic pending a final determination. Nurse Moody was thus expressly asked to determine whether Curtis appeared to have any medical issues that would render housing in general population inappropriate, notwithstanding his discharge. At the time of Nurse Moody's evaluation, Curtis's health status was so obviously inconsistent with housing in the general population that even a lay person would have known to complete the form in the affirmative. Nurse Moody, however, falsely completed the form in the negative, indicating that he had no such symptoms.

49.     At approximately 6:00 p.m. on January 22, 2018, Curtis was taken to K dorm via wheelchair, being still too weak to walk.

50.     Dr. Gonzalez notified Dr. Sharma, RMC's medical director, of Curtis's unresolved symptoms. Rather than take immediate action to procure immediate diagnostic testing and treatment, Dr. Sharma and Dr. Gonzalez decided to submit a non-emergent request for a consultation with a gastroenterologist to evaluate Curtis.

51.     A few hours after leaving the infirmary, at approximately 3:40 a.m. the next morning, Curtis reported to Nurse Morton that he was "on death's door," or words to that effect.

12

He described his symptoms to Nurse Morton, who documented Curtis's reports that he had recently taken antibiotics, had been vomiting and experiencing diarrhea for several days and had not eaten, and had severe abdominal pain throughout his abdomen. Nurse Morton noted that Curtis's abdomen appeared severely tender, and that his bowel sounds were hypoactive. She noted that at the time of her evaluation, Curtis weighed just 106 pounds (having lost a total of 28 pounds since he was admitted to the infirmary 11 days earlier). The protocol Nurse Morton used to guide her evaluation of Curtis directed her to immediately notify a clinician. But Nurse Morton instead did nothing but fill out a non-urgent/routine request form to mental health. Nurse Mahoney signed off on Nurse Morton's actions in the early morning hours of January 23, 2018.

52.     A few hours after Nurse Morton decided not to notify a physician about Curtis's health status, Curtis was found unresponsive during count time in his cell. Efforts to revive him failed, and Dr. Dure pronounced Curtis dead.

53.     The forensic pathologist who conducted Curtis's autopsy determined that Curtis died of pseudomembranous colitis. That colitis was caused by a C. diff infection.

54.     In the days prior to his death, Curtis's sister contacted several Defendants in an effort to save Curtis's life. On January 18, after Ms. McCrimmon spoke with Curtis on the phone, she contacted Defendants Radford and Allen, notifying them of Curtis's deteriorating condition and asking them to investigate. Defendant Radford acknowledged receipt of Ms. McCrimmon's email but did not address it.

55.     Ms. McCrimmon also contacted Centurion of Florida, LLC, notifying the corporation of Curtis's serious medical condition and her fear that Curtis would die if he did not receive proper medical attention. Ms. McCrimmon asked Centurion of Florida, LLC to provide Curtis with proper testing and care, and to investigate the response by their staff at RMC. Farrah

Hudson, a regional assistant at Centurion of Florida, LLC, acknowledged that Centurion of Florida, LLC had received Ms. McCrimmon's email and referred it to Defendant Priscilla Roberts, the Health Services Administrator at RMC, to investigate. Administrator Priscilla Roberts wrote to Ms. McCrimmon, promising to investigate Curtis's health status the following day.

56.     Ms. McCrimmon also notified Warden Robert Smith of Curtis's urgent health needs on January 18. Warden Robert Smith promised Ms. McCrimmon that he would investigate. On information and belief, however, Warden Robert Smith did not conduct any adequate investigation into Curtis's condition or treatment.

57.     On information and belief, none of the parties contacted by Ms. McCrimmon took any steps to adequately investigate Curtis's health condition, or to ensure that he was receiving proper testing, evaluation, and treatment.

58.     On or about January 20, during one of her visits to see Curtis, Ms. McCrimmon confronted Administrator Priscilla Roberts at RMC about Curtis's abhorrent treatment. Administrator Priscilla Roberts refused to take further action to ensure that Curtis received proper treatment, and instead had Ms. McCrimmon escorted out of RMC.

59.     Ms. McCrimmon contacted Defendant Hummel, as well as Defendants Reimers and Whalen in the Office of Health Services, to report her concerns about Curtis's health condition and lack of care and ask for help. On information and belief, however, though they could have done so none of these Defendants took appropriate action to intervene to ensure Curtis received constitutionally adequate medical care.

60.     Ms. McCrimmon also contacted Defendants Radford, Jones, and Robert Smith to report her concerns and request assistance for Curtis. In response, Warden Robert Smith again

promised Ms. McCrimmon to investigate Curtis's health status and treatment, but instructed Ms. McCrimmon to "refrain from your continued scrutiny" of Curtis's treatment by medical staff at RMC. On information and belief, though they could have done so Defendants Radford, Jones, and Robert Smith did not take meaningful steps to investigate Ms. McCrimmon's warnings and took no steps to ensure that Curtis received minimally adequate medical care.

61.     On January 22, Curtis told his sister that he was being discharged to general population, even though none of his symptoms had resolved. Ms. McCrimmon immediately contacted Defendant Whalen and begged him to intervene. She told him: "If my brother is discharged from the hospital he's going to die." Defendant Whalen took no steps to ensure that Curtis received adequate medical care.

62.     Ms. McCrimmon also contacted Defendant Taylor. Defendant Taylor promised to investigate and intervene to ensure Curtis was not discharged from the RMC infirmary. But on information and belief, Defendant Taylor took no action to ensure that Curtis received adequate medical care.

63.     Ms. McCrimmon also spoke with Dr. Sharma and begged him to take action to evaluate and treat Curtis. Dr. Sharma refused.

64.     In total, Ms. McCrimmon sent dozens of emails and made dozens of phone calls in an effort to obtain assistance for her brother in order to prevent his death. Yet each of these Defendants refused to take action to intervene on Curtis's behalf, leaving Curtis to die.

**COUNT 1**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**CENTURION OF FLORIDA, LLC**

65.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

66.     Curtis Dettmann's injuries were proximately caused by the policies and practices of Defendant Centurion of Florida, LLC.

67.     Prior to and during the events giving rise to Plaintiffs' Complaint, Centurion of Florida, LLC maintained policies and practices pursuant to which prisoners like Mr. Dettmann with serious medical needs were routinely denied medical care and access to medical care.

68.     Specifically, there exist policies and widespread practices at the FDC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which (1) healthcare staff commonly disregard reports by patients of objectively serious symptoms; (2) healthcare staff refuse to provide adequate treatment to patients that they perceive as difficult; (3) healthcare staff refuse to conduct or obtain diagnostic testing for patients; (4) healthcare staff fail to create a sensible treatment plan for patients whose health status require the creation of a treatment plan; (5) healthcare staff fail to ensure continuity of care among healthcare staff; (6) employees prioritize profits at the expense of constitutionally adequate care; (7) inadequate levels of health care staffing are maintained; and (8) healthcare staff fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

69.     These policies and practices were allowed to flourish because Centurion of Florida, LLC, which direct the provision of healthcare services at the RMC and within the FDC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Centurion of Florida, LLC violated Mr. Dettmann's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

70.     The above-described policies and practices were able to exist and thrive because Centurion of Florida, LLC was deliberately indifferent to the problem, thereby effectively ratifying it.

71.     Centurion of Florida, LLC also acted to violate Mr. Dettmann's constitutional rights through the actions and failures to act by individuals with final policymaking authority for Centurion of Florida, LLC.

72.     Mr. Dettmann's injuries were caused by persons, including but not limited to the defendants named individually in this complaint, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this complaint.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a)  Actual and compensatory damages,

    b)  Punitive damages,

    c)  An award of attorneys' fees and costs, and

    d)  Any other relief this court deems just and proper.

## COUNT 2
## 42 U.S.C. § 1983 – EIGHTH AMENDMENT
## RAKESH SHARMA

73.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

74.     Sharma was personally notified on multiple occasions of Mr. Dettmann's severe medical symptoms, and recognized that he was in dire need of appropriate medical care.  Despite being so aware, however, Sharma did not take steps to intervene or to secure appropriate medical care for Mr. Dettmann.

75.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a)  Actual and compensatory damages,

    b)  Punitive damages,

    c)  An award of attorneys' fees and costs, and

    d)  Any other relief this court deems just and proper.

**COUNT 3**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**MARINETTE GONZALEZ**

76.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

77.     Gonzalez saw Mr. Dettmann on multiple occasions during the time that he was exhibiting clear and obvious symptoms of his serious medical condition.  As such, Gonzalez recognized and was personally aware that Mr. Dettmann was in dire need of testing to diagnose his serious medical condition and provide treatment for it.  And, having seen Mr. Dettmann multiple times, Gonzalez was also personally aware that what treatment she had ordered was inadequate and was not addressing his symptoms.  Despite this knowledge, however, Gonzalez failed to order basic testing or adequate treatment, and did not otherwise take steps to intervene or secure appropriate medical treatment for Mr. Dettmann.

78.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a)  Actual and compensatory damages,

    b)  Punitive damages,

    c)  An award of attorneys' fees and costs, and

    d)  Any other relief this court deems just and proper.

**COUNT 4**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**DAVID RODRIGUEZ**

79.　　Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

80.　　Rodriguez saw Mr. Dettmann on multiple occasions during the time that he was exhibiting clear and obvious symptoms of his serious medical condition.  As such, Rodriguez recognized and was personally aware that Mr. Dettmann was in dire need of testing to diagnose his serious medical condition and provide treatment for it.  Despite this knowledge, however, Rodriguez failed to order basic testing or adequate treatment, and did not otherwise take steps to intervene or secure appropriate medical treatment for Mr. Dettmann.

81.　　As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a) Actual and compensatory damages,

    b) Punitive damages,

    c) An award of attorneys' fees and costs, and

    d) Any other relief this court deems just and proper.

**COUNT 5**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**GERARDO PEDROZA**

82.　　Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

83.　　Pedroza was asked by a nurse to evaluate Mr. Dettmann on or about January 20, long after he had been exhibiting severe symptoms of a C. diff infection and long after it was evident that testing was required.  As such, Pedroza recognized and was personally aware that Mr. Dettmann was in dire need of testing to diagnose his serious medical condition, and as well

as treatment for the condition.  Despite this knowledge, however, Pedroza failed to order basic testing or adequate treatment, and did not otherwise take steps to intervene and secure adequate treatment for Mr. Dettmann.

84.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 6**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**NURSE ALEX RENELUS**

85.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

86.     Nurse Alex Renelus encountered Mr. Dettmann in the infirmary at RMC on January 19, during which time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical illness. Renelus recognized that Mr. Dettmann was in dire need of medical care, and knew the risk to Mr. Dettmann's life if he did not receive adequate medical treatment. Rather than take action to secure appropriate medical care for Mr. Dettmann, however, Renelus purported to assess that Mr. Dettmann was forcing himself to vomit. Renelus knew that it was improper for him to make such an assessment and took no adequate measures to determine whether Mr. Dettmann's vomiting was truly a volitional act. He further knew that his inappropriate and incorrect documentation put Mr. Dettmann at risk of substantial harm. Despite

this knowledge, Renelus took no action to ensure that Mr. Dettmann's severe illness was adequately addressed.

87.     Renelus's actions and inactions were undertaken intentionally and with deliberate indifference to the substantial risk of harm faced by Mr. Dettmann.

88.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 7**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**KAYLA MCCARTER**

89.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

90.     McCarter encountered Mr. Dettmann in the infirmary at RMC on January 21, during which time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical illness.  In addition to her encounters, other staff reported Mr. Dettmann's incontinence to McCarter.  McCarter recognized that Mr. Dettmann was in dire need of medical care, and knew the risk to Mr. Dettmann's life if he did not receive adequate medical treatment. Rather than take action to secure appropriate medical care for Mr. Dettmann, however, McCarter falsified medical records, including a record purporting to document that Mr. Dettmann ate the entirety of his lunch and supper on January 21, and a record purporting to report that Mr. Dettmann was not suffering any nausea, vomiting, bowel incontinence, or diarrhea. Nurse

McCarter also made improper assessments. Like Nurse Renelus, Nurse McCarter purported to assess that Mr. Dettmann was forcing himself to vomit. Nurse McCarter further purported to assess that Mr. Dettmann was using a wheelchair unnecessarily and that he was defecating on himself voluntarily. McCarter knew that it was improper for her to falsify Mr. Dettmann's medical records or to make such assessments, which she made without any adequate measures to determine whether Mr. Dettmann's vomiting or defecation were truly volitional acts. She further knew that this false and inappropriate documentation put Mr. Dettmann at risk of substantial harm. Despite this knowledge, McCarter took no action to ensure that Mr. Dettmann's severe illness was adequately addressed.

91.    McCarter's actions and inactions were undertaken intentionally and with deliberate indifference to the substantial risk of harm faced by Mr. Dettmann.

92.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a)  Actual and compensatory damages,

    b)  Punitive damages,

    c)  An award of attorneys' fees and costs, and

    d)  Any other relief this court deems just and proper.

**COUNT 8**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**SHARON COOPER**

93.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

94.    Cooper encountered Mr. Dettmann in the infirmary at RMC on January 21, during which time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical

illness.  Cooper recognized that Mr. Dettmann was in dire need of medical care, and knew the risk to Mr. Dettmann's life if he did not receive adequate medical treatment. Rather than take action to secure appropriate medical care for Mr. Dettmann, however, Cooper falsified medical records, including a record purporting to document that Mr. Dettmann was not suffering any nausea, vomiting, bowel incontinence, diarrhea, or weakness, or required the use of a wheelchair. Cooper knew that this documentation was false, and further knew that this false documentation put Mr. Dettmann at risk of substantial harm. Despite this knowledge, Cooper took no action to ensure that Mr. Dettmann's severe illness was adequately addressed.

95.     Cooper's actions and inactions were undertaken intentionally and with deliberate indifference to the substantial risk of harm faced by Mr. Dettmann.

96.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 9**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**TANESHA ADKINS**

97.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

98.     Adkins encountered Mr. Dettmann in the infirmary at RMC on January 22, during which time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical illness.  Adkins recognized that Mr. Dettmann was in dire need of medical care, and knew the

risk to Mr. Dettmann's life if he did not receive adequate medical treatment. Rather than take action to secure appropriate medical care for Mr. Dettmann, however, Adkins falsified medical records, including a record purporting to document that Mr. Dettmann was not suffering any nausea, vomiting, bowel incontinence, or diarrhea. Adkins knew that this documentation was false, and further knew that this false documentation put Mr. Dettmann at risk of substantial harm. Despite this knowledge, Adkins took no action to ensure that Mr. Dettmann's severe illness was adequately addressed.

99.    Adkins's actions and inactions were undertaken intentionally and with deliberate indifference to the substantial risk of harm faced by Mr. Dettmann.As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 10**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**ELIZABETH MORTON**

100.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

101.    Morton encountered Mr. Dettmann in the RMC one or more times between January 17 and January 23, during the time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical illness.  Morton recognized that Mr. Dettmann was in dire need of medical care, including diagnosis of his severe symptoms.  Morton, among other things,

examined Mr. Dettmann on the morning off January 23, when he told her that he was on "death's door," and she recorded Mr. Dettmann's symptoms using a protocol that—given those symptoms—directed her to immediately notify a clinician, out of concern for C. diff in particular.  Nevertheless, Morton did not take steps to intervene or secure appropriate medical treatment for Mr. Dettmann, including securing the simple testing for and treatment of C. diff. Indeed, despite after her examination on the morning of January 23, she did nothing but fill out a non-urgent/routine request for mental health care, even as the information she recorded on the protocol alerted her that Mr. Dettmann was in dire need of emergency help.

102.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

### COUNT 11
### 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### CLARISSA MOODY

103.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

104.    Moody encountered Mr. Dettmann at RMC on January 22, during which time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical illness.  Moody recognized that Mr. Dettmann was in dire need of medical care, and knew the risk to Mr. Dettmann's life if he did not receive immediate medical treatment. Rather than take action to secure appropriate medical care for Mr. Dettmann, however, Moody discharged Mr. Dettmann

from the infirmary. The form Moody used to complete Mr. Dettmann's discharge expressly asked her to determine whether Mr. Dettmann had any apparent medical issues that made it inappropriate for him to be housed outside of the infirmary, and further advised that if the answer was in the affirmative, Mr. Dettmann should be returned to the infirmary pending a final determination. Moody knew that Mr. Dettmann's obviously emergent health status clearly made it inappropriate for him to be housed outside of the infirmary. Despite that knowledge, Moody completed the form by answering the question in the negative and processing Mr. Dettmann for placement outside the infirmary. Moody knew that her actions caused a substantial risk of harm to Mr. Dettmann's health. Despite this knowledge, Moody took no action to ensure that Mr. Dettmann's emergent health status was adequately addressed.Moody's actions and inactions were undertaken intentionally and with deliberate indifference to the substantial risk of harm faced by Mr. Dettmann.

105.   As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

## COUNT 12
## 42 U.S.C. § 1983 – EIGHTH AMENDMENT
## TABITHA MAHONEY

106.   Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

107.    Mahoney encountered Mr. Dettmann in the RMC one or more times between January 17 and January 23, during the time Mr. Dettmann was exhibiting clear and obvious symptoms of a severe medical illness.  Mahoney recognized that Mr. Dettmann was in dire need of medical care, including diagnosis of his severe symptoms.  Despite these encounters, however, Mahoney did not take steps to intervene or secure appropriate medical treatment for Mr. Dettmann, including securing the simple testing for and treatment of C. diff.  Indeed on January 23, Mahoney approved the protocol filled out by Nurse Morton, even though that very protocol identified Mr. Dettmann's condition as an emergency requiring critical medical intervention.

108.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a)  Actual and compensatory damages,

    b)  Punitive damages,

    c)  An award of attorneys' fees and costs, and

    d)  Any other relief this court deems just and proper.

**COUNT 13**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**PRISCILLA ROBERTS**

109.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

110.    Priscilla Roberts was personally notified on multiple occasions about Mr. Dettmann's dire medical condition and inadequate medical care, but despite the power to intervene she refused to take action to ensure that Mr. Dettmann was receiving appropriate medical care.

111.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a) Actual and compensatory damages,

    b) Punitive damages,

    c) An award of attorneys' fees and costs, and

    d) Any other relief this court deems just and proper.

**COUNT 14**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**TAMARA TAYLOR**

112.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

113.    Taylor was personally notified about Mr. Dettmann's dire medical condition and lack of adequate medical care, but despite the authority to intervene she refused to take action to ensure that Mr. Dettmann was receiving appropriate medical care.

114.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a) Actual and compensatory damages,

    b) Punitive damages,

    c) An award of attorneys' fees and costs, and

    d) Any other relief this court deems just and proper.

**COUNT 15**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**ROBERT E. SMITH, JR.**

115.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

28

116.     Smith was made personally aware of Mr. Dettmann's urgent health needs and lack of appropriate medical care on multiple, different occasions between January 17 and January 23, when Mr. Dettmann was suffering extreme symptoms from his C. diff infection. Despite this awareness and the power to intervene, Smith did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

117.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

  a)  Actual and compensatory damages,

  b)  Punitive damages,

  c)  An award of attorneys' fees and costs, and

  d)  Any other relief this court deems just and proper.

### COUNT 16
### 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### JULIE JONES

118.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

119.     Jones was made personally aware of Mr. Dettmann's urgent health needs and lack of appropriate medical care during the period that Mr. Dettmann was suffering extreme symptoms from his C. diff infection and was in dire need of medical help.  Despite this awareness and the power to intervene, Jones did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

120.     As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

   a)  Actual and compensatory damages,

   b)  Punitive damages,

   c)  An award of attorneys' fees and costs, and

   d)  Any other relief this court deems just and proper.

### COUNT 17
### 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### ERICH HUMMEL

121.   Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

122.   Hummel was made personally aware of Mr. Dettmann's urgent health needs and lack of appropriate medical care during the period that Mr. Dettmann was suffering extreme symptoms from his C. diff infection and was in dire need of medical help.  Despite this awareness and the power to intervene, Hummel did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

123.   As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

   a)  Actual and compensatory damages,

   b)  Punitive damages,

   c)  An award of attorneys' fees and costs, and

   d)  Any other relief this court deems just and proper.

### COUNT 18
### 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### THOMAS REIMERS

124.   Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

125.    Reimers was made personally aware of Mr. Dettmann's urgent health needs and lack of appropriate medical care during the period that Mr. Dettmann was suffering extreme symptoms from his C. diff infection and was in dire need of medical help.  Despite this awareness and the power to intervene, Reimers did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

126.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a)  Actual and compensatory damages,

    b)  Punitive damages,

    c)  An award of attorneys' fees and costs, and

    d)  Any other relief this court deems just and proper.

**COUNT 19**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**TIMOTHY WHALEN**

127.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

128.    Whalen was made personally aware on multiple occasions of Mr. Dettmann's urgent health needs and lack of appropriate medical care during the period that Mr. Dettmann was suffering extreme symptoms from his C. diff infection and was in dire need of medical help. Despite this awareness and the power to intervene, Whalen did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

129.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 20**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**DAVID ALLEN**

130.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

131.    Allen was made personally aware of Mr. Dettmann's urgent health needs and lack of appropriate medical care during the period that Mr. Dettmann was suffering extreme symptoms from his C. diff infection and was in dire need of medical help.  Despite this awareness and the power to intervene, Allen did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

132.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 21**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**MAURICE RADFORD**

133.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

134.    Radford was made personally aware on multiple occasions of Mr. Dettmann's urgent health needs and lack of appropriate medical care during the period that Mr. Dettmann was suffering extreme symptoms from his C. diff infection and was in dire need of medical help. Despite this awareness and the power to intervene, Radford did not an adequate investigation or otherwise intervene to secure adequate medical treatment for Mr. Dettmann.

135.    As a direct and proximate result of these acts and omissions, Mr. Dettmann suffered the pain and injuries described herein, including death.

WHEREFORE, Plaintiffs demand judgement against defendant for

a)    Actual and compensatory damages,

b)    Punitive damages,

c)    An award of attorneys' fees and costs, and

d)    Any other relief this court deems just and proper.

**COUNT 22**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**DEFENDANTS RAKESH SHARMA; PRISCILLA ROBERTS; MARINETTE GONZALEZ; DAVID RODRIGUEZ; GERARDO PEDROZA; KAYLA MCCARTER; ALEX RENELUS; SHARON COOPER; TANESHA ADKINS; ELIZABETH MORTON; CLARISSA MOODY; TABITHA MAHONEY**

136.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

137.    In the manner described more fully above, by denying Mr. Dettmann medical evaluation or treatment, or access to medical evaluation or treatment, the Defendants identified in this count engaged in extreme and outrageous conduct.

138.    Defendants' actions as set forth above were rooted in an abuse of power or authority.

33

139.     Defendants' actions as set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

140.     Defendants' actions, as set forth above, were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Dettmann's rights.

141.     As a direct and proximate result of Defendants' misconduct, Mr. Dettmann experienced suffering injuries, including severe emotional distress, before his death.

WHEREFORE, Plaintiffs demand judgement against defendant for

    a) Actual and compensatory damages,

    b) Punitive damages, and

    c) Any other relief this court deems just and proper.

### COUNT 23
### RESPONDEAT SUPERIOR
### CENTURION OF FLORIDA, LLC

142.     Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

143.     In committing the acts alleged in the preceding paragraphs, the above described the individual Defendants (with the exception of Robert Smith, Julie Jones, Erich Hummel, Thomas Reimers, Timothy Whalen, David Allen, and Maurice Radford) were employees, members, and agents of Centurion of Florida, LLC, acting at all relevant times within the scope of their employment.

144.     Consequently, Centurion of Florida, LLC is liable for the actions of its employees acting within the scope of their employment under state law.

145.     Centurion of Florida, LLC, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees

and agents acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

WHEREFORE, Plaintiffs demand judgement against defendant for

a)  Actual and compensatory damages,

b)  Punitive damages,

c)  An award of attorneys' fees and costs, and

d)  Any other relief this court deems just and proper.

**COUNT 24**
**F.S.A. § 768.19 – WRONGFUL DEATH**
**CENTURION OF FLORIDA, LLC**

146.    Plaintiffs incorporate paragraphs 1-64 of this Complaint as if fully restated here.

147.    In the manner described above, each of the Defendants named herein, either individually or through their agents or employees, wrongfully caused the death of Mr. Dettmann by failing to provide Mr. Dettmann with adequate medical care.

148.    Defendant Centurion breached a duty of reasonable care in failing to provide medical care to Mr. Dettmann while Mr. Dettmann was incarcerated at RMC.

149.    Each of the Defendants' acts, omissions, policies, practices, and/or customs described above were wrongful acts within the meaning of F.S.A. § 768.19 and was the direct and proximate cause of Mr. Dettmann Dettmann's untimely and wrongful death.

150.    Caron and William Dettmann are the parents of Curtis Dettmann. They are entitled to recover for their mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, filial care, attention, advice, and counsel related to the loss their late son.

WHEREFORE, Plaintiffs Sarah McCrimmon and Caron Dettmann, as Co-Administrators of the Estate of Curtis Dettmann, hereby respectfully request that this Court enter a judgment in their favor and against Defendants Centurion of Florida, LLC

WHEREFORE, Plaintiffs demand judgement against defendant for

    a) Actual and compensatory damages, and

    b) Any other relief this court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: March 9, 2021

Respectfully submitted,


/s/ Steve Weil
Steve Weil
**Attorney for Plaintiffs**


Arthur Loevy
Jon Loevy
Sarah Grady
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

Jesse Wilkison
SHEPPARD, WHITE, KACHERGUS, & DEMAGGIO, P.A.
215 North Washington St.
Jacksonville, FL 32202
(904) 356-9661