## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

Sarah McCrimmon *et al.*,

               Plaintiffs,

v.

Centurion of Florida, LLC *et al.*,

               Defendants.

Case No. 3:20-cv-0036-BJD-JRK

Hon. Brian J. Davis, J.

Hon. James R. Klindt, M.J.

## PLAINTIFFS' MOTION TO COMPEL

Pursuant to Federal Rule of Civil Procedure 37, Plaintiffs, through their undersigned counsel, respectfully present this motion to compel discovery responses from defendants Centurion of Florida LLC (Centurion) and the individual defendants who were employed by Centurion during the events at issue (collectively the Centurion defendants). The Centurion defendants are all represented by the same counsel. Plaintiffs seek the following relief:

(1)    An order compelling Centurion to conduct searches using 19 "*Monell*" terms proposed by Plaintiffs and listed *infra* and to otherwise respond to the "*Monell*" discovery requests.

(2)    An order compelling the Centurion defendants to conduct searches set out in the time periods proposed by Plaintiff for the discovery at issue.

(3)    An order that individual Centurion defendants conduct a search using limited terms in their personal email, text messages, and social media.

(4)    An order that Centurion not redact information regarding other patients in the FDC and to produce un-redacted versions of documents so redacted.

In support of their motion Plaintiffs submit the following memorandum in support:

1

# BACKGROUND

This case involves claims under 42 U.S.C. § 1983 and state law against Centurion, a number of its employees, and others arising from the death of Curtis Dettmann while he was held by the Florida Department of Corrections (FDC) in its Reception Medical Center (RMC). Centurion has a contract with the FDC to provide medical care to FDC prisoners. On January 10, 2018, Mr. Dettmann had a routine surgery and was sent to RMC to recuperate. Around January 17 he developed severe diarrhea, vomiting, and weight loss—all signs of Clostridium difficile (C. diff), a common post-surgical infection. Staff refused to diagnose his symptoms or provide adequate care, and on January 23 he died from C. diff.

Plaintiffs, administrators of Mr. Dettmann's estate, allege the individual Centurion defendants (among others) were indifferent to Mr. Dettmann's medical needs. They also allege Centurion has widespread practices of inadequate medical care and were a moving force behind Mr. Dettmann's death. *See* ECF 12 ¶ 59.[1] None of the alleged practices concerned the diagnosis or treatment of C. diff specifically. Rather, they concerned broader failures, such as failure to diagnose conditions, understaffing, refusal to make referrals or do adequate testing, and the like. *Id.* Plaintiffs allege Centurion allowed these practices to flourish within the

---

[1]   The corresponding allegations in the operative complaint are ECF 123 ¶ 68.

RMC and FDC, and that it failed adequately to supervise and discipline its employees responsible for these failures. *Id.* ¶¶ 60-61. These policies and practices, Plaintiffs allege, were a moving force behind Mr. Dettmann's mistreatment and death. *Id.* ¶¶ 62-63.

Centurion moved to dismiss these allegations pursuant to Rule 12(b)(6), arguing that they did not state a viable *Monell* claim. ECF 63. That was so, it argued, because "[t]o prevail here, Plaintiffs must reasonably plead that Centurion had an official custom or policy of deliberate indifference or an unofficial custom or practice *related to the treatment of C. diff*." ECF 63 at 7 (emphasis added). Because Plaintiffs had not alleged policies and practices relating to C. diff specifically, Centurion argued, Plaintiffs' allegations, including the allegations in ECF 12 ¶ 59, were insufficient to state a *Monell* claim. *See* ECF 63 at 7-8 & n. 5.

***Keyword search terms***. While Centurion's motion to dismiss was pending, Plaintiffs served discovery going to their *Monell* allegations and the parties began negotiating an ESI protocol, including which search terms would be used to search for ESI going to Plaintiffs' *Monell* claims.[2] Plaintiffs proposed an ESI protocol with two sets of terms relevant here. One set of 23 terms were identifiers for Mr.

---

[2]    Plaintiffs do not understand there to be any dispute among the parties about whether there is a mismatch between Plaintiffs' underlying discovery requests and the ESI search terms they have proposed. Rather the disagreement between the parties concerns the match between the ESI search terms and the *Monell* allegations that Plaintiffs have adequately pleaded.

Dettmann (his name, prison numbers, SSN, etc.) and the medical conditions he

suffered immediately before his death:

> curtis; dettman!; detman!; mccrimmon; caron; v38231; 38321;
> j00222782749; "me18-0060"; "18-0060"; "18-01522"; 201711170004
> [Mr. Dettmann's SSN]; cdiff; diff; clostridium; colitis; ischemic;
> diaper; vomit!; faking; weight /3 loss lost; "perianal hidradenitis";

Centurion agreed to search these 23 terms. Plaintiffs' second set of terms were for

discovering information about their *Monell* claims. Centurion refused to search

these terms and refused to propose alternate *Monell* terms.

While the parties were negotiating over search terms, Judge Davis issued his

Rule 12 decision. ECF 95. In that decision, Judge Davis rejected Centurion's

*Monell* argument. Pointing specifically to allegations in Plaintiffs' First Amended

Complaint, ECF 12 ¶ 59, Judge Davis noted that Plaintiffs

> identify seven policies or practices Centurion maintained in treating
> inmates at FDOC institutions: ignoring obvious symptoms of serious
> medical conditions; refusing to order necessary diagnostic tests or
> creating a sensible treatment plan for patients; prioritizing profits over
> care; failing to ensure a continuity of care for patients; failing to
> ensure adequate staffing; refusing to provide proper treatment for
> difficult patients; and refusing to send patients to outside facilities.

ECF 95 at 20. These widespread practice claims were "alleg[ations of] fact[],"

Judge Davis held, "that permit the reasonable inference Centurion was the moving

force behind a constitutional violation." *Id.* at 20-21. Accordingly, the Court

denied Centurion's motion to dismiss Plaintiffs' *Monell* claim. *Id.* at 21.

4

In light of the Court's Rule 12 ruling, Plaintiffs proposed an amended set of

*Monell* search terms. These terms were as follows:

1. (lack! OR fail! OR refus! OR not OR never OR didn't  OR insufficien! OR inadequate OR adequate OR incomplete OR complete OR minimal OR incompeten! OR competen!  OR unsatisf! OR satisf!) /s ((plan /3 treat!) OR diagnos! OR test!)

2. differen! diagnosis

3. continu! /10 (care OR healthcare)

4. (profit! OR market! OR margin! OR revenue) AND (healthcare OR care OR florida OR FDC)

5. understaff!

6. (budget! or profit!) AND (offsite OR emergen! OR special!)

7. (nurs! OR practitioner! OR doctor! OR staff!) AND (adequate OR inadequate OR enough OR sufficien! OR insufficien! OR inadequa! OR adequa! OR lean OR lack! OR minimal OR minimum OR unsatisfactory OR meager OR efficien!)

8. (combative OR difficult! OR antagon! OR argumentative OR hostile OR belli!) AND (patient OR prisoner OR offender OR inmate)

9. malinger! OR faked OR faking

10. follow! /3 up

11. treat! /2 plan!

12. (griev! OR lawsuit OR complaint) AND diagnos!

13. (send OR refer!) /s (outside OR special! OR hospital OR diagnos! OR cost! OR expens!)

14. (order OR request OR refer) /s (test! OR diagnos! OR assess!)

15. "c. diff" OR "c diff" OR clostridium

16. induc! /3 vomit!

17. (weight! OR pounds) /5 (lost OR loss OR drop!)

18. (corizon OR legacy) /P (screen OR assess OR investigat! OR determin! OR inciden! OR management OR practices OR policies OR deficien! OR problem OR inadequate OR "not adequate")

19. (staff! OR doctor! OR nurs! OR practitioner!) /P (hire OR hiring OR retention OR retain OR background OR screen! OR interview!)

As Plaintiffs explained to Centurion, these amended *Monell* terms corresponded directly to the *Monell* allegations that Plaintiffs had laid out in their Complaint, as well as to the Court's Rule 12(b)(6) opinion, *i.e.* ECF 95 at 20-21, which upheld those *Monell* allegations.[3]

Centurion rejected these search terms as well, claiming they were overbroad. Plaintiffs invited Centurion to propose alternative terms, but Centurion refused, stating that the handful of existing search terms it had already agreed to search (*i.e.*, the 23 terms listed on page 4 *supra*) were sufficient for *Monell* discovery in this case. And, Centurion argued alternatively, to the extent broader policy discovery was called for, Centurion had satisfied that need by producing its written policies and training documents. When Plaintiffs pointed out that their *Monell* claim involved widespread *practices*, Centurion reiterated that it was unwilling to search any terms except the 23 listed on page 4, apparently on the grounds that it was appropriate to confine Plaintiffs' *Monell* discovery to the written policies of Centurion and nothing further.

---

[3] Between proposing the two sets of *Monell* terms outlined in this motion, Plaintiffs had proposed third set as well, but that proposal was based on a misunderstanding about whether the parties contemplated iterative searching. After clarification Plaintiffs withdrew the proposal and proposed the amended set of *Monell* terms described here.

The parties have been unable to resolve other search disputes as well:

*Time period*. The parties have been unable to agree on a time period for ESI

searches. Plaintiffs proposed two search periods. First, for those terms identifying

Mr. Dettmann and his immediate condition (*i.e.*, the 23 terms on page 4), Plaintiffs

proposed a search period starting in December 2017 when Mr. Dettmann entered

the RMC in preparation for surgery, through the present. This period was designed

to capture contextual records about Mr. Dettmann before he developed the

infection, and carry through to the present when persons within Centurion might

have been discussing Mr. Dettmann's death as well as this lawsuit (filed in January

2020). Centurion agreed to start the search in December 2017, but refused to go

past July 2018 (just a few months after Mr. Dettmann's death), even when

Plaintiffs offered to narrow the 23 terms for the later period to a smaller list.

Second, Centurion started to provide healthcare at FDC in January 2016.

Plaintiffs have asked Centurion to conduct ESI searches for their *Monell* terms

going back at least to that date through the present. Having refused to search any

*Monell* terms at all, Centurion has refused to conduct any searches outside of the

December 2017 to July 2018 period for the 23 terms listed on page 4.

*Searches of personal ESI*. Plaintiffs' discovery request seeks

communications about this case that may have been created on the individual

Centurion defendants' personal ESI, such as their personal email, text messages, or

7

social media. Plaintiffs asked Centurion counsel to agree to conduct a limited word search of this personal ESI. Centurion counsel refused to conduct this search—even for a single word, such as Mr. Dettmann's name. Centurion counsel insisted that instead they would ask their clients to look for "relevant" communications (without elaboration) but otherwise would not oversee the conduct of the search.

*Redactions of prisoner names*. Pursuant to several document requests, Centurion produced hospital administration documents in which Mr. Dettmann's name appeared, alongside the names of other prisoners who were also patients at RMC. Centurion redacted the names of all other prisoners, even though there is a HIPAA-qualified protective order in place in this case that permits the discovery of such records without redaction, marked confidential to ensure adequate privacy. *See* ECF 81. Plaintiff explained that given the entry of ECF 81 there was no basis for the redactions, and explained the identities of other prisoners were relevant, both because they are potential witnesses and because records of other prisoners were likely relevant to Plaintiffs' *Monell* widespread-practice claims. Centurion refused, insisting that Plaintiffs identify which redacted prisoners were likely to be witnesses beforehand.

*    *    *

After voluminous written correspondence and multiple conference calls, the

parties determined that they were at issue with respect to each of the disputes

described above. This motion follows.

## ARGUMENT

"The scope of discovery is broad in order to provide parties with information

essential to the proper litigation of all relevant facts, to eliminate surprise and to

promote settlement." *Johnson v. Chase Bankcard Servs., Inc.*, No. 6:19-cv-2252,

2021 WL 2905560, at *2 (M.D. Fla. Apr. 13, 2021) (quotation omitted). As

Plaintiffs set out below, the Centurion defendants have frustrated this principle on

multiple fronts, requiring this Rule 37 motion.

**I.    Centurion should be ordered to search Plaintiffs' *Monell* terms.**

Disputes over keyword searching often concern disagreements about

"[w]hether [particular] search terms . . . will yield the information sought," a

question that is often highly technical and involves disciplines like computer

technology and linguistics. *United States v. O'Keefe*, 537 F. Supp. 2d 14, 24

(D.D.C. 2008). This dispute is different. The parties do not disagree about which

search terms "will yield the information sought[.]" *Id*. Rather, they disagree about

what information Plaintiffs are entitled to seek—*i.e.*, the appropriate scope of

Plaintiffs' *Monell* claims in the first place. And Centurion's position in that dispute

9

is in direct defiance of the Court's dismissal order, apparently attempting to win through discovery obstruction an argument Judge Davis has already rejected.

Centurion already argued to the Court, in its Rule 12 motion, that only its policies or practices relating specifically to C. diff are relevant in this case. ECF 63 at 7-8. And Judge Davis has already rejected that position, pointing—*with particularity*—to multiple alleged widespread practices that do *not* concern C. diff in particular, but which, he nevertheless held, could plausibly have caused the abysmal care Centurion provided to Mr. Dettmann. *See* ECF 95 at 20-21.

That opinion set the scope of *Monell* discovery in this litigation. "The scope of allowable discovery is determined by the claims (and defenses) raised in the case," *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 n.37 (11th Cir. 1997), and a Rule 12(b)(6) opinion determines what those claims and defenses are, "establish[ing] the scope of permissible discovery" going forward. *Koppelman v. Galt Ocean Manor Condo. Ass'n, Inc.*, No. 16-cv-62175, 2016 WL 6777896, at *2 (S.D. Fla. Nov. 16, 2016) (summarizing arguments and citing *Chudasama*). *Cf. Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293, 2009 WL 1789090, at *6 (W.D. Tenn. June 23, 2009) ("[S]hould any part of Plaintiff's claims survive the Motion to Dismiss, then Plaintiffs will also be entitled to discovery as to those claims[.]"). Centurion made this very point when it sought to stay discovery,

10

contending that the Court's Rule 12(b)(6) order would set the scope of appropriate discovery going forward. *See* ECF 75 at 3-4.

In its Rule 12(b)(6) opinion, the Court held that the widespread policies and practices which *Plaintiffs had alleged* adequately identified defects in the provision of medical care that plausibly could have led to Mr. Dettmann's appalling medical care. That holding, which rejected Centurion's efforts to confine the *Monell* claims in this case to policies relating to C. diff only, established the appropriate scope of discovery under Rule 26(b)(1) in this case, and Centurion's desire to confine discovery to its policies about C. diff does not change this. "The parties cannot pick and choose which claims or defenses define the scope of discovery." *Garden-Aire Vill. S. Condo. Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-cv-61985, 2012 WL 12861090, at *3 (S.D. Fla. May 14, 2012). That is the Court's job, and it is a task Judge Davis has already performed.

Though this Court need not reach the question, Judge Davis's opinion also reflects settled law. Consider *Davies v. Israel*, 342 F. Supp. 3d 1302 (S.D. Fla. 2018), in which a jail detainee alleged that the jail's medical contractor delayed transferring him to an emergency room after he suffered a head injury, causing brain damage. 342 F. Supp. 3d at 1306. Pursuant to *Monell* the plaintiff also alleged that the contractor, a company called Armor, "consistently declines to provide immediate emergency medical care . . . and instead permits inmates to die

11

or suffer serious injuries." *Id.* at 1306-07. Armor moved to dismiss, arguing that the plaintiff had not alleged practices "substantially similar" to the conduct that caused his injuries, *id.* at 1309, but the court explained that in alleging "systemic deficiencies" the plaintiff was not required to allege that the defendant had improper practices regarding the treatment of *head injuries* in particular; it was enough that Plaintiff alleged that "Armor habitually delays taking inmates who require emergency medical care to the hospital for treatment, thus causing serious injury and death." *Id.* at 1310. An allegation that the defendant had a "wide-spread custom or policy that encourages prison officials to delay emergency medical treatment to critically ill patients" identified a widespread practice that resulted in the failure to provide appropriate treatment—which, in *Davies*, happened to be a head injury. *Id*. As in *Davies*, in this case Judge Davis held that Plaintiffs stated a *Monell* claim by alleging policies and practices that could plausibly have been a moving force behind the failure of care at issue, which happens to involve a failure to diagnose and treat C. diff.

Confining discovery to C. diff is particularly inappropriate on the facts of this case. Deliberate indifference under the Eighth Amendment does not require that the defendant *know* which disease a prisoner has and refuse to treat that specific condition, which is the premise of Centurion's "C. diff only" stance. As *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), explained, "[a]lthough [the

12

defendants] did not diagnose [the plaintiff's] condition as cancer and did not know
that he had cancer, a jury could find that [defendants] were aware of the
tremendous pain and illness that [plaintiff] was suffering," 182 F.3d at 1256, since
it is enough for a deliberate indifference claim if an official "knows that an inmate
is in serious need of medical care, but he fails or refuses to obtain medical
treatment for the inmate." *Id.* at 1255 (quotation omitted). The policies at issue in
this case, in other words, are not confined to C. diff in particular, but rather to the
manner in which Centurion treats inmates with serious medical needs as Plaintiffs
have alleged. Indeed one of the practices that Plaintiffs allege is a widespread
failure to *diagnose* serious medical conditions in the first place. ECF 12 ¶ 59; ECF
123 ¶ 68. Insisting that discovery be confined policies relating only to C. diff thus
is not just inappropriately narrow, it "put[s] the cart before the horse." *Kaether v.
Armor Corr. Health Servs.*, No. 16-cv-62950, 2017 WL 6507793, at *3 (S.D. Fla.
Dec. 11, 2017). It bears repeating that this discussion is academic: Judge Davis's
Rule 12(b)(6) opinion has already defined the claims at issue in the case, and that
scope includes the practices alleged in ECF 12 ¶ 59. These authorities, however,
highlight that Centurion is flouting both Judge Davis's order and established law.

During meet-and-confer Centurion also made an alternative argument:
because it is concurrently producing its *written* policies, training materials, and the
like, there is no need to use Plaintiffs' *Monell* search terms. This position also

defies *Monell*. While it is certainly true that under *Monell* a municipality can be liable for adopting unlawful *written* policies, this is not the exclusive or even the most common source of *Monell* liability. Rather, an entity like Centurion can engage in unlawful conduct "by *either* an express policy *or* a widespread practice that, *although not authorized by written law or express municipal policy*, is so permanent and well settled as to constitute a custom and usage with the force of law." *Cuesta v. School Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966 (11th Cir. 2002) (emphasis added). Under this branch of *Monell* liability, a municipality "'may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Torres-Bonilla v. City of Sweetwater*, 805 F. App'x 839, 840 (11th Cir. 2020) (quoting *Monell*). To succeed on this theory, a plaintiff "must show 'a widespread practice that, although *not authorized by written law or express municipal policy*, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (emphasis added)). Plaintiffs have pleaded a widespread-practice *Monell* theory. ECF 123 ¶¶ 68-70. While written policies may be relevant to such a theory, Centurion's contention that it can refuse Plaintiffs' discovery about its alleged widespread practices by producing only its written policies flouts bedrock municipal liability law.

14

Finally, counsel for Centurion objected that Plaintiffs' terms as written are "overbroad" and would return numerous irrelevant documents. This objection has two problems. First, Centurion's counsel refused to say what they meant by their objection. Does Centurion claim that the search terms are overbroad for gathering information about Centurion's preferred "C. diff-only" version of *Monell* liability? That argument is a nonstarter, for all the reasons described above.

Second, presuming Centurion concedes the scope of Plaintiffs' *Monell* allegations and merely objects to the use of this or that term—meaning that the parties have the more familiar linguistic disagreement about "[w]hether [particular] search terms . . . will yield the information sought," *O'Keefe*, 537 F. Supp. 2d at 24—Plaintiffs' counsel invited Centurion to propose alternative search terms that would address Centurion's overbreadth concerns. Centurion, however, refused to propose alternative terms, insisting that if Plaintiffs wanted searches of terms outside the 23 "Dettmann / C. diff" terms Centurion had already agreed to search, Plaintiffs would have to file a motion with the Court. That refusal contravenes Centurion's obligations as a responding party. Because "[t]he party responsible for production of documents is typically 'most familiar with its own records,'" *Silver Streak Trailer Co., LLC v. Thor Indus., Inc.*, No. 18-cv-14126, 2018 WL 8367073, at *4 (S.D. Fla. Nov. 15, 2018) (quoting *L–3 Commc'ns Corp. v. Sparton Corp.*, 313 F.R.D. 661, 667 (M.D. Fla. 2015)), "[i]f confronted with a search term they

15

believe is overly burdensome, [responding parties] have an obligation not just to assert their objection, but explain the grounds for the objection and to point to evidence supporting it." *L-3 Commc'ns*, 313 F.R.D. at 670. Furthermore,

> [i]f asked, [responding parties] must offer specific suggestions for narrowing the offending search terms in a way that addresses their concerns while still retrieving as many of the relevant documents targeted by the disputed search terms as possible.

*Id.* Centurion's counsel pointedly refused to do any of this, leaving Plaintiffs to file this motion with the Court. That was unnecessary and it should not have occurred.

Plaintiffs respectfully submit that in light Centurion's inappropriate position with respect to the scope of the *Monell* claims in this case as well as its refusal to identify a single alternative search term to address its overbreadth objections, Centurion should be ordered to run the *Monell* search terms Plaintiffs have proposed. Modern document gathering software will allow the parties to identify terms that are actually overbroad and refine any overbroad results going forward.[4]

## II.    Centurion should be ordered to search appropriate date ranges.

Plaintiffs proposed two time periods for Centurion to search. ***First***, for the 23 terms immediately involving Mr. Dettmann and his condition (page 4 *supra*), Plaintiffs proposed a period beginning in early December 2017, when Mr.

---

[4] Because the parties are at issue regarding the scope of *Monell* discovery, they have not yet come to ground on which custodians are likely to have responsive *Monell* information. Plaintiffs anticipate the parties will be able to do so once the scope of *Monell* discovery has been resolved.

16

Dettmann arrived at the RMC, through the present, *i.e.* after the lawsuit had been filed. Centurion agreed to begin the search in December 2017, but insisted on a cutoff of July 18, 2018, arguing that searches past when this lawsuit was filed would be overbroad. Plaintiffs offered to narrow the 23 terms down to a handful (such as "Dettmann" and "C. diff") for the later period, but Centurion refused.

Centurion's refusal to search past July 2018 is unreasonable. It is reasonable to expect that once the lawsuit was filed and summonses served, some of the people implicated in Mr. Dettmann's care might have communicated about it. A search conducted through that time is reasonably likely to reveal relevant information. And the use of a few limited terms, as Plaintiffs proposed, will not impose a meaningful review burden. It should be ordered.

***Second***, for their *Monell* terms Plaintiffs proposed a broader period, running at least to the beginning of 2016, when Centurion began the contract,[5] through the present. This broader period is entirely reasonable for gathering sufficient information about the widespread practices that Plaintiffs allege, since the prevalence of incidents indicating a widespread practice is usually measured over multi-year timespans, making discovery covering such spans appropriate. *See, e.g.*,

---

[5] Centurion appears to have been formed in November 2015, and while Plaintiffs are still attempting to determine its lifespan as a corporate entity, a search going back at least that far may be appropriate as well.

17

*Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 728-29 (3d Cir. 1989) (assessing *Monell* evidence of complaints of abuse over 4 years); *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1119 (N.D. Ga. 2016) (assessing *Monell* claims involving pattern covering "at least three years."). Likewise, post-incident practices are also relevant for proving a *Monell* claim, making discovery through the present relevant as well. *See, e.g.*, *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) ("[P]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of a constitutional right" and can "lend weight to a finding that there was a policy behind the actions which led to the constitutional violation." (internal quotation marks omitted)).

Centurion has refused to search any *Monell* terms; and to the extent it claims that the 23 terms it has agreed to search are sufficient for *Monell*, it has confined itself to beginning the search in December 2017—a month before the incident in this case. That is woefully insufficient. A broader search period, beginning at least in January 2016 through the present, is appropriate.

## III.    Limited keywords should be used to search personal ESI.

Personal ESI, as opposed to workplace communications, are highly relevant in a case like this one. Mr. Dettmann's death was a catastrophic failure of medical care, exposing the individual defendants to professional liability and moral culpability. And common sense teaches that employees know not to implicate

18

themselves on their work email, and are likely to communicate about inappropriate or embarrassing matters privately instead. *See, e.g.*, *S.E.C. v. Conradt*, 947 F. Supp. 2d 406 (S.D.N.Y. 2013) (employees careful not to discuss improper conduct over work email but did so over an instant messenger service). The personal ESI of the individual Centurion defendants is thus highly relevant to this case.

Given its relevance, Centurion counsel's refusal to search even a handful of words that discuss this particular event (such as "dettmann") is not reasonable. The events at issue in this case happened more than three years ago, which would tax any layperson's ability to follow an instruction to find "relevant" emails on their own—indeed sifting through each person's numerous unrelated emails, texts, and social media posts would be exceptionally time consuming.  Private email and phone text message services usually have word-search features, meaning that a search for a handful of keywords would take a matter of seconds. There is simply no good reason to refuse to conduct such a search here. The Court should order it.

## IV.    Centurion's redaction of third-party PHI is inappropriate.

Finally, Centurion's insistence on redacting the names of other inmates as personal health information (PHI) contravenes settled law and frustrates needed discovery in this case. Centurion cited three grounds for making the redactions. None of them have any merit. Rather, the HIPAA-qualified protective order that the Court has entered, *see* ECF 81, appropriately provides protection for third-party

19

PHI while allowing its disclosure in this case—as HIPAA-qualified protective

orders are intended to do.

*First*, Centurion claims that the redactions are required by HIPAA. That is

not true. HIPAA certainly does normally require redaction of PHI. But "HIPAA

does not constitute a bar to discovery of medical records" because "it . . . is a

purpose of [HIPAA] that [PHI] which may be eventually used in litigation should

be made available during the discovery phase," which is ensured through a

HIPAA-qualified protective order. *See State Farm Mut. Auto. Ins. Co. v. Kugler*,

840 F. Supp. 2d 1323, 1328 (S.D. Fla. 2011). *Accord Nw. Mem'l Hosp. v. Ashcroft*,

362 F.3d 923, 925 (7th Cir. 2004) (explaining that HIPAA's enabling regulations

anticipate that third-party PHI will be relevant in "numerous . . . classes of federal

case[s] which medical records [are relevant] whether of the parties or of

nonparties," and the regulations therefore provide for disclosure of third-party PHI

with a qualified protective order). Specifically, HIPAA's enabling regulations

provide that third-party PHI may be produced in litigation if a protective order has

been entered requiring that 1) PHI may be used or disclosed only for the case at

hand, and 2) the PHI be returned or destroyed at the conclusion of the litigation. 45

C.F.R. §§ 164.512(e)(1)(ii)(A) and (B). Third-party PHI produced under such an

order need not be redacted. *See Kaether v. Armor Corr. Health Servs.*, Inc., No.

16-cv-62950, 2017 WL 11536873, at *2 (S.D. Fla. Oct. 17, 2017) ("As a HIPAA

20

Qualified Protective Order covers all information disclosed, ECF No. 48,

information protected by HIPAA need not be redacted.").

In this case, ECF 81 is a HIPAA-qualified protective order under 45 C.F.R.

§ 164.512. *See* ECF 81 ¶ 3(c). It provides that PHI may not be used or disclosed

for any purpose whatsoever other than this litigation, *id.* ¶ 4(a), and it requires that

at the conclusion of the litigation the PHI be returned or destroyed. *Id.* ¶ 6. As

such, HIPAA does not countenance Centurion's redactions. *See Haywood v.*

*Wexford Health Sources, Inc.*, No. 16-cv-3566, 2021 WL 2254968, at *6 (N.D. Ill.

June 3, 2021) (collecting cases regarding disclosure of third-party PHI in jail

setting pursuant to HIPAA-qualified protective order, and ordering sanctions for

redactions where qualified protective order was in place).

**Second**, Centurion argues that the redactions are required by state

confidentiality laws. This is wrong too. This case is in federal court on federal-

question jurisdiction. State-law privileges therefore do not apply. *See Hancock v.*

*Hobbs*, 967 F.2d 462, 466-467 (11th Cir. 1992) (holding "that the federal law of

privilege provides the rule of decision in a civil proceeding where the court's

jurisdiction is premised upon a federal question" and refusing to bar disclosure of

PHI based on asserted state-law privileges); *State Farm Mut. Auto. Ins. Co. v.*

*Kugler*, 840 F. Supp. 2d 1323 (S.D. Fla. 2011) (same).

*Third* and finally, Centurion claims that it is redacting the names of other prisoners in the RMC because they are not relevant to the case—or alternatively, that Plaintiffs must identify redacted entries they claim to be relevant before Centurion will consider un-redacting them. This position is improper even on its own terms. "The practice of redacting for nonresponsiveness or irrelevance finds no explicit support in the Federal Rules of Civil Procedure, and the only bases for prohibiting a party from seeing a portion of a document in the Rules are claims of privilege and work-product protections." *Burris v. Versa Products, Inc.*, No. 07-cv-3938, 2013 WL 608742, at *3 (D. Minn. Feb. 19, 2013). *See also TrueNorth Companies, LC v. TruNorth Warranty Plans of N. Am., LLC*, No. 17-cv-31, 2019 WL 5460208, at *2-3 (N.D. Iowa Mar. 19, 2019) (same, collecting cases).

What is more, "unilateral editing of documents frequently gives rise to suspicion that relevant material harmful to the producing party has been obscured, and . . . tends to make documents confusing or difficult to use," *Bonnell v. Carnival Corp.*, No. 13-cv-22265, 2014 WL 10979823, at *3 (S.D. Fla. Jan. 31, 2014) (quotation omitted), particularly because apparently irrelevant information may "*lead* to the discovery of admissible evidence." *Id.* (emphasis original, quotation omitted). That is a pressing issue here. Plaintiffs seek to identify eyewitnesses, making the identities of other prisoners potentially relevant in the litigation. Identifying which prisoners likely to have witnessed relevant events

22

often involves tracking different inmates across multiple medical and administrative documents. Plaintiffs also seek to prove widespread practices impacting multiple inmates, and identifying the care provided and problems that may have arisen likewise requires tracking inmates across documents. With inmate names redacted, tracking persons across different records, and thus putting them in context, is effectively impossible. And without that context, Plaintiffs' counsel will have difficulty knowing whether they are looking at documents of marginal relevance, or whether they have in their hands records that, when connected to each other, identify a key witness or provide highly relevant evidence about the policies and practices at issue in this case. It is precisely for this reason, where PHI may be relevant in litigation (or lead to the discovery of relevant evidence) that HIPAA's enabling regulations provide for disclosing third-party PHI with the entry of a qualified protective order like the one that the Court put in place in this case. Centurion's redactions are entirely improper.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court enter the relief Plaintiffs have set forth in their motion:

(1) An order compelling Centurion to conduct searches using the 19 "*Monell*" terms proposed by Plaintiffs and listed *supra* and to otherwise respond to the "*Monell*" discovery requests.

(2) An order compelling Centurion to conduct searches set out in the time periods proposed by Plaintiff for the discovery at issue.

23

(3) An order that individual Centurion defendants conduct a search using limited terms in their personal email, text messages, and social media.

(4) An order that Centurion not to redact information regarding other patients in the FDC and to produce un-redacted versions of documents so redacted.

August 6, 2021                                              Respectfully submitted,


                                                           /s/ *Stephen H. Weil*

                                                           Stephen H. Weil


Sarah C. Grady                            Jesse Wilkison
Stephen H. Weil                           SHEPPARD, WHITE, KACHERGUS
LOEVY & LOEVY                             & DEMAGGIO, P.A.
311 North Aberdeen St., 3rd Floor         215 North Washington St.
Chicago, IL 60607                         Jacksonville, FL 32202
T: (312) 243-5900                         T: (904) 356-9661
weil@loevy.com


                                          *Counsel for Plaintiffs*

## **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), counsel for Plaintiffs conferred with counsel for the Centurion Defendants prior to filing this Motion via teleconference and email. Defense counsel does not consent.

/s/ Stephen H. Weil
Stephen H. Weil
One of Plaintiffs' Attorneys

## **CERTIFICATE OF SERVICE**

I, Stephen H. Weil, an attorney, hereby certify that on August 6, 2021, I filed the foregoing via the Court's CM/ECF system which effected service on all counsel of record.

/s/ Stephen H. Weil
Stephen H. Weil
One of Plaintiffs' Attorneys