# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | | |
|---|---|---|
| SARAH MCCRIMMON *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:20-cv-0036 |
| | ) | |
| v. | ) | Hon. Brian J. Davis, J. |
| | ) | |
| CENTURION OF FLORIDA, LLC *et al.*, | ) | Hon. James R. Klindt, M.J. |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION TO COMPEL THE CENTURION DEFENDANTS TO RESPOND TO PLAINTIFFS' DISCOVERY

Plaintiffs, through their undersigned counsel, present this motion to compel, which seeks an order instructing Defendant Centurion to respond to Plaintiffs' Second Set of Interrogatories and Second Request to Produce to the Centurion Defendants. This discovery seeks documents and information pertaining to C. diff infections suffered by other patients at the FDC's Reception and Medical Center ("RMC"), where Mr. Dettmann contracted C. diff and died. In support of their motion Plaintiffs state:

## INTRODUCTION

This motion seeks documents and information going to Plaintiffs' claims against both Centurion and the individual providers who failed to treat Curtis Dettmann as he lay dying of an easily treatable C. diff infection. Several

documents produced in this case thus far indicate that Centurion had allowed C. diff to spread throughout the RMC in the months and years before and after Curtis Dettmann was there in January 2018 to recover from surgery.  C. diff is an infection that has obvious manifestations, is easy to diagnose, and is easy to treat.  Yet these documents reveal that in July 2017, a few months before Mr. Dettmann himself died of a C. diff infection, the C. diff infection of another RMC patient was allowed to progress to the point that this patient also died.  Other information in the record, including patient logs, confirm that multiple C. diff outbreaks occurred both before and after Curtis Dettmann's death.

In light of information about the spread of C. diff, Plaintiffs have issued follow-up discovery seeking documents and information regarding the scope of C. diff infections at RMC before and after Mr. Dettmann's death, and Centurion's response to those infections.  In essence, the discovery asks Centurion to provide information and documents about other C. diff cases at RMC and how Centurion staff responded to them.  Centurion objected to this discovery and has refused to respond.  To make this latest round of objections, Centurion has performed a 180-degree reversal of the position it has taken to resist other *Monell* discovery Plaintiffs have served on it.  Whereas Centurion has objected to previous *Monell* discovery on grounds that *only* its practices with respect to C. diff are relevant to

this case, *see* ECF 150 at 11-12, here it argues that its practices with respect to C. diff are *irrelevant* to any of Plaintiffs' claims.

Centurion's new position is simply wrong. The prevalence of C. diff at the RMC, and how Centurion responded to it, are highly relevant to Plaintiffs' claims. C. diff is a highly contagious infection that spreads in hospitals when infected patients are not tested and treated promptly, so evidence that Centurion had allowed C. diff to spread at the RMC indicates that among other things, Centurion staff had widespread practices in which they refused to order diagnostic testing, disregarded patients' reports of serious symptoms, and failed to supervise and discipline employees for providing inadequate or indifferent medical care. Plaintiffs have alleged those exact practices in support of their *Monell* claims against Centurion. *See* ECF 167 ¶ 68. And, of course, evidence that Centurion allowed C. diff to spread throughout the RMC is itself evidence that its widespread practices caused Mr. Dettmann to become infected with the disease in the first place.

The prevalence of C. diff at the RMC is also relevant to Plaintiffs' claims against the Individual Defendants. In a setting where C. diff had spread and persisted, the Individual Defendants would have known to be on high alert for any signs of a C. diff infection and to develop appropriate protocols to identify patients with the disease—particularly patients like Mr. Dettmann who were taking

3

antibiotics, which are well known to leave one particularly vulnerable to C. diff infections, and *particularly* when such patients exhibited hallmark C. diff symptoms, like Mr. Dettmann did.  Evidence that C. diff had spread in RMC is thus directly relevant to Plaintiffs' individual deliberate indifference claims.

Put simply, evidence about other C. diff infections at RMC, how they developed, and how staff responded to them are highly relevant to all of Plaintiffs' claims.  The Court should order Centurion to provide responses to this discovery.

## BACKGROUND

Plaintiffs have uncovered documents indicating that before Mr. Dettmann's death, Centurion had lost control of C. diff infections and had allowed the C. diff microbe to spread throughout the RMC.  An administrative document prepared before Mr. Dettmann's death identified "C. diff prevention at RMC hospital" as one of the three top priorities to address at RMC in 2017-2018.  *See* Ex.1 at 3. Shortly after Mr. Dettmann's death, one employee at RMC emailed another and noted that C. diff was "getting out of control *again*," Ex. 2 at 5 (emphasis added). As of December 2017, a few weeks before Mr. Dettmann arrived at RMC, at least four patients were being treated there for the disease.  Ex. 3.  And in July 2017, a few months before Mr. Dettmann arrived at RMC, the C. diff infection of one patient was allowed to progress so far that he died from the disease. Ex. 4.

4

Plaintiffs have served Centurion with a single interrogatory and a set of requests to produce going to the facts revealed in these documents. Centurion's responses to this discovery are attached as Ex. 5, Ex. 6, and Ex. 7. Plaintiffs' interrogatory asks Centurion to identify previous C. diff cases at the RMC, and their requests to produce ask it to produce medical records from those cases, as well as communications among Centurion employees about the C. diff infections. The discovery additionally asks Centurion to produce search information from an online medical reference service used by Centurion employees called "UpToDate," which would indicate the frequency with which staff at the RMC were referring to medical literature regarding the treatment of C. diff infections.

Besides producing a single document showing a single UpToDate search conducted months after Mr. Dettmann died, Centurion has refused to respond to this discovery. Plaintiffs engaged in informal enforcement but Centurion refused to change its position. This motion follows.

## ARGUMENT

### I. Information about C. diff at the RMC is relevant to Plaintiffs' claims about Mr. Dettmann's C. diff infection at the RMC.

Centurion objects that the C. diff discovery Plaintiffs have propounded is irrelevant because the manner in which other patients were treated for C. diff "has no relevance to the treatment that Mr. Dettmann did or did not receive." Ex. 5 at 23; Ex. 6 at 3, 5. As such, Centurion argues, "[t]he collection of documents or

5

communications related to the[] care [of other C. diff patients] is irrelevant to the claims at issue in this case." *Id.* Centurion's apparent reasoning is that because Plaintiffs' claim concerns a failure to *diagnose* Mr. Dettmann's C. diff, evidence about how other patients were *treated* for C. diff is not relevant to the case.

      This argument ignores what Plaintiffs actually allege, the scope of discovery as set forth in Federal Rule 26, and the basic science of C. diff itself. C. diff is a highly contagious bacterial infection can become epidemic in hospitals where appropriate disease transmission-prevention protocols are not observed. Ex. 8 (L.C. McDonald et al., *Clostridioides difficile infection: Prevention and control* (UpToDate April 30, 2021)). The C. diff bacteria can survive in hospitals for months. *Id.* Preventing its spread among patients in hospitals requires the aggressive "contact" precautions, as well as "vigilant screening for new-onset diarrhea in patients at risk and rapid, accurate testing," so as to prevent patients from becoming generators of C. diff bacteria that can be spread from infected patients to other persons in the hospital. *Id.*

      The presence and prevalence of other C. diff infections at RMC is relevant to the care Mr. Dettmann received in part because those cases dramatically increased the risk that another patient, like Mr. Dettmann, would become infected as well. That goes directly to the question of whether the Individual Defendants and Centurion were deliberately indifferent in the face of Mr. Dettmann's

6

symptoms, since knowledge of the risk of serious harm may be established by "inferences from circumstantial evidence" or "from the very act that the risk was obvious." *Valderrama v. Rosseu*, 7800 F.3d 1108 (11th Cir. 2015). That risk was acute for Mr. Dettmann, who had been discharged to RMC with a post-operative course of antibiotics that made him especially vulnerable to a C. diff infection. Ex. 8 *passim*. The pervasiveness of C. diff at RMC before and after Mr. Dettmann's death goes directly to the obviousness and severity of the risk that he faced from the disease, and thus to the question of whether his treaters were deliberately indifferent in ignoring multiple signs that Mr. Dettmann had a C. diff infection.

This discovery is also relevant to Plaintiffs' *Monell* claims. C. diff is an infection that patients *contract in hospitals*, meaning that there are likely to be patients like Mr. Dettmann who came to RMC for some unrelated condition and became infected with C. diff after they arrived. Whether Centurion medical staff detected these infections, and how long it took them to do so, is highly relevant to Plaintiffs' allegations that Centurion maintained widespread practices in which staff failed to diagnose conditions or order prompt testing. The fact that C. diff spread in a hospital like RMC is *itself* evidence that Centurion staff persistently did not engage in the necessary screening, evaluation, and monitoring of vulnerable patients, exactly the widespread practices that Plaintiffs allege caused Mr. Dettmann's death. Records reflecting widespread practices in which staff delayed

7

or denied the necessary testing of a patient—even where the patient was fortunate enough to survive—are directly relevant to Plaintiffs' *Monell* claims and directly related to the failures of care that caused Mr. Dettmann's death.  Courts routinely look to rates of infection and prior outbreaks at corrections institutions when deciding *Monell* claims in cases where those institutions failed to contain or adequately treat such diseases.  *See, e.g., Duvall v. Dallas County,* 631 F.3d 203, 207-09 (5th Cir. 2011) (holding plaintiff presented sufficient evidence to sustain a *Monell* claim at summary judgment for failure to treat and contain MRSA, based on considerations of jail's infection rate and the severity of MRSA outbreaks the jail had experienced over the last three years); *Navarez v. City of New York*, 16-cv-1980, 2017 WL 1535386, **7-9 (S.D.N.Y. April 17, 2017) (holding plaintiff adequately alleged *Monell* claim against City for tuberculosis infection based on multiple incidents of failing to isolate and contain outbreaks of tuberculosis).

      The limited information regarding C. diff at the RMC that has been produced in discovery so far—including the death of an RMC patient from C. diff only months before Mr. Dettmann—is evidence supporting Plaintiffs' allegations of Centurion's widespread failure to provide adequate medical treatment to FDC prisoners.  Plaintiffs' discovery requests simply seek information and documents reflecting the scope of the problem identified in the documents they have uncovered.

Finally, Plaintiffs seek the "UpToDate" search information for the same purpose: to determine whether Centurion staff at RMC were reviewing information on C. diff during the course of previous infections—or weren't—which is relevant to the question of whether staff took seriously the various C. diff infections in the facility and how to prevent their spread; and whether the spread of C. diff infections at the RMC was a matter of concern among medical staff there.

\*   \*   \*

Plaintiff's discovery requests seek information and documents that are relevant both to Plaintiffs' widespread practice claims and to their claims that the Individual Defendants ignored known risks to Mr. Dettmann when he entered the RMC on an antibiotics regimen and then fell ill. Centurion's claim that such information is not relevant to Plaintiffs' claims in this case is simply wrong.

## II. Centurion has failed to show that Plaintiffs' C. diff discovery is unduly burdensome.

Centurion also contends that gathering responsive information would be unduly burdensome or overbroad. But those claims are unsupported. This Court should reject Centurion's burden argument and order production of the discovery.

Centurion objects that gathering discovery back to 2016 is overbroad. Its only proposal has been to take discovery back to December 2017, a few weeks before Mr. Dettmann arrived at the RMC. ECF. 147 at 7; ECF 150 at 4-5. But as Plaintiffs have explained in prior motions to compel, *see* ECF 156 at 7-9,

9

Centurion's proposed "relevant time period" lacks factual or legal support.  Courts routinely order *Monell* discovery to go back several years—often at least five—precisely because *Monell* claims require a plaintiff must demonstrate a "a widespread practice that, although not authorized by written law or express municipal policy, is so *permanent and well settled* as to constitute a custom or usage with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quotations omitted; emphasis added).  Information about how Centurion responded to C. diff *after* Mr. Dettmann's death is relevant for the same reason, since "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right," since such evidence can "lend weight to a finding that there was a policy behind the actions which led to the constitutional violation." *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (quotation omitted).  The widespread practice evidence Plaintiffs seek is not cumulative, but rather is intended to "satisfy the demanding standard of *Monell*," *Smith v. McNesby*, No. 3:05-cv-410, 2007 WL 9735000, at *37 (N.D. Fla. Sept. 28, 2007), which Plaintiffs must meet to prove their claims against Centurion.

      Centurion also asserts that identifying other C. diff cases would be unduly burdensome, because it "does not keep in the regular course of business a record identifying all patients with C. diff infections over several years at RMC and

treatment thereof," and suggests that Centurion would therefore have to search through the individual records of "all the inmates ever housed at RMC for the requested time" in order to identify persons with C. diff. Ex. 5 at 3; Ex. 6 at 3, 5.

Centurion did not engage with Plaintiffs regarding the manner in which this burden concern could be addressed, but on its face Centurion's burden claim simply is not plausible. Centurion claims an undue burden because it does not keep a log dedicated to tracking the information Plaintiffs seek. But by all appearances Centurion records information that would allow it to locate the relevant records with ease. For example, Plaintiffs have uncovered forms prepared by Centurion employees reporting on infectious diseases and outbreaks, which identify patients with C. diff by name. *See* Exs. 9 and 10. The forms indicate that they are sent daily to Florida Department of Health. *Id*. In and of themselves, these reports are responsive to Plaintiffs' requests, yet Centurion has failed to produce any. Centurion also maintains daily hospital charts that list the illness or medical of each patient in its care, which includes records of C. diff infections. *See* Ex. 3. It would be a simple task to search these records and identify many responsive cases. Records related to tests (including stool samples) conducted to determine whether a patient had C. diff is another way for Centurion to identify patients at RMC who contracted the bacterial infection.

Plaintiffs have obtained these documents incidentally through other discovery requests. It is unlikely that they are the only documents created by Centurion that record C. diff information. Computerized information commonly stored by medical providers records virtually every aspect of a patient's medical conditions and care. Even if Centurion does not keep a "log" dedicated to identifying its patients' medical conditions, it is simply implausible that the electronic medical records Centurion does maintain do not reflect its patients' medical conditions. At a minimum, Centurion should describe what records it does maintain regarding patients, and explain whether any electronic records exist that would permit it to identify patients with C. diff by means other than the manual search of every patient's medical files that it claims would be required.

Additionally, Centurion's objections about the burden of searching medical records simply do not apply to communications *about* C. diff cases, *see* Ex. 6 at 1 (requesting all communications pertaining to C. diff infections). Those records can be discovered through word searches in email accounts of medical staff at RMC. Centurion has not explained how such searches would be unduly burdensome or even particularly difficult. Centurion should be compelled to conduct such searches and produce responsive documents.

### III. Centurion is required to produce documents within its custody and control.

Centurion also objects that the requests seeking documents that it claims are not within its custody and control. *See* Ex. 6 at 3, 5. Specifically, it states that the FDC is the custodian of medical records of other patients and that Centurion is not custodian of the medical records of prisoners who have died, been released, or who are no longer in Centurion's care. *Id.*

There are several problems with this objection. Centurion's reference to the Florida Department of Corrections as the "record custodian" does not relieve it from its discovery obligations. Rule 34 requires a party to produce items that are in the party's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). "Control is defined not only as possession, but as the legal right to obtain documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 654 (11th Cir. 1984). *Cf. Scruggs v. Int'l Paper Co.*, No. CV411-203, 2012 WL 1899414, at *4 (S.D. Ga. May 24, 2012) ("'[A] party need not have actual possession of documents to be deemed in control of them if the party has the legal right to control or obtain them. . . . If the responding party can obtain documents in the possession of a third party upon request, the documents are considered within the responding party's control." (citing *Searock*; quoting 1 Discovery Proceedings in Federal Court § 17:7 (3d ed. Mar. 2012)). Unquestionably, Centurion has the right to obtain records of any prisoners currently in its care, since it routinely relies on those records to treat

13

prisoners. And Centurion has identified no actual, legal bar to gathering medical records of past patients, even if it contends that the FDC is a custodian of those records. Notably, in March 2020, before discovery in this case began, Centurion was able to obtain and produce hundreds of pages of Mr. Dettmann's medical records to Plaintiffs in its "pre-suit" disclosures made pursuant to Section 766.106(6)(b)(2) Fla. Stat. At a minimum, Centurion should explain exactly what medical records it can access, which records it cannot, and why.

Moreover, as Plaintiffs have noted, their discovery is not limited to medical records. Plaintiffs seek communications among medical staff about C. diff, *see supra*, as well as records *relating* to C. diff patients, Ex. 6 at 1, which would include, for example, the floor charts listing the medical conditions of the various hospitalized patients in the RMC. Ex. 3. Centurion's claim that it does not have custody of past patients' *medical records* ignores many of the documents Plaintiffs seek. Plaintiffs have served discovery asking Centurion to produce documents and information *about* C. diff infections at the RMC. Those requests are not limited to medical records alone and expressly includes related documents and communications. Centurion is obligated to identify, gather, and produce other documents relating to those cases as well. It has failed to do this.

### IV. Centurion should respond to Plaintiffs' discovery regarding UpToDate searches.

Centurion also objects to discovery requests for documents relating to searches using the UpToDate website. Specifically, Plaintiffs sought two categories of UptoDate searches: (1) documents showing search queries by any Centurion employees between January 1, 2016 and January 30, 2018 pertaining to C. diff., and (2) any searches of Up-to-Date made by the named defendants from January 1, 2018 to January 30, 2018. Ex. 6 at 5-7. Centurion objected to these requests on relevance grounds, stating: "Up to Date is typically used by providers to obtain CME credit. There is no reason why the Up-to-Date usage of the Individual Defendants related to any subject matter has any relevance to the claims of defenses in this matter nor is it proportional." *Id.* at 6, 7. But the December 13, 2017, e-mail from Defendant Sharma, the RMC medical director, attached UpToDate C. diff information, which he indicated he was sending because there "seems to be some misunderstanding in terms of treatment." *See* Ex. 2 at 1. This correspondence indicates that RMC medical staff used UpToDate not just a resource for earning educational credits, but also in connection with medical care.

Centurion also objects that "upon information and belief, the Up-to-Date account the Centurion Defendants have accessed through the Centurion portal does not save or log searches beyond what was 'recently' conducted by an individual user in that user's account." But Centurion has offered nothing by way of details

15

regarding what, if any, evidence or information such an objection is based or whether it is instead pure speculation. Centurion at a minimum should confirm that such information is actually true.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request this Court enter an order compelling Centurion to respond to Plaintiffs' Second Request for Production and Second set of Interrogatories.

November 10, 2021                                   Respectfully submitted,

/s/ *Stephen H. Weil*
Stephen H. Weil

Sarah C. Grady                                  Jesse Wilkison
Stephen H. Weil                                 SHEPPARD, WHITE, KACHERGUS
LOEVY & LOEVY                                   & DEMAGGIO, P.A.
311 North Aberdeen St., 3rd Floor               215 North Washington St.
Chicago, IL 60607                               Jacksonville, FL 32202
T: (312) 243-5900                               T: (904) 356-9661
weil@loevy.com

*Counsel for Plaintiffs*

## **LOCAL RULE 3.01(g) CERTIFICATION**

    Pursuant to Local Rule 3.01(g), counsel for Plaintiffs conferred with counsel for the Centurion Defendants prior to filing this Motion via teleconference and email. Defense counsel does not consent.

                                                     /s/ Stephen H. Weil
                                                   Stephen H. Weil
                                                   One of Plaintiffs' Attorneys

## **CERTIFICATE OF SERVICE**

    I, Stephen H. Weil, an attorney, hereby certify that on November 10, 2021, I filed the foregoing via the Court's CM/ECF system which effected service on all counsel of record.

                                           /s/ Stephen H. Weil
                                           Stephen H. Weil
                                           One of Plaintiffs' Attorneys